UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## 05-11481 MEL

WORKSCAPE, INC.,
            Plaintiff,

v.                                    Civil Action No.

WORKSTREAM, INC.,                    MAGISTRATE JUDGE
            Defendant.

RECEIPT #_____
AMOUNT $ 250
SUMMONS ISSUED ✓
LOCAL RULE 4.1
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 7/13/05

COMPLAINT AND DEMAND FOR JURY TRIAL

### Introductory Statement

1.      This action arises out of defendant's intentional and improper interference with plaintiff's contractual relationship with its former Executive Vice President, Products, Services and Technology, Michael Gioja, and tortious conduct that has caused significant harm and expense to plaintiff. The plaintiff seeks to recover money damages and the award of other appropriate relief for the defendant's willful misconduct.

### Parties

2.      Plaintiff Workscape, Inc. ("Workscape") is a privately-held corporation with its principal place of business at 123 Felton Street, Marlborough, Massachusetts.

3.      Upon information and belief, Defendant Workstream, Inc. ("Workstream") is a Canadian corporation with a principal place of business at 495 March Road, Suite 300, Ottawa, Ontario, Canada. Workstream markets and sells products and related service applications throughout the United States and Canada, and has approximately twenty (20) offices in locations throughout the United States.

## Jurisdiction

4.      This Court has jurisdiction under 28 U.S.C. § 1332 because of the complete diversity of the parties and because the amount in controversy exceeds $75,000.

5.      Venue is proper within this District based on 28 U.S.C. § 1391, as a substantial portion of the events giving rise to the claims occurred in this district, and personal jurisdiction exists under Mass. Gen. Laws c. 223(a).

## Background Facts

### Mr. Gioja's Employment by Workscape

6.      Workscape designs, develops, markets and sells a range of comprehensive human resource ("HR") technology, products and related software applications and services. Workscape products and web-based HR solutions and software applications are delivered primarily on a hosted basis.

7.      In December 2002, Mr. Gioja accepted a full-time Executive Vice President, Products and Technology position at Workscape, with general responsibilities for the executive management of product engineering, product management and information technology ("IT") operations.

8.      In connection with his employment at Workscape, Mr. Gioja signed an employment agreement (the "2002 Employment Agreement") that contained confidentiality and non-competition obligations.

9.      The term of the 2002 Employment Agreement was eighteen months, from December 9, 2002 through May 8, 2004, which term would renew for one-year periods upon written notice by Workscape.

10.     In 2004, Workscape and Mr. Gioja agreed to extend Gioja's employment. As of

May 7, 2004, Mr. Gioja and Workscape executed an Amended and Restated Employment

Agreement (the "2004 Employment Agreement"). A true and correct copy of the 2004

Employment Agreement is attached hereto as Exhibit A. Under the 2004 Employment

Agreement, Mr. Gioja served as Executive Vice President, Products, Services and Technology.

In this capacity, Mr. Gioja's duties included those previously performed, including without

limitation, the executive management of Workscape's product engineering, product

management, hosting and IT operations, but also now officially included the executive

management of Workscape's professional services organization, which were duties that he had

assumed in or about August 2003.

11.     Pursuant to the 2004 Employment Agreement, Mr. Gioja's employment with

Workscape was to continue for a term ending on May 6, 2005, unless earlier terminated.

Thereafter, Mr. Gioja's employment term was to extend automatically for consecutive one-year

periods unless either party delivered no less than thirty (30) days written notice prior to an

anniversary date of its election not to renew the 2004 Employment Agreement (§ 2).

12.     Section 7(a) of the 2004 Employment Agreement states in relevant part:

No Competing Employment. The Executive [Gioja] acknowledges that
the agreements and covenants contained in this Section 7 are essential to protect
the value of the Company's business and assets and by his employment with the
Company, the Executive will obtain knowledge, contacts, know-how, training and
experience regarding the Company and its proprietary information, and there is a
substantial probability that such knowledge, know-how, contacts, training and
experience could be used to the substantial advantage of a competitor of the
Company and to the Company's substantial detriment. Therefore, the Executive
agrees that for the period commencing on the date of this Agreement and ending
on the second anniversary of the termination of the Executive's employment
period hereunder, except in the event of termination by the Company without
Cause or by the Executive with Good Reason such period shall end on the date
that is six months after the termination of the Executive's employment (either
such period, as applicable, is hereinafter referred to as the "Restricted Period"),

3

the Executive shall not participate or engage, directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder (except for the ownership of a less than 5% stock interest in a publicly-traded corporation), partner, joint venturer, investor or otherwise, in any business activities if such activity competes with the Company's business activities, including, without limitation, those expressly proposed to be undertaken by the Company or any of its subsidiaries as of the termination of the Executive's employment.

Mr. Gioja's Acquisition and Use of Workscape's Confidential Information

13.     Mr. Gioja was a highly compensated senior member of the executive committee who was responsible for two-thirds of the company's approximately 350 employees, and as such, was privy to a wide array of confidential and proprietary information and customer and partner goodwill.

14.     In connection with his employment, Mr. Gioja served as one of five Executive Committee members at Workscape, reported directly to Workscape's CEO Timothy Clifford, and routinely provided presentations during Workscape's quarterly Board of Directors' meetings.

15.     As the Executive Vice President, Products, Services and Technology, Mr. Gioja was responsible for product engineering, research and development and the operational and technical administration of Workscape's professional services and hosting and internal infrastructures.

16.     As the Executive Vice President, Products, Services and Technology at Workscape, Mr. Gioja had access to and acquired a great deal of highly confidential and proprietary information and customer and partner goodwill.

17.     During his employment at Workscape, Mr. Gioja acquired a great deal of highly confidential information regarding potential and existing customers and partners of Workscape, including the identities of potential and existing customers and partners of Workscape, and

4

contact information for potential and existing customers of Workscape. Much of that information is confidential and proprietary to Workscape.

18.    During his employment at Workscape, Mr. Gioja acquired a great deal of highly confidential information regarding the current and future product specifications, the existing and anticipated technological information about Workscape's technology and software functionality, as well as its hosting infrastructure design and capability.  Such information is confidential and proprietary to Workscape.

19.    During his employment at Workscape, Mr. Gioja acquired a great deal of highly confidential information regarding the prices and fee structure for Workscape's products and services, as well as the profit margins and cost structure of Workscape's client and partner transactions.  Much of that information is confidential and proprietary to Workscape.

20.    During his employment at Workscape, Mr. Gioja acquired a great deal of highly confidential information regarding Workscape's competitive marketing strategy, including without limitation product differentiations. Mr. Gioja had access to and obtained information regarding Workscape products and services, as well as anticipated future products and services (including the "product roadmap"), and how Workscape's products and services are integrated and how they compare with others in the marketplace. Mr. Gioja had access to and obtained information regarding Workscape's current and anticipated time requirements for go-live implementation and execution of product delivery.  Much of that information is confidential and proprietary to Workscape.

21.    While at Workscape, Mr. Gioja's responsibilities included, among other things, the executive management and oversight of the development of Workstream's human resources

5

technology products, software applications and services and their integration into a single platform. Much of that information is confidential and proprietary to Workscape.

22. While at Workscape, Mr. Gioja's responsibilities involved, among other things, the development and deployment, as well as the integration of Workscape's products into, the "OneForce" platform. Much of that information is confidential and proprietary to Workscape.

Workstream's Business, And Its Competition With Workscape

23. Workstream is based in Ottawa, Canada, and has approximately twenty (20) offices in locations throughout the United States.

24. Workscape and Workstream are direct competitors.

25. As does Workscape, Workstream markets and sells a range of comprehensive HR technology products and related service applications. As does Workscape, Workstream products and web-based HR solutions and software applications are delivered primarily on a hosted basis.

26. Workstream provides solutions and services that provide management assistance for employee recruitment, benefits, performance, compensation, rewards and transition, as well as portal technology.

27. Workstream markets and sells its HR software applications, products and services throughout the United States.

28. As does Workscape, Workstream provides organizations with the option of software applications that include a service approach through a hosting function, and, if desired by the customer, through a portal application. Similarly, as with Workscape, Workstream's software products and solutions are used to complement or enhance its customers' broad software applications.

6

29.     Although Workstream emphasizes a suite of products more so than Workscape does, both Workscape and Workstream sell their HR software products and solutions individually.

30.     Both Workscape and Workstream, through either in-house development or a number of acquisitions and mergers, directly compete in the development and provision of products that deliver employee and manager self-service HR applications, including compensation planning, benefits administration, performance management, and portal applications.

31.     Workstream and Workscape also solicit the same customers and partners. Workstream attempts to or does sell and/or market its compensation products to multiple Workscape customers including without limitation, General Motors. Workscape and Workstream both maintain separate distribution partnerships with IBM.

Mr. Gioja's Separation Agreement with Workscape

32.     In early February 2005, Workscape decided that it would not renew Mr. Gioja's Employment Agreement when it expired on May 6, 2005. Thereafter, Workscape and Mr. Gioja negotiated a letter agreement dated February 15, 2005 (the "Separation Agreement") that set forth the terms of Mr. Gioja's departure from Workscape. A true and correct copy of the Separation Agreement is attached hereto as Exhibit B.

33.     The Separation Agreement contained a one-year non-competition covenant by which Mr. Gioja agreed to refrain from participating in a competing business activity with a competitor of Workscape for a period of one year.

34.     The Separation Agreement is governed by the laws of Massachusetts.

7

Workstream's Intentional and Improper Interference with
Mr. Gioja's Separation Agreement with Workscape

35.    In March 2005, Workstream had knowledge of the existence of the Separation

Agreement. Workstream was provided a copy of both the 2004 Employment Agreement and the

Separation Agreement by Mr. Gioja.

36.    Nevertheless, in or about March 2005, Gioja and Workstream entered into an

Employment Agreement (the "Workstream Employment Agreement"). A copy of the

Workstream Employment Agreement is attached hereto as Exhibit C.

37.    During negotiations relating to the terms and conditions of the Workstream

Employment Agreement, Gioja's legal counsel was Jennifer Goddard, who represented Gioja

throughout the Separation Agreement negotiations with Workscape and who was fully familiar

with Gioja's non-competition obligations to Workscape under the 2004 Employment Agreement

(having negotiated it on his behalf, as well as the earlier 2002 Employment Agreement.)

38.    The Workstream Employment Agreement contains an indemnification provision

by which Workstream agreed to indemnify and defend Mr. Gioja when Workscape filed legal

action against Mr. Gioja in relation to the non-competition sections of the 2004 Employment

Agreement and Separation Agreement. Under the Workstream Employment Agreement,

Workstream also was obligated to pay Mr. Gioja severance in the event that a Court enjoined

him from working at Workstream.

39.    Section 17 of the Workstream Employment Agreement states in relevant part:

The Employer [Workstream] agrees to fully indemnify and defend the Employee
against all claims, liabilities, losses, costs, attorney's fees, settlements and
damages (collectively, "Liabilities") relating to or arising from any Action (as
defined below) should the company by which the Employee was last employed
before the date hereof threatens or take any legal action against the Employee in
relation to Section 7 of the Employee's prior employment agreement with such
company and/or the Employee's employment with the Employer (any such

8

threatened or actual actions are collectively referred to as the "Action"). Notwithstanding the foregoing, the Employer may determine in its sole discretion not to continue with such a defence (sic) if it believes there is no reasonable likelihood of succeeding with such a defence (sic). In the event the Employee's employment with the Employer ceases as a result or consequence of any Action, such termination shall be without cause and the Employee will be entitled to the payments and benefits set forth in Section 10.1.3 hereof, and the Employer will nonetheless indemnify the Employee for all Liabilities relating to or arising from any Action.

40.     Furthermore, the documented history of the negotiations between Mr.

Gioja and Workstream concerning the Workstream Employment Agreement in general and the indemnification provision in particular, demonstrates that Workstream and Mr. Gioja understood that Mr. Gioja's employment with Workstream would be a breach of his one-year non-competition obligation to Workscape.

41.     For example, under the Separation Agreement, Mr. Gioja was obligated to inform Workscape if and when he accepted other, non-competing employment. See Exhibit A, § 1.a.(iii). By email dated March 27, 2005, Mr. Gioja inquired to Workstream personnel how he should comply with this contractual obligation and how he should "play" with the required notice provision. A copy of the March 27, 2005 email from Mr. Gioja to Workstream's then Chief Financial Officer David Polansky, bates stamped MG000291, is attached hereto as Exhibit D.

42.     By email dated March 28, 2005, David Polansky instructed Mr. Gioja that he and Workstream coordinate through Attorney Richard Lieberman, Workstream's attorney, the notice that would be provided to Workscape. See Exhibit D at bates stamped MG000305. Workstream's intent was for Mr. Lieberman to handle the subsequent, and anticipated, litigation regarding Mr. Gioja's violation of his non-competition obligations to Workscape.

43.     Indeed, prior to the execution of the Workstream Employment Agreement, Workstream and its representatives provided knowing and substantial assistance and

9

encouragement to Mr. Gioja so as to induce him to breach his one-year non-competition obligations to Workscape.

44.    On or about March 11, 2005, Workstream's President and CEO Michael Mullarkey traveled to Boston, Massachusetts to meet with Mr. Gioja for the purpose of, among other things, knowingly inducing Mr. Gioja to breach his contractual obligations to Workscape. Mr. Mullarkey and Mr. Gioja met for several hours in Boston, Massachusetts. At the conclusions of this meeting, Mr. Gioja agreed to accept employment with Workstream as its Executive Vice President of Technology and Operations, despite the fact that such employment was in violation of his non-competition obligations to Workscape.

45.    Workstream and Mr. Gioja agreed that Mr. Gioja would fulfill the title and role of Executive Vice President of Technology and Operations. Workstream and Mr. Gioja further agreed that Mr. Gioja would be responsible for any duties that would be reasonably required of the position of Executive Vice President of Technology and Operations.

46.    Throughout the next couple of weeks, Workstream representatives, including Mr. Mullarkey, continued to meet and communicate with Mr. Gioja to discuss Mr. Gioja's general responsibilities at Workstream.

47.    Upon information and belief, during this time period, Workstream and Mr. Gioja also devised a strategy in which they would defend any claim by Workscape that Mr. Gioja was in breach of his non-competition obligations by arguing that Mr. Gioja's specific responsibilities at Workstream did not constitute a competing business activity within the meaning of Mr. Gioja's 2004 Employment Agreement. However, both Workstream and Mr. Gioja knew full well that Mr. Gioja's activities for Workstream would be competitive with Workscape, and it was precisely for such competitive advantage that Workstream hired Mr. Gioja.

10

48. At the request of Workstream, Mr. Gioja also attended Workstream's User Conference held in Orlando, Florida in March 2005. Workstream reimbursed Mr. Gioja for his attendance at Workstream's User Conference including Mr. Gioja's expenses relating to his transportation, meals and hotel.

49. Indeed, upon information and belief, it was during Workstream's User Conference that Workstream and Mr. Gioja surreptitiously finalized specific details relating to the Workstream Employment Agreement. Coincidentally, by email dated March 21, 2005 to Mr. Gioja, Workscape's President and CEO Timothy Clifford ("Clifford") inquired into, among other things, Mr. Gioja's employment status, as it had been rumored that Mr. Gioja was considering employment with Fidelity. A copy of the March 21, 2005 email from Clifford to Mr. Gioja, bates stamped MG000141, is attached hereto as Exhibit E.

50. By email dated March 21, 2005, Mr. Gioja misleadingly and deceptively responded that there were "always good conversations happening and always rumors." See Exhibit E. Upon information and belief, Mr. Gioja sent the March 21 email to Clifford at or about the very time that he attended the Workstream User Conference, where he met with Workstream's customers and clients on behalf of Workstream, and agreed to specific details relating to this employment with Workstream.

Workstream and Mr. Gioja Act Together To Cause Significant
And Unnecessary Expense to Workscape

51. By email sent after the close of business on Friday, April 1, 2005, Mr. Gioja informed Clifford that he would be employed by Workstream, a direct competitor of Workscape, as of Monday, April 4, 2005. Upon information and belief, the specific language of the April 1, 2005 email was prepared by Workstream's attorneys. A true and accurate copy of the April 1, 2005 email from Mr. Gioja to Clifford is attached hereto as Exhibit F.

11

52.    Subsequently, in a press release statement dated April 4, 2005, Workstream announced that Mr. Gioja had joined Workstream as Executive Vice President of Technology and Operations, an equivalent executive position to the position he held at Workscape. Attached hereto as Exhibit G is a copy of Workstream's press release statement dated April 4, 2005 entitled "Workstream Expands Senior Management Team with Seasoned Public Company Executive and Additional Industry Expertise," which appears on Workstream's website. The press release statement specifically cites to Mr. Gioja's previous senior management position at Workscape. See Exhibit G.

53.    As the Executive Vice President of Technology and Operations at Workstream, Mr. Gioja is to be "responsible for managing Workstream's Research and Development team, data center operations and day-to-day technology and operational activities." See Exhibit G. As the Executive Vice President of Technology and Operations at Workstream, Mr. Gioja also is to be responsible for the executive management and oversight of the development of Workstream's HR technology products, software applications and services and their integration into a single platform or portal based application. These duties and responsibilities are virtually identical to the responsibilities he held at Workscape as its Executive Vice President, Products, Services and Technology.

54.    By letter dated April 4, 2005, Workscape, by and through counsel, notified Mr. Mullarkey that Mr. Gioja's employment with Workstream was in breach of his contractual non-competition and confidentiality obligations to Workscape and that such employment will cause irreparable harm to Workscape. Workscape, by and through counsel, further explained the nature of Workstream's liability for hiring Mr. Gioja and intentionally inducing him to materially breach his non-competition obligations to Workscape. Workscape demanded that Workstream

12

immediately cease and desist Mr. Gioja's employment with Workstream. A true and accurate copy of the April 4, 2005 letter to Michael Mullarkey, Workstream's President and CEO, is attached hereto as Exhibit H.

55.     Workstream continued to employ Mr. Gioja.

56.     Workstream and Mr. Gioja then continued to act in concert and conspired to orchestrate a crafty stratagem to divert the resources of Workscape and cause significant and unnecessary expense to Workscape by, among other things, forcing Workscape to file suit in Middlesex County Superior Court (the "Superior Court") against Mr. Gioja to enforce his contractual non-competition obligations in a case entitled Workscape, Inc. v. Gioja, Civil Action No. 05-1205 (the "Superior Court action.")

57.     On April 7, 2005, Workscape filed the Superior Court action seeking injunctive relief to enforce the confidentiality and one-year non-competition agreements by Mr. Gioja.

58.     During the Superior Court action, Mr. Gioja's attorney was Richard Lieberman, who also represented Workstream. On information and belief, Workstream paid Mr. Gioja's attorney's fees and costs incurred in the Superior Court action.

59.     On April 11, 2005, a hearing on Workscape's Motion for Temporary Restraining Order and Preliminary Injunction was held before the Superior Court (the "April 11 hearing").

60.     At the conclusion of oral argument at the April 11 hearing, the Superior Court, among other things, enjoined Gioja by way of a temporary restraining order from working for Workstream.

61.     At the Superior Court's suggestion, Workscape agreed, and the Court then ordered, that Workscape would pay to Mr. Gioja the severance and related benefits set forth in the Separation Agreement, subject to the terms and conditions therein, while the order remained

13

in effect. See Order on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, ¶ 4 attached hereto as Exhibit I. Neither Workscape nor the Superior Court at that time was aware of the existence of the Workstream Employment Agreement or its indemnification and severance provisions. Neither Mr. Lieberman nor Mr. Gioja informed the Superior Court or Workscape at that time of the existence of the Workstream Employment Agreement or its indemnification and severance provisions.

62.     Mr. Gioja had worked for Workstream from at least April 4 to April 11, 2005, at which time he was enjoined by the Superior Court from working at Workstream.

63.     Despite his employment with Workstream, Workscape continued to provide severance and related benefits under the Separation Agreement to Mr. Gioja from April 4 through April 11, 2005.

64.     Workscape also continued to provide severance and related benefits under the Separation Agreement to Mr. Gioja from April 11 to May 18, 2005, while he was temporarily enjoined from working at Workstream.

65.     Section 1.a.(iii) of the Separation Agreement permits Workscape to set off from amounts due to Gioja for salary continuation under the Separation Agreement the compensation amounts paid to Gioja in respect of other employment or business activity during the 6 month severance period. See Exhibit A.

66.     Pursuant to Section 17 of the Workstream Employment Agreement, Workstream was obligated to pay Mr. Gioja severance during the period he was enjoined by the Superior Court (April 11 through May 18, 2005). See Exhibit C.

67.     As a result of Workstream's intentional and tortious conduct including without limitation the improper concealment of the Workstream Employment Agreement and

14

indemnification and severance provisions, Workscape was required to pay Mr. Gioja severance and benefits under the Separation Agreement that in fact should have been paid by Workstream.

68.     In granting the temporary injunctive relief, the Superior Court set an expedited four-week discovery schedule, which culminated in a four-day trial held from May 10 to May 13, 2005.

The Superior Court's Findings of Fact and Conclusions of Law

69.     On May 18, 2005, the Superior Court rendered its findings of fact and conclusions of law in the Superior Court action.

70.     While reducing the one-year non-competition period to a period of six months, and Workscape's severance obligation from six months to three months, the Superior Court held that Mr. Gioja had breached his Separation Agreement with Workscape by accepting employment with Workstream as its Senior Executive Vice President of Technology and Operations.

71.     Moreover, the Superior Court specifically rejected claims made by Mr. Gioja that Workstream and he sincerely attempted to prevent Mr. Gioja from violating his non-competition agreements by purportedly attempting to limit Mr. Gioja's responsibilities at Workstream. A copy of the May 18, 2005 Court Transcript containing the Superior Court's Findings of Fact and Conclusions of Law is attached hereto as Exhibit J.

72.     The Superior Court concluded that because Workstream announced in its April 4, 2005 press release (that remains on its website today as a publicly available document to the investing community) that Mr. Gioja would "be responsible for managing Workstream's Research and Development team, data center operations and day-to-day technology and operational activities" and that Mr. Gioja would be a member of Workstream's Executive

15

Committee, these activities alone violated his non-competition agreement with Workscape. See
Exhibit J.

73.     The Superior Court also flatly rejected -- and found simply not credible --
assertions made by Mr. Gioja that Workstream attempted to limit Mr. Gioja's specific
responsibilities at Workstream to not include operational responsibilities for services or
implementation, contact with customers or any role with pricing or sales. Indeed, the Superior
Court found Mr. Gioja's testimony under oath about these same subjects to be highly suspect,
unpersuasive and not credible. Id.

74.     In addressing Mr. Gioja's testimony in which Mr. Gioja claimed that Workstream
personnel informed him that his anticipated role on Workstream's Executive Committee would
not include business competition, finances or strategic discussions, but rather be more of a status
meeting, the Superior Court specifically stated,

> I do not accept that evidence as persuasive. It is simply not imaginable to
> me that the Executive Committee of a company in this field would not
> address important issues in all aspects of the business at meetings of the
> Executive Committee.

75.     The Superior Court also found that Mr. Gioja's testimony relating to his
responsibilities for research and development at Workstream not extending to the Workstream
products, "not to ring true." The Superior Court also concluded that the distinctions of Mr.
Gioja's responsibilities, as compared to those of Mr. Kevin Jackson at Workstream, relating to
the delivery and functionality of Workstream products, as well as Workstream's efforts and plans
to enhance its products, "to be stilted, and to essentially emasculate the give and take across
borders that must prevail in a business atmosphere."

76.     Because Workstream had knowledge of the specific provisions of Mr. Gioja's
contract with Workscape and was aware that its conduct would result in the material breach by

16

Mr. Gioja of his non-competition obligations to Workscape, but yet still intentionally took the actions it did, well knowing what the result would be, Workstream is liable for its intentional interference with Workscape's contractual relations with Mr. Gioja.

77.     Workscape has been harmed by Workstream's intentional actions. Because Workscape was forced to file suit against Mr. Gioja to hold him to his non-competition obligation with Workscape, with which Workstream intentionally interfered, Workscape has been harmed by Workstream's intentional actions including, without limitation its attorney's fees incurred in the Superior Court action against Mr. Gioja, which exceed $230,000. Workscape also has been harmed by Workstream's intentional actions that caused Workscape to make severance and benefits payments to Mr. Gioja, of approximately $29,000, which should have been paid by Workstream.

## COUNT I
### (Intentional Interference with Contractual Relations)

78.     Workscape repeats and realleges the allegations set forth in paragraphs 1 through 77 as if fully set forth herein.

79.     At all relevant times, Workstream was aware of the 2004 Employment Agreement and Separation Agreement between Workscape and Mr. Gioja.

80.     Mr. Gioja had agreed within the 2004 Employment Agreement and Separation Agreement to refrain from participating in a competing business activity with a competitor of Workscape for a period of one year.

81.     Workstream knowingly interfered with that contract for an improper purpose and with improper means.

82.     Upon information and belief, Workstream intended to deprive Workscape of the benefits of the Separation Agreement with Mr. Gioja, and divert the benefits of Mr. Gioja's

17

employment to Workstream, in part due to the existence of the competitive business relationship between Workstream and Workscape. Moreover, upon information and belief, Workstream intended to harm and cause damage to Workscape by, among other things, inducing Mr. Gioja to breach his Separation Agreement with Workscape, subsequently employing Mr. Gioja in a position that would be impossible for Gioja to avoid disclosing and using Workscape's trade secrets and confidential information in violation of his Separation Agreement and for the direct benefit of Workstream, causing significant and unnecessary expense to Workscape and diverting Workscape's resources including without limitation, forcing Workscape to file suit against Mr. Gioja to enforce his contractual, non-competition obligations.

83.      As a result of the tortious acts committed by Workstream, Workscape has suffered damages, in an amount to be determined at trial, but in an amount not less than $230,000.

## COUNT II
## (Violations of G.L. c. 93A)

84.      Workscape repeats and realleges the allegations contained in paragraphs 1 through 83 above as if fully set forth herein.

85.      At all relevant times hereto, Workscape and Workstream were engaged in trade or commerce in the Commonwealth of Massachusetts within the meaning of G.L. c. 93A, §§ 2 and 11.

86.      The actions by Workstream, including without limitation its intentional and improper interference with Workscape's contract with Gioja; its knowing and intentional withholding of information concerning the existence of the indemnification agreement for the purposes of causing significant and unnecessary expense to Workscape including the severance payments provided to Mr. Gioja by Workscape; its ill-motivated use of the undisclosed

18

indemnification agreement as part of Workstream's assistance and encouragement to Mr. Gioja to breach his Separation Agreement; and its efforts to cause Workscape to incur significant and unnecessary expense by, among other things, forcing Workscape to file suit against Mr. Gioja to enforce its legal rights and Mr. Gioja's contractual non-competition obligations, all constitute unfair and deceptive acts and practices in violation of G.L. c. 93A, §§ 2 and 11.

87.    Workstream committed these unfair and deceptive acts and practices knowingly and willfully. Because these intentional and tortious acts and practices by Workstream and its representatives constitute knowing violations of c. 93A, Workscape is entitled to multiple damages.

88.    As a result of the knowing and willful violations of G.L. c. 93A by Workstream, Workscape has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT III
### (Civil Conspiracy)

89.    Workscape repeats and realleges the allegations contained in paragraphs 1 through 88 above as if fully set forth herein.

90.    At all relevant times, Workstream was aware of the 2004 Employment Agreement and Separation Agreement between Workscape and Gioja by which Mr. Gioja had agreed to refrain from participating in competing business activity with a competitor of Workscape for a period of one year.

91.    Workstream knowingly interfered with that contract for an improper purpose and with improper means.

92.    At all relevant times, Workstream and Gioja understood that Gioja's employment with Workstream would be a breach of his one-year non-competition obligation to Workscape.

19

93.     At all relevant times, Workstream provided substantial assistance and
encouragement to Mr. Gioja so as to induce Mr. Gioja to breach his 2004 Employment
Agreement and Separation Agreement with Workscape.

94.     By providing substantial assistance and encouragement to Mr. Gioja to breach his
2004 Employment Agreement and Separation Agreement, Workstream's conduct, separately
considered, constitutes a breach of duty to Workscape.

95.     In addition, Workstream and its representatives, including Mr. Mullarkey,
individually, and Mr. Gioja further agreed and acted in concert to cause significant harm to
Workscape including without limitation their intentional and improper interference with
Workscape's contract with Mr. Gioja; their knowing and intentional withholding of information
concerning the existence of the indemnification agreement for the purposes of causing significant
and unnecessary expense to Workscape, including the severance payments improperly provided
to Mr. Gioja by Workscape; their assistance and encouragement to Mr. Gioja to breach his 2004
Employment Agreement and Separation Agreement; and their efforts to cause Workscape to
incur significant and unnecessary expense by, among other things, forcing Workscape to file suit
against Mr. Gioja to enforce its legal rights and Mr. Gioja's contractual non-competition
obligations.

96.     As a result of the tortious acts committed by Workstream, including Mr.
Mullarkey, individually, as well as other Workstream representatives, Workscape has suffered
damages, in an amount to be determined at trial, but in an amount not less than $260,000.

20

## PRAYERS FOR RELIEF

WHEREFORE, Workscape respectfully requests that this Court:

a.      Enter judgment for monetary damages in an amount not less than $260,000

against Workstream;

b.      Award Workscape treble damages in an amount not less than $780,000 against

Workstream under G.L. c. 93A;

c.      Award Workscape prejudgment interest;

d.      Award Workscape its reasonable attorney's fees and other legal costs and

expenses; and

e.      Award Workscape such other and further relief as this Court deems just and

proper.

## DEMAND FOR TRIAL BY JURY

Workscape hereby demands a trial by jury as to all issues so triable.

WORKSCAPE, INC.
By its attorneys,

Dated: July 13, 2005

David E. Lurie, BBO #542030
Thomas E. Lent, BBO #644970
Lurie & Krupp, LLP
One McKinley Square
Boston, MA  02109
(617) 367-1970

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

THIS AMENDED AND RESTATED EMPLOYMENT AGREEMENT, is dated as of May 7, 2004 (the "Amendment Date") and amends and restates that certain Employment Agreement between the parties dated as of December 9, 2002 (the "Effective Date"), between Workscape, Inc., a Delaware corporation (the "Company"), and Michael Gioja (the "Executive").

### RECITALS:

WHEREAS, the Company has employed the Executive since the Effective Date, and the Company and the Executive desire to extend the employment of the Executive, on the terms and conditions set forth herein.

NOW, THEREFORE, on the basis of the foregoing premises and in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency are hereby acknowledged, the parties hereby agree as follows.

### Section 1.    Employment

(a)    The Company agrees to employ the Executive on the terms and subject to the conditions hereinafter set forth. Subject to the terms and conditions contained herein, the Executive shall serve as Executive Vice President, Products, Services and Technology, of the Company and, in such capacity, shall be subject to the supervision of the Chief Executive Officer and shall have such duties as are typically performed by an Executive Vice President, Products, Services and Technology, of a corporation of a similar size and industry as the Company, including, initially, those set forth on Exhibit A, together with such additional duties as may be reasonably assigned to the Executive from time to time by the Chief Executive Officer of the Company. The principal locations of the Executive's employment shall be at the Company's offices in Framingham and Natick, Massachusetts, or such other place as the Company determines to locate the principal engineering facility of the Company. Provided, however, the Company acknowledges and agrees that the Executive will perform some of his employment responsibilities from his home in New York and that the Executive will not be required to relocate to Massachusetts.

(b)    The Executive hereby accepts such employment and agrees to undertake the duties and responsibilities inherent in the position of Executive Vice President, Products, Services and Technology and such other duties and responsibilities as the Chief Executive Officer shall from time to time assign to him consistent with his duties as described above. Except as provided in Section 4 below, the Executive agrees to devote his entire business time, attention and energies to the business and interests of the Company during the Employment Term (as defined in Section 2 below). The Executive agrees to abide by the rules, regulations, instructions, personnel practices and policies of the Company and any changes therein which may be adopted from time to time by the Company. The Company acknowledges and agrees that any such rules, regulations, instructions, practices and policies, and any such changes thereto shall not be applied in a discriminatory manner to the Executive. The Executive acknowledges receipt of copies of all such rules and policies committed to writing as of the date of this Agreement.

### Section 2.    Term.

The Executive's employment hereunder shall commence on the Effective Date and, unless earlier terminated pursuant to Section 6 hereof, shall continue during the period ending on May 6, 2005 (the "Term"). Thereafter, the Employment Term (as defined below) shall extend automatically for consecutive one year periods unless either party delivers no less than 30 days written notice prior to an anniversary date of its election to terminate this Agreement. The Term,

together with any extension pursuant to this Section 2, is referred to herein as the "Employment Term." The Employment Term shall terminate upon any termination of the Executive's employment pursuant to Section 6.

Section 3.  **Compensation.** Commencing on the Amendment Date, and thereafter during the Employment Term, the Executive shall be entitled to the following compensation and benefits:

(a)    **Salary.** As compensation for the performance of the Executive's services hereunder, during the period of the Employment Term subsequent to May 24, 2004, the Company shall pay to the Executive a salary (the "Salary") at a rate equal to Two Hundred Thirty-One Thousand Seven Hundred Fifty Dollars ($231,750) per annum. In the event that this Agreement remains in effect following May 6, 2005, the Company shall continue to pay the Executive's Salary at the rate payable on the date immediately preceding the date that begins the extension of the Employment Term unless the parties otherwise mutually agree in writing. The Salary shall be payable in accordance with the payroll practices of the Company as the same shall exist from time to time.

(b)    **Bonus Plans.** (i) *Corporate Bonus.* The Executive shall be eligible to receive an annual cash bonus (the "Corporate Bonus") of up to fifty percent (50%) of the Executive's annual Salary;  the payment and amount of the Corporate Bonus shall be determined by the Board of Directors of the Company (the "Board of Directors") in its sole and absolute discretion and is payable for all Company fiscal years, based upon achievement of the Company's objectives for the applicable fiscal year, and the Executive's performance in his role as measured against the Management Business Objectives ("MBOs") established for him by the Chief Executive Officer. MBOs for all periods during the Employment Term shall be established as part of the Company's annual performance review and management process. The Executive shall be entitled to be considered for such Corporate Bonus for all years for which the Company employs him on the last day of the applicable fiscal year, *provided* that the Executive is employed by the Company on the date that the Corporate Bonus is paid. Notwithstanding the foregoing, nothing in this Section 3(b)(i) shall limit the Board of Directors' discretion to determine the payment and amount of the Corporate Bonus.

(ii) *Performance Bonus.* The parties acknowledge and agree that (i) the initial installment of the Performance Bonus due under the original terms of this Employment Agreement equal to $42,187.50 was paid to the Employee and (ii) the second installment, in an equal amount (in lieu of the terms originally established in this Agreement) was paid to the Employee in two equal installments of $21,093.75 each (the "Performance Bonus").

(c)    **Option Grants.** (1) Subject to the terms and conditions of the Company's standard form of Option Agreement, the Company agrees to grant to the Executive under its 2000 Equity Incentive Plan an option to purchase up to Two Million Five Hundred Thousand (2,500,000) shares of its Class A Common Stock, $.01 par value per share, at a price per share equal to the fair market value of the shares of common stock of the Company at the time of the grant, which option shall vest as follows:

(i)    2,000,000 shares shall vest ratably over a four-year period commencing on the date the Board of Directors approved such grant; and

2

(ii)     500,000 shares shall vest immediately following the approval of such grant at the Board of Directors meeting following the execution of this Amended and Restated Employment Agreement.

(2) In the event of the consummation of a Change of Control (as defined below) transaction, fifty percent (50%) of the then-remaining unvested options granted to the Executive under Section 3(c)(i) above shall become immediately vested and exercisable. For purposes hereof, "Change of Control" means:

(i)     the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of more than 50% of either (x) the then-outstanding shares of common stock of the Company that are not owned by the Company or any corporation controlled by the Company ("Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors ("Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following shall not constitute a Change of Control: (a) any acquisition by the Company or any corporation controlled by the Company, or (b) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or

(ii)     consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of either the then outstanding shares of common stock or the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries); or

(iii)     approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

(d)     Benefits. In addition to the Salary, Bonuses, if any, and Option Grant described above, (i) the Company, at its cost, shall provide to the Executive appropriate housing accommodations, including payment of utilities, in the vicinity of its principal offices and (ii) the Executive shall be entitled to participate in health, insurance, and other benefits provided to other senior executives of the Company in accordance with the Company policy in effect from time to time on terms no less favorable than those available to such senior executives, including the same number of vacation days, holidays and sick days as are generally allowed to other senior executives of the Company in accordance with the Company policy in effect from time to time.

3

Section 4.    Exclusivity.  During the Employment Term, the Executive shall devote his full business time to the business of the Company, shall faithfully serve the Company, shall in all respects conform to and comply with the lawful and reasonable directions and instructions given to him by the Chief Executive Officer in accordance with the terms of this Agreement, shall use his best efforts to promote and serve the interests of the Company and shall not engage in any other business activity, whether or not such activity shall be engaged in for pecuniary profit, except that the Executive may (i) participate in the activities of professional trade organizations related to the business of the Company; (ii) engage in personal investing activities and (iii) serve as a member of the board of directors of other corporations, *provided* that activities set forth in these clauses (i), (ii) and (iii) either singly or in the aggregate, do not interfere in any material respect with the services to be provided by the Executive hereunder.

Section 5.    Reimbursement for Expenses.  The Executive is authorized to incur reasonable expenses in the discharge of the services to be performed hereunder, including expenses for travel, entertainment, lodging and similar items in accordance with the Company's expense reimbursement policy, as the same may be modified by the Company from time to time.  The Company shall reimburse the Executive for all such proper expenses upon presentation by the Executive of itemized accounts of such expenditures.

Section 6.    Termination and Default.

(a)    Death.  The Executive's employment shall automatically terminate upon his death and, upon such event, the Executive's estate shall be entitled to receive the amounts specified in Section 6(f) below.

(b)    Disability.  If the Executive is unable to perform the duties required of him under this Agreement because of a Disability (as defined below), the Employment Term shall continue for a period of thirty days thereafter. As used in this Agreement, the term "Disability" shall mean the inability of the Executive with reasonable accommodation as may be required by State or Federal law, due to a physical or mental disability, for a period of 120 days, whether or not consecutive, during any 360-day period to perform the services contemplated under this Agreement.  A determination of Disability shall be made by a physician satisfactory to both the Executive and the Company, provided that if the Executive and the Company do not agree on a physician, the Executive and the Company shall each select a physician and these two together shall select a third physician; this third physician's determination as to Disability shall be binding on all parties.

(c)    Cause.  The Company may terminate the Executive's employment at any time without Cause (as defined below), upon 60 days' written notice.  In the event of termination pursuant to this Section 6(c) for Cause, the Company shall deliver to the Executive written notice setting forth the basis for such termination, which notice shall specifically set forth in detail the nature of the Cause which is the reason for such termination.  Termination of the Executive's employment with Cause shall be effective upon delivery of such notice of termination, except as provided in sub-section (B) below. Amounts owed by the Company in respect of Salary, Bonuses, benefits (including accrued unused vacation) or reimbursement for expenses or other amounts shall be paid promptly upon any termination; provided, however, in the event of a termination for Cause, the Company shall be relieved of all obligations to pay any Salary or benefits accrued or Bonus amounts owed following the effective date of termination. For purposes of this Agreement, "Cause" shall mean:

(A) a reasonable and good faith determination by the Company that the Executive (1) committed any act involving dishonesty in any material respect, fraud or disloyalty, or breach of his fiduciary duty, each with respect to the

4

Company, (2) engaged in unprofessional or unethical conduct or conducted himself in a manner which is materially detrimental to the business or reputation of the Company, (3) engaged in gross negligence or willful misconduct with respect to the Company, or (4) committed any material breach of the Agreement or any other agreement with the Company;

(B) the Executive's failure (except where due to a Disability), neglect or refusal to substantially perform his duties, including (1) those described in Exhibit A under "Other Primary Responsibilities" and (2) to be a constructive contributor to the Executive Committee, which failure, neglect or refusal shall not have been corrected by the Executive within 30 days of receipt by the Executive of written notice from the Company of such failure, neglect or refusal, which notice shall specifically set forth in reasonable detail the nature of said failure, neglect or refusal;

(C) any continued or repeated absence from the Company, unless such absence is (1) approved or excused by the Chief Executive Officer; (2) the result of the Executive's Disability (in which event the provisions of Section 6(b) hereof shall control); or (3) is protected by any applicable federal or state law;

(D) use of illegal drugs by the Executive or repeated drunkenness; or

(E) conviction of the Executive or entry of a plea of guilty or nolo contendere to a felony, or to a crime or offense involving the property of the Company or that is reasonably likely to injure the reputation or business of the Company.

(d) Good Reason. The Executive may terminate his employment for "Good Reason" following a Substantial Breach (as hereinafter defined), but only if such Substantial Breach shall not have been corrected by the Company within thirty (30) days of receipt by the Company of written notice from the Executive of the occurrence of such Substantial Breach, which notice shall specifically set forth the nature of the Substantial Breach which is the reason for such resignation. The term "Substantial Breach" means (i) the failure by the Company to pay to the Executive the Salary or Bonuses, if any, in accordance with Sections 3(a) and 3(b) hereof; (ii) the failure by the Company to allow the Executive to participate in the Company's employee benefit plans generally available from time to time to senior executives of the Company; (iii) a material breach by the Company of this Agreement or any other agreement with the Executive; or (iv) a material reduction or material diminution by the Company in the Executive's title, responsibilities, authority or reporting structure from that which existed on the Amendment Date; *provided, however*, that the term "Substantial Breach" shall not include a termination of the Executive's employment hereunder pursuant to Sections 6(a), (b) or (c) hereof. The date of termination of the Executive's employment under this Section 6(d) shall be the effective date of any resignation specified in writing by the Executive, which shall not be less than thirty (30) days after receipt by the Company of written notice of such resignation, *provided* that such resignation shall not be effective pursuant to this Section 6(d) and the Substantial Breach shall be deemed to have been cured if such Substantial Breach is corrected by the Company during such 30-day period.

(e)  <u>Without Good Reason.</u>  The Executive may terminate his employment without Good Reason at any time upon sixty days' written notice to the Company.

(f)  <u>Severance Benefits.</u>  In the event that the Executive's employment is terminated by the Company without Cause or by the Executive with Good Reason (a "Termination Event"), (i) the Executive shall continue to receive the Salary (less any applicable withholding or similar taxes) at the rate in effect hereunder on the date of such termination periodically, in accordance with the Company's prevailing payroll practices, for a period equal to six months following the date of such termination (the "Severance Term"), (ii) to the extent permissible under the Company's benefit plans, the Executive shall continue to receive any benefits provided him (including any family health coverage benefits offered by the Company's health plans) as of the date of such termination in accordance with Section 3(d) hereof during the Severance Term (and in the event not permissible, the Company will pay the applicable amount of the premium for health and dental coverage under COBRA), (iii) the Company shall extend the exercise period for any vested options on the termination date to a period equal to the Severance Term and (iv) with respect to the Corporate Bonus, in the event that the Executive satisfies all of the conditions for qualification other than being an employee on the applicable payment date (i.e., the Executive- is terminated without Cause or resigns for Good Reason between the last date of the applicable fiscal year and the payment date for such year's Corporate Bonus), the Company shall nonetheless pay the Corporate Bonus, if any, to the Executive. If the Executive accepts other employment or engages in his own business prior to the last date of the Severance Term, the Executive shall forthwith notify the Company and the Company shall be entitled to set off from amounts due the Executive for salary continuation under this Section 6(f) after the date Executive first receives other compensation, the compensation amounts paid to the Executive in respect of such other employment or business activity.

## Section 7.   Secrecy and Non-Competition.

(a)  <u>No Competing Employment.</u>  The Executive acknowledges that the agreements and covenants contained in this Section 7 are essential to protect the value of the Company's business and assets and by his employment with the Company, the Executive will obtain knowledge, contacts, know-how, training and experience regarding the Company and its proprietary information, and there is a substantial probability that such knowledge, know-how, contacts, training and experience could be used to the substantial advantage of a competitor of the Company and to the Company's substantial detriment. Therefore, the Executive agrees that for the period commencing on the date of this Agreement and ending on the second anniversary of the termination of the Executive's employment hereunder, except in the event of termination by the Company without Cause or by the Executive with Good Reason such period shall end on the date that is six months after the termination of the Executive's employment (either such period, as applicable, is hereinafter referred to as the "Restricted Period"), the Executive shall not participate or engage, directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder (except for the ownership of a less than 5% stock interest in a publicly-traded corporation), partner, joint venturer, investor or otherwise, in any business activities if such activity competes with the Company's business activities, including, without limitation, those expressly proposed to be undertaken by the Company or any of its subsidiaries as of the termination of the Executive's employment.

(b)     Nondisclosure of Confidential Information. The Executive, except in connection with his employment hereunder, shall not disclose to any person or entity or use, either during the Employment Term or for a period of five (5) years thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by the Executive in the course of his employment with the Company or any predecessor to the Company's business or, if acquired following the Employment Term, such information which, to the Executive's knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to the Company or any of its subsidiaries or affiliates, relating to the Company, its subsidiaries or affiliates, including but not limited to information regarding customers, vendors, suppliers, trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any of the Company's products or services), business plans, code books, invoices and other financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, which is or was used or useful in the business of the Company or any subsidiaries or affiliates thereof. The Executive agrees and acknowledges that all of such information, in any form, and copies and extracts thereof, are and shall remain the sole and exclusive property of the Company, and upon termination of his employment with the Company, the Executive shall return to the Company the originals and all copies of any such information provided to or acquired by the Executive in connection with the performance of his duties for the Company, and shall return to the Company all files, correspondence and/or other communications received, maintained and/or originated by the Executive during the course of his employment. Notwithstanding the foregoing, the obligations of the Executive in this Section 7(b) shall not apply to confidential information (i) which at the date hereof or thereafter becomes a matter of public knowledge without breach by the Executive or his representatives of this Agreement; or (ii) which is obtained by the Executive from a person, firm, or entity (other than the Company or an affiliate of the Company ) under circumstances permitting its disclosure to others.

(c)     No Interference. During the Restricted Period, the Executive shall not, whether for his own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company), directly or indirectly solicit, endeavor to entice away from the Company or its subsidiaries, or otherwise interfere with the relationship of the Company or its subsidiaries with any person who, to the knowledge of the Executive, is employed by the Company or its subsidiaries (including, but not limited to, any independent sales representatives), or any person who is, or was within the twelve-month period prior to such prohibited activity, a customer, client or prospect (which shall be defined as an entity with which the Company can reasonably demonstrate it had sales activity) of the Company, its predecessors or any of its subsidiaries. The placement of any general classified or "help wanted" advertisements and/or general solicitations to the public at large shall not constitute a violation of this Section 7(c) unless the Executive's name is contained in such advertisements or solicitations.

(d)     Assignments of Inventions and Original Works. Executive has attached hereto, on Exhibit C, a complete list of all inventions, original works of authorship, developments, improvements, and trade secrets that he has, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of his employment with the Company, that he considers to be his property or the property of third parties and that he wishes to have excluded from the scope of this Agreement. If disclosure of an item on Exhibit C would cause him to violate any prior confidentiality agreement, Executive understands that he is not to list such in Exhibit C but is to inform the Company that all items have not been listed for that

reason. A space is provided on Exhibit C for such purpose. If no list is attached, Executive represents that there are no such items.

(ii)     Executive agrees that he will make prompt and full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and will and hereby do assign to the Company all of his right, title and interest in and to any ideas, inventions, original works of authorship, mask works, developments, improvements or trade secrets which he may solely or jointly develop, conceive or reduce to practice, or cause to be developed, conceived or reduced to practice during the period of his employment with the Company and which in any way relate to the actual or anticipated business activities of the Company or result from work which he does for the Company or such business of the Company ("Developments"). All Developments devised, made, developed or perfected after termination of his employment with the Company are within the provisions of the preceding sentence if conceived in whole or material part during the period of his employment or with the use of Company resources or facilities. Executive acknowledges that all original works of authorship which are made by him (solely or jointly with others) within the scope of his employment and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C., Section 101).

(iii)    Executive will assist the Company in every reasonable way to obtain and from time to time enforce United States and foreign proprietary rights relating to any and all Developments in any and all countries.  To that end Executive will execute, verify and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and his assignment thereof to the Company.  In addition, Executive will execute, verify and deliver all assignments of such proprietary rights to the Company or its designee.  Executive's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue beyond the termination of his employment, but the Company shall compensate Executive at a reasonable rate after his termination for the time actually spent by him at the Company's request on such assistance.  During and after the Executive's employment with the Company, the Company shall bear any and all expenses incurred by Executive in fulfilling his obligations under this Section 7(d). In the event the Company is unable for any reason, after reasonable effort, to secure Executive's signature on any document needed in connection with the actions specified in this paragraph (iii), Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as his agent and attorney-in-fact, to act for and in his behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purpose of this paragraph (iii) with the same legal force and effect as if executed by him. Executive hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which he now or may hereafter have for infringement of any proprietary rights assigned by him to the Company.

(iv)     In addition to his obligations under paragraph (ii) above, during the period of his employment, Executive will promptly disclose to the Company fully and in writing all patent applications filed by him or on his behalf. Executive agrees to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all proprietary information developed by him and all inventions made by him during

the period of his employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

(v)     The assignments under this Section shall not apply to any development that fully qualifies under the provisions of any applicable federal or state law that restricts the enforcement of invention assignment. Executive agrees to advise the Company promptly in writing of any inventions in which he believes he has legal rights.

Section 8. **Injunctive Relief.** Without intending to limit the remedies available to the Company, the Executive acknowledges that a breach of any of the covenants contained in Section 7 hereof may result in material irreparable injury to the Company or its subsidiaries or affiliates for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach of Section 7 hereof, restraining the Executive from engaging in activities prohibited by Section 7 hereof or such other relief as may be required specifically to enforce any of the covenants in Section 7 hereof.

Section 9. **Extension of Restricted Period.** In addition to the remedies the Company may seek and obtain pursuant to Section 8 of this Agreement, the Restricted Period shall be extended by any and all periods during which the Executive shall be found by a court to have been in violation of the covenants contained in Section 7 hereof.

Section 10. **Representations and Warranties of the Executive.** The Executive represents and warrants to the Company as follows:

(a)     This Agreement, upon execution and delivery by the Executive, will be duly executed and delivered by the Executive and (assuming due execution and delivery hereof by the Company) will be the valid and binding obligations of the Executive and the Company enforceable against both, respectively, in accordance with its terms.

(b)     Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby nor the performance of this Agreement in accordance with its terms and conditions by the Executive (i) requires the approval or consent of any governmental body or of any other person or (ii) conflicts with or results in any breach or violation of, or constitutes (or with notice or lapse of time or both would constitute) a default under, any agreement, instrument, judgment, decree, order, statute, rule, permit or governmental regulation applicable to the Executive. Without limiting the generality of the foregoing, the Executive is not a party to any non-competition, non-solicitation, no hire or similar agreement (other than with the Company) that restricts in any way the Executive's ability to comply with this Agreement, fulfill his obligations hereunder or engage in the Company's business.

(c)     The Executive agrees that he will not, during his employment with the Company, improperly use or disclose any confidential or proprietary information or trade secrets of any former employers or companies, if any, and that he will not bring onto the premises of the Company any unpublished documents or any property belonging to his former employers or companies unless consented to in writing by said employers or companies. Further, the Executive agrees to indemnify and hold harmless the Company for any claims or liabilities (including reasonable attorneys fees) related to any breach by the Executive of the terms of this Section 10(c) as determined by final adjudication by a court of competent jurisdiction.

**Section 11.  Successors and Assigns: No Third-Party Beneficiaries.** This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of each of the parties, including, but not limited to, the Executive's heirs and the personal representatives of the Executive's estate; *provided, however,* that neither party shall assign or delegate any of the obligations created under this Agreement without the prior written consent of the other party. Notwithstanding the foregoing, the Company shall have the unrestricted right to assign this Agreement and to delegate all or any part of its obligations hereunder either to (i) any corporation with which, or into which, the Company may be merged or which may succeed to its assets or business, or (ii) any of its subsidiaries or affiliates. Nothing in this Agreement shall confer upon any person or entity not a party to this Agreement, or the legal representatives of such person or entity, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement. This Agreement shall automatically be binding upon any successor of the Company.

**Section 12.  Waiver and Amendments.** Any waiver, alteration, amendment or modification of any of the terms of this Agreement shall be valid only if made in writing and signed by the parties hereto; *provided, however,* that any such waiver, alteration, amendment or modification is consented to on the Company's behalf by the Chief Executive Officer. No waiver by either of the parties hereto of their rights hereunder shall be deemed to constitute a waiver with respect to any subsequent occurrences or transactions hereunder unless such waiver specifically states that it is to be construed as a continuing waiver.

**Section 13.  Severability and Governing Law.** The Executive acknowledges and agrees that the covenants set forth in Section 7 hereof are reasonable and valid in geographical and temporal scope and in all other respects. If any of such covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This agreement shall be governed by and construed in accordance with the laws of the state of Delaware applicable to contracts made and to be performed entirely within such state.

**Section 14.  Notices.**

(a)     All communications under this Agreement shall be in writing and shall be delivered by hand or facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid;

(1)     if to the Executive, at 217 Plattekill Rd., Greenville, NY 12083 (facsimile: (518) 966-4955), or at such other address or facsimile number as the Executive may have furnished the Company in writing,

(2)     if to the Company, at 500 Old Connecticut Path, Framingham, MA 01701 (facsimile: (508) 861-6257), marked for the attention of the General Counsel, or at such other address or facsimile number as it may have furnished in writing to the Executive, or

(b)     Any notice so addressed shall be deemed to be received:  if delivered by hand or facsimile, on the date of such delivery; if mailed by courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

10

Section 15.   **Section Headings.**  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof, affect the meaning or interpretation of this Agreement or of any term or provision hereof.

Section 16.   **Entire Agreement.**  This Agreement, and the exhibits attached hereto, constitute the entire understanding and agreement of the parties hereto regarding the employment of the Executive.   This Agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter of this Agreement.

Section 17.   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

Section 18.   **Survival of Operative Sections.**   Upon any termination of the Executive's employment, the provisions of sections 6 (f) and 7 through 18 of this Agreement shall survive to the extent necessary to give effect to the provisions thereof.  If the Executive's employment terminates for any reason, the Company shall pay to the Executive all Salary, accrued and unpaid vacation, and expenses accrued but unpaid hereunder through the date of termination and any and all Bonus amounts as may otherwise be provided in Sections 3 and 6 above. The Executive acknowledges that the terms of Section 6(f) shall apply only to a termination and shall not apply to the election of the Company not to renew this Agreement upon the expiration of any applicable term.

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Agreement as of the date first above written.

WORKSCAPE, INC.

By: _____
Name: Timothy T. Clifford
Title: President & CEO

_____
Michael Gioja

## Exhibit A

Further to the provisions of Section 1 of the Agreement to which this Exhibit A is attached, the Executive agrees that his duties shall include the following, and that he shall perform such duties in accordance with the direction of the Chief Executive Officer of the Company and the terms of this Exhibit A:

**(1) Executive management of the following functions:** (a) Product Engineering, (b) Product Management (c) Professional Services and (d) IT Operations.

**(2) Other Primary Responsibilities:**

> **(a) Maintaining Tight Focus:** The Company recognizes that the Executive has experiences beyond the scope of the role he will fulfill for the Company, however Executive's performance will be evaluated based upon his ability to maintain a tight focus on the executive management role described above.

## Exhibit B
Performance Bonus.

INTENTIONALLY OMITTED

## Exhibit C

    1.    The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Workscape, Inc. (the "Company") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company.

    \_\_\_\_    No inventions or improvements.

    \_\_\_\_    See below.

    \_\_\_\_    Due to confidentiality agreements with a prior employer, I cannot disclose certain inventions that would otherwise be included on the above-described list.

    \_\_\_\_    Additional sheets attached.

    2.    I propose to bring to my employment the following devices, materials and documents of a former employer or other person to whom I have an obligation of confidentiality that are not generally available to the public, which materials and documents may be used in my employment pursuant to the express written authorization of my former employer or such other person (a copy of which is attached hereto):

    \_\_\_\_    No materials or documents.

    \_\_\_\_    See below.

    \_\_\_\_    Additional sheets attached.

_____
Signature
Print Name:  Michael Gioja
Date: December \_\_, 2002.

*(2) Ensure copy placed in file.*

Mike Gioja
217 Plattekill Rd.,
Greenville, NY 12083

February 15, 2005

Dear Mike:

Reference is hereby made to that certain Amended and Restated Employment Agreement (the "Employment Agreement"), dated as of May 7, 2004, by and between you and Workscape, Inc. ("Workscape" or the "Company"); all capitalized terms used and not defined herein shall have the meanings ascribed thereto in the Employment Agreement.

This letter agreement (the "Agreement") is written in order to notify you, pursuant to the terms of Section 2 of the Employment Agreement, of the Company's election to not extend the Term of the Employment Agreement, and to offer the following terms and conditions in connection with such election.

1. **Terms**

a.   You acknowledge that, pursuant to the last sentence of Section 18 of the Employment Agreement, Section 6(f) does not apply to this election of the Company, which shall be deemed be a non-renewal of the Employment Agreement upon the expiration of the current term. Nonetheless, in connection with this election, the Company agrees, in consideration of the terms hereof, to provide the following:

   (i)    The Employment Agreement will terminate as of February 18, 2005 (the "Separation Date"); provided, that, except as expressly modified by the terms hereof, the terms of the Agreement that survive termination are hereby ratified and confirmed including, without limitation, those set forth in Sections 7, 8 and 9 of the Employment Agreement.

   (ii)   Workscape will continue to pay you your salary for a period of six (6) months following the Separation Date at the rate in effect on such date, periodically and in accordance with the Company's prevailing payroll practices;

   (iii)  If you accept other employment or engage in your own business prior to August 18, 2005, you shall forthwith notify the Company and the Company shall be entitled to set off from amounts due to you for salary continuation under Section 1.a(i) after the date you first receive other compensation, the compensation amounts paid to you in respect of such other employment or business activity;

   (iv)  You acknowledge that the foregoing salary continuation and the other items set forth in this Section 1 are the sole monetary compensation to be paid to you following the execution of this Agreement, except for any accrued, unused vacation, which will be paid to you on the

Separation Date, and reimbursement of expenses in accordance with Section 10 hereof.

(v)     Workscape will continue your medical and dental insurance coverage until August 18, 2005 as if your employment had continued through such date, paying the same proportion of premiums that the Company was paying as of the Separation Date, consistent with your medical and dental insurance plan documents.

(vi)    The Company shall extend the exercise period for any vested options on the Separation Date to a period equal to six (6) months following the Separation Date, that is, until August 18, 2005.

(vii)   The Company will pay for the cost for you to move personal items from the apartment you have been renting in Massachusetts in connection with your employment to your home in New York.

2.      **Releases of Claims**

a.      In connection with the foregoing, you agree to accept and be bound by the following:

IN CONSIDERATION OF THE TERMS DESCRIBED ABOVE, I HEREBY SETTLE, WAIVE, RELEASE, AND DISCHARGE (ON BEHALF OF MY HEIRS, EXECUTOR AND ADMINISTRATORS) ANY AND ALL CLAIMS, DEMANDS, ACTIONS, OR CAUSES OF ACTION, KNOWN OR UNKNOWN, WHICH I HAVE OR MAY HAVE AGAINST WORKSCAPE, INC., (INCLUDING ANY PREDECESSOR OR SUCCESSOR CORPORATIONS), PRESENT AND FORMER DIRECTORS, OFFICERS, SHAREHOLDERS, AGENTS, ATTORNEYS, OR EMPLOYEES (COLLECTIVELY REFERRED TO IN THIS SECTION AS "THE COMPANY PARTIES"). I RECOGNIZE THAT BY SIGNING THIS AGREEMENT, I MAY BE GIVING UP SOME CLAIM, DEMAND, OR CAUSE OF ACTION WHICH I MAY HAVE, WHETHER KNOWN OR UNKNOWN.

I EXPRESSLY ACKNOWLEDGE THAT THE TERMS HEREOF INCLUDE CONSIDERATION FOR THE SETTLEMENT, WAIVER, RELEASE, AND DISCHARGE OF ANY AND ALL CLAIMS OR ACTIONS ARISING FROM OR DURING MY EMPLOYMENT, THE TERMS AND CONDITIONS OF MY EMPLOYMENT AND EMPLOYMENT AGREEMENT, OR THE TERMINATION OF MY EMPLOYMENT, INCLUDING CLAIMS ARISING UNDER THE FAIR LABOR STANDARDS ACT OF 1939; CLAIMS OF EMPLOYMENT DISCRIMINATION ARISING UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED BY THE CIVIL RIGHTS ACT OF 1991; THE AMERICANS WITH DISABILITIES ACT OF 1990; THE FAMILY AND MEDICAL LEAVE ACT OF 1993; THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED BY THE OLDER WORKERS BENFIT PROTECTION ACT; AND/OR CLAIMS ARISING UNDER STATE, FEDERAL, OR LOCAL LAW OR ORDINANCE

COVERING AGE DISCRIMINATION, WRONGFUL TERMINATION, OR
ANY CLAIM ARISING UNDER EXPRESS OR IMPLIED CONTRACT,
TORT, PUBLIC POLICY, COMMON LAW, OR ANY FEDERAL, STATE, OR
LOCAL STATUTE (INCLUDING BUT NOT LIMITED TO STATE AND
LOCAL ANTI-DISCRIMINATION STATUTES), ORDINANCE,
REGULATION OR CONSTITUTIONAL PROVISION.

b.  In connection with this Agreement, the Company agrees to accept and be bound
by the following:

IN EXCHANGE FOR THE RELEASE PROVIDED ABOVE AND YOUR
EXECUTION OF THIS AGREEMENT, THE COMPANY (INCLUDING ANY
PREDECESSOR OR SUCCESSOR CORPORATIONS) HEREBY SETTLES,
WAIVES, RELEASES, AND DISCHARGES YOU AND YOUR HEIRS,
ESTATE, EXECUTOR AND ADMINISTRATORS, FROM ANY AND ALL
CLAIMS, DEMANDS, ACTIONS, OR CAUSES OF ACTION, KNOWN OR
UNKNOWN, WHICH THE COMPANY HAS OR MAY HAVE AGAINST
YOU. THE COMPANY EXPRESSLY ACKNOWLEDGES THAT THE
TERMS HEREOF INCLUDE CONSIDERATION FOR THE SETTLEMENT,
WAIVER, RELEASE, AND DISCHARGE OF ANY AND ALL CLAIMS OR
ACTIONS ARISING FROM OR DURING YOUR EMPLOYMENT, THE
TERMS AND CONDITIONS OF YOUR EMPLOYMENT AND
EMPLOYMENT AGREEMENT, AND THE TERMINATION OF YOUR
EMPLOYMENT.

c.  NOTWITHSTANDING THE FOREGOING SUBSECTIONS, NEITHER YOU
NOR THE COMPANY RELEASES ANY CLAIMS THAT ARISE OUT OF OR
RELATE TO THIS AGREEMENT.

**3.    Existing Agreement; Confidentiality.**

a.  I acknowledge that, in connection with my employment by Workscape, I am a
party to the Employment Agreement, which includes terms regarding confidentiality,
assignment of inventions, and certain other matters, and that I understand that the
terms of this Agreement are in addition to those terms, and in no way supercede the
terms of the Employment Agreement unless otherwise expressly specified. In
connection with the foregoing, I acknowledge that the terms of Sections 7 through 18
of the Employment Agreement remain in full force and effect and survive pursuant to
their terms, and the Company and I further agree that the Restricted Period shall end
on February 18, 2005. Further, I agree that I (a) shall keep the terms and conditions
of this Agreement confidential, and will not discuss them with, or disclose them to,
any other persons including, but not limited to, former or current employees or
customers of Workscape (but excluding my spouse, immediate family, attorneys,
accountants or tax preparers, who shall be advised of the necessity to maintain
confidentiality), except as required by law or pursuant to legal or administrative

proceedings; and (b) shall not make negative or disparaging comments, oral or written, about Workscape, its products, policies, business, officers, directors, or stockholders.   In the event that I become legally compelled to disclose any confidential information as described in Section 7(b) of the Employment Agreement, I will provide Workscape with prompt notice in advance of such disclosure so that it may   seek   a   protective   order   or   other   appropriate   remedy.

b.  The Company agrees that it (a) shall keep the terms and conditions of this Agreement confidential, and will not discuss them with, or disclose them to, any other persons including, but not limited to, former or current employees or customers of Workscape (but excluding current Workscape employees who need to know such information in order to perform their jobs, members of the Company's Board of Directors, and Workscape's attorneys, accountants or tax preparers, all of whom shall be advised of the necessity to maintain confidentiality), except as required by law or pursuant to legal or administrative proceedings; and (b) shall not make negative or disparaging comments, oral or written, about you, either personally or professionally.

4.    Cooperation.    You agree that you will cooperate fully, at reasonable and mutually convenient times requested by the Company, with any and all Workscape investigations or legal actions arising out of matters with which you were involved as an employee of Workscape, or of which you have direct knowledge or which occurred, during the period of your employment with Workscape.  The Company will promptly reimburse you for any out-of-pocket expenses you incur in connection with providing such cooperation; moreover, the Company will pay you an hourly fee of $200 for any such cooperation that you provide after August 18, 2005, except that no fee shall be paid for                                    giving                                    testimony.

5.    Remedies.  You acknowledge that if the Board, by resolution of a majority of its members, determines reasonably and in good faith that you have materially violated the provisions of this Agreement, in addition to other remedies which Workscape may have, you will forfeit any and all remaining payments or benefits available to you under this Agreement, and Workscape may seek any other remedies available at law, including damages                    and                    injunctive                    relief.

6.  Review, Waiting Periods and Revocation

a.  You acknowledge that you have been informed of your right to consult with an attorney of your choice prior to signing this Agreement, and that you have been given 45 days to review and consider the contents of this Agreement.  You acknowledge that this Agreement is revocable for a seven-day period after its execution by you, after which it will become automatically effective and enforceable, without any further act by you, unless specifically revoked by you during such seven-day period.

b.  Your signature below indicates that you acknowledge that you have read this

Agreement, fully understand its meaning and legal effect, have entered into this Agreement voluntarily, and that you have been advised by Workscape in writing to consult with an attorney prior to signing this Agreement, if you so desire.

c. You acknowledge that if you execute this Agreement at any time prior to the end of the 45 day period during which you may consider this Agreement, such early execution was a knowing and voluntary waiver of your right to review and consider the contents of this Agreement for 45 days and was due to your desire to receive the consideration provided under this Agreement more quickly and your belief that you had ample time in which to consider, understand, and review this Agreement with an attorney.

d. You agree that if you revoke this Agreement within seven days of signing it, all of its provisions shall be void and unenforceable.

e. If you wish to revoke this Agreement within seven days after signing it, then the revocation should be in writing, stating, "I hereby revoke the Severance Agreement between myself and Workscape, Inc.," and mailed or delivered to the following address, so as to be received by the seventh day after your execution of this Agreement: Workscape, Inc., c/o Rick Olin, 500 Old Connecticut Path, Building A, Framingham, MA 01701, fax (508) 861-6257.

7. Survivorship. Should you die following the execution of this Agreement but prior to the date that all benefits have been paid, your estate or your heirs will receive any remaining applicable Severance Benefits due in a lump sum.

8. Severability. If any provision of this Agreement other than the releases in paragraph 2 hereof is declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement. In the event that the either of the releases in paragraph 2 hereof is declared to be unenforceable, in whole or in part, then this Agreement shall be void in its entirety and you will return all payment which you received pursuant to this Agreement.

9. Miscellaneous. Except as described herein with respect to the Employment Agreement, and any written stock options agreements between you and the Company, as may be modified by Section 1(a)(vi) hereof, this Agreement contains the complete understanding between you and Workscape relating to your employment and cannot be changed unless by written agreement of both parties. This Agreement is governed by the law of the Commonwealth of Massachusetts. Unless otherwise indicated, all notices to Workscape shall be sent to the following address: Workscape, Inc., Attn: General Counsel, 500 Old Connecticut Path, Building A, Framingham, MA 01701.

10. Return of Company Assets; Submission and Payment of Expenses. You agree to return any and all company assets in your possession, including but not limited to any and all computer equipment, telephones and related equipment, pagers, and/or Personal

Digital Assistants no later than February 28, 2005. You agree and understand that you are required to submit all outstanding expenses for approval in a timely manner, not to exceed 45 days from your Separation Date. Workscape agrees to pay all valid and approved expenses in a timely manner and consistent with our policies and practices.

We appreciate your past contributions and wish you the best in your future endeavors.

WORKSCAPE, INC.

By: _____
Timothy H. Clifford,
President and CEO

Accepted and Agreed:

Signature _____
Michael Gioja

Date: 2/17 ,2005

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

THIS AMENDED AND RESTATED EMPLOYMENT AGREEMENT, is dated as of May 7, 2004 (the "Amendment Date") and amends and restates that certain Employment Agreement between the parties dated as of December 9, 2002 (the "Effective Date"), between Workscape, Inc., a Delaware corporation (the "Company"), and **Michael Gioja** (the "Executive").

### RECITALS:

WHEREAS, the Company has employed the Executive since the Effective Date, and the Company and the Executive desire to extend the employment of the Executive, on the terms and conditions set forth herein.

NOW, THEREFORE, on the basis of the foregoing premises and in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency are hereby acknowledged, the parties hereby agree as follows.

### Section 1.  Employment

(a)     The Company agrees to employ the Executive on the terms and subject to the conditions hereinafter set forth. Subject to the terms and conditions contained herein, the Executive shall serve as Executive Vice President, Products, Services and Technology, of the Company and, in such capacity, shall be subject to the supervision of the Chief Executive Officer and shall have such duties as are typically performed by an Executive Vice President, Products, Services and Technology, of a corporation of a similar size and industry as the Company, including, initially, those set forth on **Exhibit A**, together with such additional duties as may be reasonably assigned to the Executive from time to time by the Chief Executive Officer of the Company. The principal locations of the Executive's employment shall be at the Company's offices in Framingham and Natick, Massachusetts, or such other place as the Company determines to locate the principal engineering facility of the Company. Provided, however, the Company acknowledges and agrees that the Executive will perform some of his employment responsibilities from his home in New York and that the Executive will not be required to relocate to Massachusetts.

(b)     The Executive hereby accepts such employment and agrees to undertake the duties and responsibilities inherent in the position of Executive Vice President, Products, Services and Technology and such other duties and responsibilities as the Chief Executive Officer shall from time to time assign to him consistent with his duties as described above. Except as provided in Section 4 below, the Executive agrees to devote his entire business time, attention and energies to the business and interests of the Company during the Employment Term (as defined in Section 2 below). The Executive agrees to abide by the rules, regulations, instructions, personnel practices and policies of the Company and any changes therein which may be adopted from time to time by the Company. The Company acknowledges and agrees that any such rules, regulations, instructions, practices and policies, and any such changes thereto shall not be applied in a discriminatory manner to the Executive. The Executive acknowledges receipt of copies of all such rules and policies committed to writing as of the date of this Agreement.

### Section 2.    Term.

The Executive's employment hereunder shall commence on the Effective Date and, unless earlier terminated pursuant to Section 6 hereof, shall continue during the period ending on May 6, 2005 (the "Term"). Thereafter, the Employment Term (as defined below) shall extend automatically for consecutive one year periods unless either party delivers no less than 30 days written notice prior to an anniversary date of its election to terminate this Agreement. The Term,

together with any extension pursuant to this Section 2, is referred to herein as the "Employment Term." The Employment Term shall terminate upon any termination of the Executive's employment pursuant to Section 6.

Section 3.  Compensation. Commencing on the Amendment Date, and thereafter during the Employment Term, the Executive shall be entitled to the following compensation and benefits:

(a)    Salary. As compensation for the performance of the Executive's services hereunder, during the period of the Employment Term subsequent to May 24, 2004, the Company shall pay to the Executive a salary (the "Salary") at a rate equal to Two Hundred Thirty-One Thousand Seven Hundred Fifty Dollars ($231,750) per annum. In the event that this Agreement remains in effect following May 6, 2005, the Company shall continue to pay the Executive's Salary at the rate payable on the date immediately preceding the date that begins the extension of the Employment Term unless the parties otherwise mutually agree in writing. The Salary shall be payable in accordance with the payroll practices of the Company as the same shall exist from time to time.

(b)    Bonus Plans. (i) *Corporate Bonus.* The Executive shall be eligible to receive an annual cash bonus (the "Corporate Bonus") of up to fifty percent (50%) of the Executive's annual Salary; the payment and amount of the Corporate Bonus shall be determined by the Board of Directors of the Company (the "Board of Directors") in its sole and absolute discretion and is payable for all Company fiscal years, based upon achievement of the Company's objectives for the applicable fiscal year, and the Executive's performance in his role as measured against the Management Business Objectives ("MBOs") established for him by the Chief Executive Officer. MBOs for all periods during the Employment Term shall be established as part of the Company's annual performance review and management process. The Executive shall be entitled to be considered for such Corporate Bonus for all years for which the Company employs him on the last day of the applicable fiscal year, *provided* that the Executive is employed by the Company on the date that the Corporate Bonus is paid. Notwithstanding the foregoing, nothing in this Section 3(b)(i) shall limit the Board of Directors' discretion to determine the payment and amount of the Corporate Bonus.

(ii) *Performance Bonus.* The parties acknowledge and agree that (i) the initial installment of the Performance Bonus due under the original terms of this Employment Agreement equal to $42,187.50 was paid to the Employee and (ii) the second installment, in an equal amount (in lieu of the terms originally established in this Agreement) was paid to the Employee in two equal installments of $21,093.75 each (the "Performance Bonus").

(c)    Option Grants. (1) Subject to the terms and conditions of the Company's standard form of Option Agreement, the Company agrees to grant to the Executive under its 2000 Equity Incentive Plan an option to purchase up to Two Million Five Hundred Thousand (2,500,000) shares of its Class A Common Stock, $.01 par value per share, at a price per share equal to the fair market value of the shares of common stock of the Company at the time of the grant, which option shall vest as follows:

(i)    2,000,000 shares shall vest ratably over a four-year period commencing on the date the Board of Directors approved such grant; and

(ii)    500,000 shares shall vest immediately following the approval of such grant at the Board of Directors meeting following the execution of this Amended and Restated Employment Agreement.

(2) In the event of the consummation of a Change of Control (as defined below) transaction, fifty percent (50%) of the then-remaining unvested options granted to the Executive under Section 3(c)(i) above shall become immediately vested and exercisable. For purposes hereof, "Change of Control" means:

(i)    the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of more than 50% of either (x) the then-outstanding shares of common stock of the Company that are not owned by the Company or any corporation controlled by the Company ("Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors ("Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following shall not constitute a Change of Control:  (a) any acquisition by the Company or any corporation controlled by the Company, or (b) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or

(ii)    consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of either the then outstanding shares of common stock or the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries); or

(iii)    approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

(d)    Benefits. In addition to the Salary, Bonuses, if any, and Option Grant described above, (i) the Company, at its cost, shall provide to the Executive appropriate housing accommodations, including payment of utilities, in the vicinity of its principal offices and (ii) the Executive shall be entitled to participate in health, insurance, and other benefits provided to other senior executives of the Company in accordance with the Company policy in effect from time to time on terms no less favorable than those available to such senior executives, including the same number of vacation days, holidays and sick days as are generally allowed to other senior executives of the Company in accordance with the Company policy in effect from time to time.

3

Section 4.  **Exclusivity.**  During the Employment Term, the Executive shall devote his full business time to the business of the Company, shall faithfully serve the Company, shall in all respects conform to and comply with the lawful and reasonable directions and instructions given to him by the Chief Executive Officer in accordance with the terms of this Agreement, shall use his best efforts to promote and serve the interests of the Company and shall not engage in any other business activity, whether or not such activity shall be engaged in for pecuniary profit, except that the Executive may (i) participate in the activities of professional trade organizations related to the business of the Company; (ii) engage in personal investing activities and (iii) serve as a member of the board of directors of other corporations, *provided* that activities set forth in these clauses (i), (ii) and (iii) either singly or in the aggregate, do not interfere in any material respect with the services to be provided by the Executive hereunder.

Section 5.  **Reimbursement for Expenses.**  The Executive is authorized to incur reasonable expenses in the discharge of the services to be performed hereunder, including expenses for travel, entertainment, lodging and similar items in accordance with the Company's expense reimbursement policy, as the same may be modified by the Company from time to time.  The Company shall reimburse the Executive for all such proper expenses upon presentation by the Executive of itemized accounts of such expenditures.

Section 6.  **Termination and Default.**

(a)  **Death.**  The Executive's employment shall automatically terminate upon his death and, upon such event, the Executive's estate shall be entitled to receive the amounts specified in Section 6(f) below.

(b)  **Disability.**  If the Executive is unable to perform the duties required of him under this Agreement because of a Disability (as defined below), the Employment Term shall continue for a period of thirty days thereafter.  As used in this Agreement, the term "Disability" shall mean the inability of the Executive with reasonable accommodation as may be required by State or Federal law, due to a physical or mental disability, for a period of 120 days, whether or not consecutive, during any 360-day period to perform the services contemplated under this Agreement.  A determination of Disability shall be made by a physician satisfactory to both the Executive and the Company, provided that if the Executive and the Company do not agree on a physician, the Executive and the Company shall each select a physician and these two together shall select a third physician; this third physician's determination as to Disability shall be binding on all parties.

(c)  **Cause.**  The Company may terminate the Executive's employment at any time without Cause (as defined below), upon 60 days' written notice.  In the event of termination pursuant to this Section 6(c) for Cause, the Company shall deliver to the Executive written notice setting forth the basis for such termination, which notice shall specifically set forth in detail the nature of the Cause which is the reason for such termination.  Termination of the Executive's employment with Cause shall be effective upon delivery of such notice of termination, except as provided in sub-section (B) below.  Amounts owed by the Company in respect of Salary, Bonuses, benefits (including accrued unused vacation) or reimbursement for expenses or other amounts shall be paid promptly upon any termination; provided, however, in the event of a termination for Cause, the Company shall be relieved of all obligations to pay any Salary or benefits accrued or Bonus amounts owed following the effective date of termination.  For purposes of this Agreement, "Cause" shall mean:

(A) a reasonable and good faith determination by the Company that the Executive (1) committed any act involving dishonesty in any material respect, fraud or disloyalty, or breach of his fiduciary duty, each with respect to the

4

Company, (2) engaged in unprofessional or unethical conduct or conducted himself in a manner which is materially detrimental to the business or reputation of the Company, (3) engaged in gross negligence or willful misconduct with respect to the Company, or (4) committed any material breach of the Agreement or any other agreement with the Company;

(B) the Executive's failure (except where due to a Disability), neglect or refusal to substantially perform his duties, including (1) those described in Exhibit A, under "Other Primary Responsibilities" and (2) to be a constructive contributor to the Executive Committee, which failure, neglect or refusal shall not have been corrected by the Executive within 30 days of receipt by the Executive of written notice from the Company of such failure, neglect or refusal, which notice shall specifically set forth in reasonable detail the nature of said failure, neglect or refusal;

(C)    any continued or repeated absence from the Company, unless such absence is (1) approved or excused by the Chief Executive Officer; (2) the result of the Executive's Disability (in which event the provisions of Section 6(b) hereof shall control); or (3) is protected by any applicable federal or state law;

(D)    use of illegal drugs by the Executive or repeated drunkenness; or

(E)    conviction of the Executive or entry of a plea of guilty or nolo contendere to a felony, or to a crime or offense involving the property of the Company or that is reasonably likely to injure the reputation or business of the Company.

(d)    Good Reason. The Executive may terminate his employment for "Good Reason" following a Substantial Breach (as hereinafter defined), but only if such Substantial Breach shall not have been corrected by the Company within thirty (30) days of receipt by the Company of written notice from the Executive of the occurrence of such Substantial Breach, which notice shall specifically set forth the nature of the Substantial Breach which is the reason for such resignation. The term "Substantial Breach" means (i) the failure by the Company to pay to the Executive the Salary or Bonuses, if any, in accordance with Sections 3(a) and 3(b) hereof; (ii) the failure by the Company to allow the Executive to participate in the Company's employee benefit plans generally available from time to time to senior executives of the Company; (iii) a material breach by the Company of this Agreement or any other agreement with the Executive; or (iv) a material reduction or material diminution by the Company in the Executive's title, responsibilities, authority or reporting structure from that which existed on the Amendment Date; provided, however, that the term "Substantial Breach" shall not include a termination of the Executive's employment hereunder pursuant to Sections 6(a), (b) or (c) hereof. The date of termination of the Executive's employment under this Section 6(d) shall be the effective date of any resignation specified in writing by the Executive, which shall not be less than thirty (30) days after receipt by the Company of written notice of such resignation, provided that such resignation shall not be effective pursuant to this Section 6(d) and the Substantial Breach shall be deemed to have been cured if such Substantial Breach is corrected by the Company during such 30-day period.

(e)     Without Good Reason.  The Executive may terminate his employment without Good Reason at any time upon sixty days' written notice to the Company.

(f)     Severance Benefits.  In the event that the Executive's employment is terminated by the Company without Cause or by the Executive with Good Reason (a "Termination Event"), (i) the Executive shall continue to receive the Salary (less any applicable withholding or similar taxes) at the rate in effect hereunder on the date of such termination periodically, in accordance with the Company's prevailing payroll practices, for a period equal to six months following the date of such termination (the "Severance Term"), (ii) to the extent permissible under the Company's benefit plans, the Executive shall continue to receive any benefits provided him (including any family health coverage benefits offered by the Company's health plans) as of the date of such termination in accordance with Section 3(d) hereof during the Severance Term (and in the event not permissible, the Company will pay the applicable amount of the premium for health and dental coverage under COBRA), (iii) the Company shall extend the exercise period for any vested options on the termination date to a period equal to the Severance Term and (iv) with respect to the Corporate Bonus, in the event that the Executive satisfies all of the conditions for qualification other than being an employee on the applicable payment date (i.e., the Executive is terminated without Cause or resigns for Good Reason between the last date of the applicable fiscal year and the payment date for such year's Corporate Bonus), the Company shall nonetheless pay the Corporate Bonus, if any, to the Executive. If the Executive accepts other employment or engages in his own business prior to the last date of the Severance Term, the Executive shall forthwith notify the Company and the Company shall be entitled to set off from amounts due the Executive for salary continuation under this Section 6(f) after the date Executive first receives other compensation, the compensation amounts paid to the Executive in respect of such other employment or business activity.

Section 7.   Secrecy and Non-Competition.

(a)     No Competing Employment.  The Executive acknowledges that the agreements and covenants contained in this Section 7 are essential to protect the value of the Company's business and assets and by his employment with the Company, the Executive will obtain knowledge, contacts, know-how, training and experience regarding the Company and its proprietary information, and there is a substantial probability that such knowledge, know-how, contacts, training and experience could be used to the substantial advantage of a competitor of the Company and to the Company's substantial detriment. Therefore, the Executive agrees that for the period commencing on the date of this Agreement and ending on the second anniversary of the termination of the Executive's employment hereunder, except in the event of termination by the Company without Cause or by the Executive with Good Reason such period shall end on the date that is six months after the termination of the Executive's employment (either such period, as applicable, is hereinafter referred to as the "Restricted Period"), the Executive shall not participate or engage, directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder (except for the ownership of a less than 5% stock interest in a publicly-traded corporation), partner, joint venturer, investor or otherwise, in any business activities if such activity competes with the Company's business activities, including, without limitation, those expressly proposed to be undertaken by the Company or any of its subsidiaries as of the termination of the Executive's employment.

6

(b)    Nondisclosure of Confidential Information. The Executive, except in connection with his employment hereunder, shall not disclose to any person or entity or use, either during the Employment Term or for a period of five (5) years thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by the Executive in the course of his employment with the Company or any predecessor to the Company's business or, if acquired following the Employment Term, such information which, to the Executive's knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to the Company or any of its subsidiaries or affiliates, relating to the Company, its subsidiaries or affiliates, including but not limited to information regarding customers, vendors, suppliers, trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any of the Company's products or services), business plans, code books, invoices and other financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, which is or was used or useful in the business of the Company or any subsidiaries or affiliates thereof. The Executive agrees and acknowledges that all of such information, in any form, and copies and extracts thereof, are and shall remain the sole and exclusive property of the Company, and upon termination of his employment with the Company, the Executive shall return to the Company the originals and all copies of any such information provided to or acquired by the Executive in connection with the performance of his duties for the Company, and shall return to the Company all files, correspondence and/or other communications received, maintained and/or originated by the Executive during the course of his employment. Notwithstanding the foregoing, the obligations of the Executive in this Section 7(b) shall not apply to confidential information (i) which at the date hereof or thereafter becomes a matter of public knowledge without breach by the Executive or his representatives of this Agreement; or (ii) which is obtained by the Executive from a person, firm, or entity (other than the Company or an affiliate of the Company) under circumstances permitting its disclosure to others.

(c)    No Interference. During the Restricted Period, the Executive shall not, whether for his own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company), directly or indirectly solicit, endeavor to entice away from the Company or its subsidiaries, or otherwise interfere with the relationship of the Company or its subsidiaries with any person who, to the knowledge of the Executive, is employed by the Company or its subsidiaries (including, but not limited to, any independent sales representatives), or any person who is, or was within the twelve-month period prior to such prohibited activity, a customer, client or prospect (which shall be defined as an entity with which the Company can reasonably demonstrate it had sales activity) of the Company, its predecessors or any of its subsidiaries. The placement of any general classified or "help wanted" advertisements and/or general solicitations to the public at large shall not constitute a violation of this Section 7(c) unless the Executive's name is contained in such advertisements or solicitations.

(d)    Assignments of Inventions and Original Works. Executive has attached hereto, on Exhibit C, a complete list of all inventions, original works of authorship, developments, improvements, and trade secrets that he has, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of his employment with the Company, that he considers to be his property or the property of third parties and that he wishes to have excluded from the scope of this Agreement. If disclosure of an item on Exhibit C would cause him to violate any prior confidentiality agreement, Executive understands that he is not to list such in Exhibit C but is to inform the Company that all items have not been listed for that

7

reason. A space is provided on <u>Exhibit C</u> for such purpose. If no list is attached, Executive represents that there are no such items.

(ii)     Executive agrees that he will make prompt and full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and will and hereby do assign to the Company all of his right, title and interest in and to any ideas, inventions, original works of authorship, mask works, developments, improvements or trade secrets which he may solely or jointly develop, conceive or reduce to practice, or cause to be developed, conceived or reduced to practice during the period of his employment with the Company and which in any way relate to the actual or anticipated business activities of the Company or result from work which he does for the Company or such business of the Company ("Developments"). All Developments devised, made, developed or perfected after termination of his employment with the Company are within the provisions of the preceding sentence if conceived in whole or material part during the period of his employment or with the use of Company resources or facilities. Executive acknowledges that all original works of authorship which are made by him (solely or jointly with others) within the scope of his employment and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C., Section 101).

(iii)    Executive will assist the Company in every reasonable way to obtain and from time to time enforce United States and foreign proprietary rights relating to any and all Developments in any and all countries. To that end Executive will execute, verify and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and his assignment thereof to the Company. In addition, Executive will execute, verify and deliver all assignments of such proprietary rights to the Company or its designee. Executive's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue beyond the termination of his employment, but the Company shall compensate Executive at a reasonable rate after his termination for the time actually spent by him at the Company's request on such assistance. During and after the Executive's employment with the Company, the Company shall bear any and all expenses incurred by Executive in fulfilling his obligations under this Section 7(d). In the event the Company is unable for any reason, after reasonable effort, to secure Executive's signature on any document needed in connection with the actions specified in this paragraph (iii), Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as his agent and attorney-in-fact, to act for and in his behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purpose of this paragraph (iii) with the same legal force and effect as if executed by him. Executive hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which he now or may hereafter have for infringement of any proprietary rights assigned by him to the Company.

(iv)     In addition to his obligations under paragraph (ii) above, during the period of his employment, Executive will promptly disclose to the Company fully and in writing all patent applications filed by him or on his behalf. Executive agrees to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all proprietary information developed by him and all inventions made by him during

8

the period of his employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

(v)     The assignments under this Section shall not apply to any development that fully qualifies under the provisions of any applicable federal or state law that restricts the enforcement of invention assignment.  Executive agrees to advise the Company promptly in writing of any inventions in which he believes he has legal rights.

Section 8.    **Injunctive Relief.** Without intending to limit the remedies available to the Company, the Executive acknowledges that a breach of any of the covenants contained in Section 7 hereof may result in material irreparable injury to the Company or its subsidiaries or affiliates for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach of Section 7 hereof, restraining the Executive from engaging in activities prohibited by Section 7 hereof or such other relief as may be required specifically to enforce any of the covenants in Section 7 hereof.

Section 9.    **Extension of Restricted Period.** In addition to the remedies the Company may seek and obtain pursuant to Section 8 of this Agreement, the Restricted Period shall be extended by any and all periods during which the Executive shall be found by a court to have been in violation of the covenants contained in Section 7 hereof.

Section  10.   **Representations and Warranties of the Executive.** The Executive represents and warrants to the Company as follows:

(a)     This Agreement, upon execution and delivery by the Executive, will be duly executed and delivered by the Executive and (assuming due execution and delivery hereof by the Company) will be the valid and binding obligations of the Executive and the Company enforceable against both, respectively, in accordance with its terms.

(b)     Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby nor the performance of this Agreement in accordance with its terms and conditions by the Executive (i) requires the approval or consent of any governmental body or of any other person or (ii) conflicts with or results in any breach or violation of, or constitutes (or with notice or lapse of time or both would constitute) a default under, any agreement, instrument, judgment, decree, order, statute, rule, permit or governmental regulation applicable to the Executive.  Without limiting the generality of the foregoing, the Executive is not a party to any non-competition, non-solicitation, no hire or similar agreement (other than with the Company) that restricts in any way the Executive's ability to comply with this Agreement, fulfill his obligations hereunder or engage in the Company's business.

(c)     The Executive agrees that he will not, during his employment with the Company, improperly use or disclose any confidential or proprietary information or trade secrets of any former employers or companies, if any, and that he will not bring onto the premises of the Company any unpublished documents or any property belonging to his former employers or companies unless consented to in writing by said employers or companies. Further, the Executive agrees to indemnify and hold harmless the Company for any claims or liabilities (including reasonable attorneys fees) related to any breach by the Executive of the terms of this Section 10(c) as determined by final adjudication by a court of competent jurisdiction.

**Section 11.  Successors and Assigns; No Third-Party Beneficiaries.**  This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of each of the parties, including, but not limited to, the Executive's heirs and the personal representatives of the Executive's estate; *provided, however,* that neither party shall assign or delegate any of the obligations created under this Agreement without the prior written consent of the other party.  Notwithstanding the foregoing, the Company shall have the unrestricted right to assign this Agreement and to delegate all or any part of its obligations hereunder either to (i) any corporation with which, or into which, the Company may be merged or which may succeed to its assets or business, or (ii) any of its subsidiaries or affiliates.  Nothing in this Agreement shall confer upon any person or entity not a party to this Agreement, or the legal representatives of such person or entity, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.  This Agreement shall automatically be binding upon any successor of the Company.

**Section 12.  Waiver and Amendments.**  Any waiver, alteration, amendment or modification of any of the terms of this Agreement shall be valid only if made in writing and signed by the parties hereto; *provided, however,* that any such waiver, alteration, amendment or modification is consented to on the Company's behalf by the Chief Executive Officer.  No waiver by either of the parties hereto of their rights hereunder shall be deemed to constitute a waiver with respect to any subsequent occurrences or transactions hereunder unless such waiver specifically states that it is to be construed as a continuing waiver.

**Section 13.  Severability and Governing Law.**  The Executive acknowledges and agrees that the covenants set forth in Section 7 hereof are reasonable and valid in geographical and temporal scope and in all other respects.  If any of such covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.  This agreement shall be governed by and construed in accordance with the laws of the state of  Delaware applicable to contracts made and to be performed entirely within such state.

**Section 14.  Notices.**

(a)    All communications under this Agreement shall be in writing and shall be delivered by hand or facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid;

(1)    if to the Executive, at 217 Plattekill Rd., Greenville, NY 12083 (facsimile: (518) 966-4955), or at such other address or facsimile number as the Executive may have furnished the Company in writing.

(2)    if to the Company, at 500 Old Connecticut Path, Framingham, MA 01701 (facsimile: (508) 861-6257), marked for the attention of the General Counsel, or at such other address or facsimile number as it may have furnished in writing to the Executive, or .

(b)    Any notice so addressed shall be deemed to be received: if delivered by hand or facsimile, on the date of such delivery; if mailed by courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

Section 15.   **Section Headings.**  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof, affect the meaning or interpretation of this Agreement or of any term or provision hereof.

Section 16.   **Entire Agreement.**  This Agreement, and the exhibits attached hereto, constitute the entire understanding and agreement of the parties hereto regarding the employment of the Executive.   This Agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter of this Agreement.

Section 17.   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

Section 18.   **Survival of Operative Sections.**   Upon any termination of the Executive's employment, the provisions of sections 6 (f) and 7 through 18 of this Agreement shall survive to the extent necessary to give effect to the provisions thereof.  If the Executive's employment terminates for any reason, the Company shall pay to the Executive all Salary, accrued and unpaid vacation, and expenses accrued but unpaid hereunder through the date of termination and any and all Bonus amounts as may otherwise be provided in Sections 3 and 6 above. The Executive acknowledges that the terms of Section 6(f) shall apply only to a termination and shall not apply to the election of the Company not to renew this Agreement upon the expiration of any applicable term.

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Agreement as of the date first above written.

WORKSCAPE, INC.

By: _____

Name: Timothy _____

Title: _____

_____

Michael Gioja

11

## Exhibit A

Further to the provisions of Section 1 of the Agreement to which this Exhibit A is attached, the Executive agrees that his duties shall include the following, and that he shall perform such duties in accordance with the direction of the Chief Executive Officer of the Company and the terms of this Exhibit A:

(1) **Executive management of the following functions:** (a) Product Engineering, (b) Product Management (c) Professional Services and (d) IT Operations.

(2) **Other Primary Responsibilities:**

> (a) **Maintaining Tight Focus:** The Company recognizes that the Executive has experiences beyond the scope of the role he will fulfill for the Company, however Executive's performance will be evaluated based upon his ability to maintain a tight focus on the executive management role described above.

12

**Exhibit B**
Performance Bonus.

INTENTIONALLY OMITTED

## Exhibit C

1.    The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Workscape, Inc. (the "Company") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company.

____    No inventions or improvements.

____    See below.

____    Due to confidentiality agreements with a prior employer, I cannot disclose certain inventions that would otherwise be included on the above-described list.

____    Additional sheets attached.

2.    I propose to bring to my employment the following devices, materials and documents of a former employer or other person to whom I have an obligation of confidentiality that are not generally available to the public, which materials and documents may be used in my employment pursuant to the express written authorization of my former employer or such other person (a copy of which is attached hereto):

____    No materials or documents.

____    See below.

____    Additional sheets attached.

_____
Signature
Print Name:  Michael Gioja
Date:  December ___, 2002.

14

1

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made as of the 4th day of April 2005.

BETWEEN:

        Michael Gioja
        of the City of Greenville, New York
        (hereinafter referred to as the "Employee")

AND:

        WORKSTREAM INC.,
        a corporation incorporated under the laws of Canada
        (hereinafter referred to as the "Employer")

WHEREAS:

The Employer wishes to employ the Employee and the Employee wishes to serve the Employer upon the terms and subject to the conditions herein contained.

NOW THEREFORE in consideration of the premises and the mutual covenants herein and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged by each of the parties, the parties hereto covenant and agree as follows:

### 1. DEFINITIONS

In this agreement, unless the context otherwise specifies or requires, the following terms shall have the following meanings:

    1.1    "Agreement," "hereto," "herein," "hereof," "hereunder" and similar expressions refer to this Agreement and not to any particular section or any particular portion of this Agreement and includes all schedules attached to this Agreement;

    1.2    "Executive Vice President" shall mean the Executive Vice President of the Company;

    1.3    "Court" shall mean a Court of competent jurisdiction;

    1.4    "Parties" shall mean the Parties to this Agreement and "Party" shall mean one of the Parties to this Agreement.

### 2. EMPLOYMENT

    2.1    The Employer agrees to employ the Employee and the Employee agrees to act as Executive Vice President or in such other employment as the Employer and the Employee may from time to time agree and the Employee agrees to serve the Employer upon the terms and subject to the conditions set out in this Agreement.

    2.2    The Employee specifically undertakes and agrees with the Employer that he shall be responsible for the following:

        2.2.1    for fulfilling the title and role of the Executive Vice President of the Employer; and

2

        **2.2.2**   such other duties as may be reasonably required.

### 3.  TERM

**3.1**    The Initial Term of this Agreement shall be a period of one (1) year from the date hereof. Unless written notice is given by either party at least ninety (90) days before the end of the Initial Term or any one (1) year extension thereof (each, a "Renewal Term"), that they wish this Agreement to terminate at the end of the Initial or respective Renewal Term, whichever may apply, this Agreement will be automatically extended by successive Renewal Terms. Any references herein to the "Term" shall include both the Initial Term and any and all Renewal Terms. In the event that this notice is given by the Employer and not the employee, during the initial term, such notice shall be deemed termination of Employee's employment other than for cause and the Employee shall be entitled to the payments set forth in section 10.1.3 hereof.

### 4.  REMUNERATION

**4.1**    In consideration of the Employee's undertaking and the performance of the obligations contained in this Agreement, the Employer shall, unless otherwise agreed upon by all parties to this Agreement, pay and grant the following remuneration to the Employee:

    **4.1.1**   **Base Salary.** The Employee shall be entitled to receive a salary, not less than $200,000.00 (U.S.) per year.

    **4.1.2**   **Bonus.** In addition to the base salary specified in section 4.1.1 the Employee shall be entitled to an aggregate annual bonus of up to $200,000.00 (U.S.) based on certain targets being achieved. The Parties will mutually agree to those targets. Achievement of targets will be assessed on a quarterly basis, and any bonus earned for a particular quarter, as reasonably determined by the Employer, will be paid to the Employee within 30 days after the close of the quarter. In no event shall the actual quarterly bonus payment be less than $12,500.00.

    **4.1.3**   **Stock Options.** In addition to the base salary outlined in section 4.1.1 the Employee shall be granted a stock option to purchase 100,000 shares of common stock of the Employer (the "Option Shares") at a price that is the closing price on the NASDAQ market on the date of the option grant. These options shall vest one third annually over a three (3) year period beginning on the first anniversary of the date of the option grant.

    **4.1.4**   **Restricted Stock Units.** In addition to the base salary outlined in section 4.1.1 the Employee shall be granted 50,000 Restricted Stock Units (the "RSU's"). These RSU's shall vest one-fifth over a five (5) year period, beginning on the first anniversary of the date of the grant.

### 5.  BENEFITS

**5.1**    In consideration of the Employee's undertaking and the performance of the obligations contained in this Agreement, the Employer shall, unless otherwise agreed upon by all parties to this Agreement, pay and grant the following benefits to the Employee:

3

    5.1.1   **Vacation.** The Employee shall be entitled to vacation time of two (2) weeks each calendar year. Such vacation time shall be used at times mutually agreeable to the Employee and the Employer.

    5.1.2   **Other Benefits.** The Employee shall be entitled to participate in all benefit programs provided by Employer to its executives. The Employer shall pay for single coverage premiums for the Employee for health and dental (if any) insurance offered by the Employer.

    5.1.3   **Expenses.** The Employer shall reimburse the Employee for all reasonable and necessary business expenses, including but not limited to cellular phone expenses, upon the presentation to the Employer of appropriate written documentation and receipts.

**6.**    **ATTENTION TO DUTIES**
The Employee shall devote his whole working time and attention to the Employer during the Term of this Agreement and will not engage in any other capacity or activity which, in the sole opinion of the Employer acting reasonably, would hinder or interfere with the performance of the duties of the Employee.

**7.**    **CONFIDENTIALITY**
The parties acknowledge that in carrying out his duties under this Agreement, the Employee will have access to and become entrusted with confidential information regarding the business plans and operations of the Employer, computer systems and technology, unique methodology and other proprietary information. The Employee acknowledges that the right to maintain such detailed confidential information constitutes a proprietary right, which the Employer is entitled to protect. Accordingly, the Employee shall not, during the Term of this Agreement, or at any time thereafter, disclose any of such detailed confidential information or trade secrets of the Employer to any person or persons, firm, association or corporation, nor shall the Employee use the same for any purpose, in either case, except on behalf of the Employer. Notwithstanding the foregoing, the obligations of the Employee in this Section 7 shall not apply to confidential information (i) which at the date hereof or thereafter becomes a matter of public knowledge without breach by the Employee of this Agreement; or (ii) which is obtained by the Employee from a person, firm, or entity (other than the Employer or an affiliate of the Employer) under circumstances permitting its use or disclosure to others.

**8.**    **OWNERSHIP OF INVENTIONS**

    8.1   The Employee shall promptly communicate and disclose to the Employer all inventions, improvements, modifications, discoveries, designs, formulae, methods and processes made, discovered or conceived by the Employee either alone or jointly with others, during the period of his employment with the Employer, providing the same relate to or are capable of being used by the corporation or any affiliate thereof in the normal course of their businesses.

    8.2   The Employee acknowledges and declares that all inventions, improvements, modifications, discoveries, designs, formulae, methods, processes, as are described in section 8.1 hereof, and all patents and patent applications relating thereto are the property of the Employer and hereby assigns to the Employer all of the right, title and interest of the Employee in any such inventions, improvements, modifications, discoveries, designs, formulae, methods and processes, and in any patents or patent applications relating thereto. The Employee shall, at the Employer's expense, execute all instruments and documents and do all such further acts and things as may be necessary or desirable, in the Employer's opinion to carry out the provisions of this section.

4

9.  **NON-COMPETITION**
The Employee shall not, without prior written consent of the Employer for the period of his employment hereunder or for a period of one (1) year following the termination of this Agreement or any renewal hereof, for any reason be it for cause or not, either alone or in conjunction with any individual, firm, corporation, association or any entity, except for the Employer, whether as principal, agent, shareholder, employee or in any other capacity whatsoever, perform the duties of or provide the services as are described in section 2.2 hereof in a business which competes with the Employer, within any geographical location where the Employer has carried on business or expended time and personnel and financial resources. Furthermore, the Employee also agrees that upon the termination of his employment he will not attempt to hire or encourage to leave their employ, any of the Employer's other employees. Notwithstanding the foregoing, the Employee shall not be precluded from competing with the business of the Employer in the event his employment is terminated by the Employee for good reason or by the Employer other than for cause, unless the Employer provides the applicable compensation and benefits set out in section 10.1.3 hereof, in which case, the Employee shall be precluded from competing as described in this section 9 until such time as such compensation and benefits are terminated.

10.  **TERMINATION**

10.1    The parties understand and agree that employment pursuant to this Agreement may be terminated during the Term in the following manner in the specified circumstances:

10.1.1    by the Employee without good reason (as defined below), on the giving of not less than one (1) month prior written notice to the Employer, which the Employer may waive, in whole or in part;

10.1.2    by the Employee for good reason on the giving of not less than one (1) month prior written notice to the Employer, if the Employer has not cured the event giving rise to good reason by the end of such notice period. For purposes of this Agreement good reason shall mean, absent the Employee's prior written consent: (i) the Employer's failure to timely provide the Employee with the salary, bonus and equity as set forth in section 4.1 hereof or to provide benefits to the Employee in accordance with section 5.1 hereof; (ii) a material breach by the Employer of this Agreement or any other agreement with the Employee; (iii) a material diminution by the Employer in the Employee's title, responsibilities, authority or reporting structure; (iv) a requirement that the Employee relocate his home to more than 35 miles away from his home in New York; or (v) failure of the Employer to ensure that any successor or assign of the Employer agrees in writing to be bound by the terms of this Agreement. If the Employee terminates his employment for good reason, he shall be entitled to the payments set forth in section 10.1.3 hereof, to be provided within thirty (30) days after his termination;

10.1.3    by the Employer in its absolute discretion without cause upon not less than one (1) month prior written notice to the Employee, on giving the Employee a payment equal to (i) six (6) months salary at the rate in effect on the Employee's termination date; (ii) the value of six (6) months of benefits and entitlements the Employee was enjoying as at his termination date (including but not limited to the cost to Employee to pay for six (6) months of COBRA payments for health and dental (if any) family insurance coverage); and (iii) all salary, benefits and

5

entitlements to which the Employee is entitled in accordance with any relevant statute or law. The payment representing this aggregate amount shall be paid within thirty (30) days from notice provided herein;

10.1.4  by the Employer for cause. The parties agree that for the purposes of this Agreement, "cause" shall mean the following, as reasonably determined by the Employer in good faith, and that the Employee shall be terminated immediately upon written notice for such cause:

10.1.4.1 any material breach of the provisions of this Agreement or of the established policies of the Employer known to the Employee in the performance of his duty under this Agreement;

10.1.4.2      any intentional or grossly negligent disclosure of any confidential information as described in section 7 hereof, by the Employee;

10.1.4.3 in carrying out his duties hereunder, the Employee; (i) has been grossly negligent, or (ii) has committed willful gross misconduct;

10.1.4.4 personal conduct on the Employee's part which is of such a serious and substantial nature that, as reasonably determined in good faith in the sole discretion of the Employer, it would materially injure the reputation of the Employer if the Employee is retained as an Employee; or

10.1.4.5 any and all omissions, commissions or other conduct, which would constitute cause under applicable law, in addition to the specified causes.

10.2    The Parties understand and agree that the giving of notice or the payment of termination pay, and severance pay, as required by the Employer to the Employee on termination shall not prevent the Employer from alleging cause for the termination.

10.3    The Employee authorizes the Employer to deduct from any payment, any amounts properly owed to the Employer by the Employee by reason of advances, loans or in recompense for damages to or loss of the Employer's property and equipment, save only that this provision shall be applied so as not to conflict with any applicable law or legislation.

11.    **RESULTS OF TERMINATION**

11.1    If this Agreement is terminated for cause, as described in section 10.1.4 hereof, the Employee shall be entitled to receive his remuneration to the date of such termination for cause, including any and all vacation pay and bonuses earned to date.

11.2    If this Agreement is terminated upon written notice as described in paragraphs 10.1.1, 10.1.2, and 10.1.3 hereof, the Employer shall pay to the Employee to the end of the notice period his salary and at the end of the date terminating the

6

notice provision, the Employer shall pay to the Employee vacation pay equivalent and any other monies due under applicable United States federal or state law, as well as any and all amounts to which he may be entitled pursuant to sections 10.1.2 or 10.1.3.

## 12    MEDIATION/ARBITRATION

12.1   Should any dispute or disagreement of any kind arise at any time; (i) regarding the rights and liabilities of the Parties hereof or with respect to the interpretation, validity, construction, meaning, performance, effect or application of this Agreement, as amended from time to time; or (ii) between the Employer and the Employee, the Parties agree that good faith negotiations shall take place between the Employer and the Employee. If such good faith negotiations have not resolved the dispute or disagreement within a reasonable period of time, either Party may request mediation between the Parties, or either Party may refer the dispute or disagreement directly to arbitration without going to mediation.

12.2   The mediator shall be agreed upon by the both Parties. In the event that the Parties are unable to agree upon the mediator, the dispute or disagreement shall be referred to arbitration in accordance with this section.

12.3   All discussions before the mediator shall be non-binding, confidential and without prejudice to the position of either Party. The Parties agree that if the mediation process does not result in a satisfactory solution of the dispute or disagreement after the lesser of either, (a) ten (10) hours of mediation, or (b) thirty (30) days from the commencement of the mediation, then either Party may refer the dispute or disagreement to arbitration pursuant to the provisions of the American Arbitration Association's National Rules for the Resolution of Employment Disputes in effect at the time of the arbitration demand, in accordance with the following:

12.3.1   the reference to arbitration shall be to one (1) arbitrator.

12.3.2   any such arbitration shall be held in the city of Ottawa. The arbitration shall be completely private. The arbitrator shall fix the appropriate procedures which may include, an oral hearing(s) and any other procedures the arbitrator deems appropriate. The issue or issues to be decided by the arbitrator shall be defined in an arbitration agreement filed on consent by the aggrieved party. In the event the Parties to the arbitration shall be unable to agree upon the issue or issues to be decided by the arbitrator in any arbitration pursuant to this paragraph, the arbitrator shall have jurisdiction to determine the issue or issues to be so decided. The Parties shall do all such acts and things as are necessary to enable the arbitrator to make a proper finding respecting the matters in issue. The arbitrator may order interest on any award and the arbitrator may award costs, including attorneys'-fees, to either Party, provided that each award is permitted by the applicable law governing the underlying claim. In the absence of any award of costs, each of the Parties shall bear their own costs, including attorneys' fees, of any arbitration pursuant to this paragraph and one-half of the cost of the arbitrator. The arbitrator shall be strictly bound by applicable legal principles and the general nature of this Agreement in rendering his/her/its decision.

7

12.3.3   The Parties agree that good faith negotiations, mediation and arbitration shall all be without recourse to the Courts. The award of the arbitrator shall be final and binding, except that either Party may appeal an arbitration award to the Courts on a question of law. Judgment upon the award rendered by the arbitrator may be entered in any Court having jurisdiction.

13.   **RIGHT TO INJUNCTIVE RELIEF**
As a violation by the Employee of the provisions of paragraphs 7 and 9 hereof could cause irreparable injury to the Employer and there is no adequate remedy at law for such violation, the Employer shall have the right, in addition to any other remedies available to it at law or in equity, to enjoin the Employee in a court of equity from violating such provisions. The provisions of paragraphs 7 and 9 hereof shall survive the termination of this Agreement.

14.   **ASSIGNMENT OF RIGHTS**
The rights and obligations which accrue to the Employer under this Agreement shall automatically inure to the benefit of and be binding on its successors and assigns, whether by operation of law or otherwise. The rights of the Employee under this Agreement are not assignable or transferable in any manner, except that any accrued salary or bonus, vested options or other benefits shall be provided to the Employee's heirs, beneficiaries or estate, or trustee under any trust set up by and for Employee.

15.   **CHANGE OF CONTROL**
The Employer agrees that should there be a change in control of the Employer during the Employee's employment with the Employer, all stock options, RSU's and restricted stock held by the Employee shall become immediately vested and exercisable in full. The Employer further agrees that should there be a change in control of the Employer and the Employee's employment is terminated for any reason save and except for cause, the Employee shall receive, any payments or benefits to which he is entitled pursuant to section 10.1.3 hereof. For the purpose of this section, "change in control" shall be defined as such term is defined the Employer's 2002 Amended and Restated Stock Option Plan.

16.   **RESIDENCE**
The Employer has agreed to secure a corporate apartment in Ottawa, Ontario to which the Employee shall have access and the cost of such apartment will be paid for by the Employer.

17.   **INDEMNIFICATION**
. The Employer agrees to fully indemnify and defend the Employee against all claims, liabilities, losses, costs, attorneys' fees, settlements and damages (collectively, "Liabilities") relating to or arising from any Action (as defined below) should the company by which the Employee was last employed before the date hereof threatens or take any legal action against the Employee in relation to section 7 of the Employee's prior employment agreement with such company and/or the Employee's employment with the Employer (any such threatened or actual actions are collectively referred to as the "Action"). Notwithstanding the foregoing, the Employer may determine in its sole discretion not to continue with such a defence if it believes there is no reasonable likelihood of succeeding with such a defence. In the event the Employee's employment with the Employer ceases as a result or consequence of any Action, such termination shall be without cause and the Employee will be entitled to the payments and benefits set forth in Section 10.1.3 hereof, and the Employer will nonetheless indemnify the Employee for all Liabilities relating to or arising from any Action.

18.   **CURRENCY**
All dollar amounts referred to in this Agreement are in United States funds.

19.   **AMENDMENT OF AGREEMENT**

8

This Agreement may be altered or amended at any time by the mutual consent in writing of the parties hereto.

20.  **TIME OF ESSENCE**
Time shall be of the essence hereof.

21.  **GOVERNING LAW**
This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario.

22.  **HEADINGS**
The headings appearing throughout this Agreement are inserted for convenience only and form no part of the Agreement.

23.  **SEVERABILITY**
The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision hereof and any such invalid or unenforceable provision will be deemed to be severable.

24.  **ENTIRE AGREEMENT**
This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous agreements, understandings and discussions, whether oral or written, and there are no other warranties, agreements or representations between the parties except as expressly set forth herein.

25.  **AGREEMENT BINDING**
This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective personal representatives, executors, administrators, successors and assigns.

9

26. **INDEPENDENT LEGAL ADVICE**
The Employee acknowledges that he has read and understands the Agreement and acknowledges that he has had the opportunity to obtain independent legal advice regarding the terms of the Agreement and their legal consequences.

27. **SURVIVAL**
In the event this Agreement terminates for any reason, sections 7, 9, 10.1.2, 10.1.3, 11, 15 and 17 hereof shall survive to the extent necessary to give full effect to their terms.

IN WITNESS WHEREOF this Agreement has been executed by the parties hereto as of the date first set forth above.

**SIGNED, SEALED & DELIVERED**

_____
Witness

_____
Michael Gioja


WORKSTREAM INC.

Per: _____
        Michael Mullarkey
Title:   Chief Executive Officer

# Gmail
by Google  BETA

mike.gioja@gmail.com | **New features!**

[ Search Mail ]   [ Search the ]

**The conversation has been labeled "Contracts".**

**Compose Mail**

« **Back to Inbox**   [ Archive ]   [ Report Spam ]   More Actions .

‹ **Newer** 62 of 8‹

**Inbox (2)**

**Starred** ★
**Sent Mail**
**Drafts**
**All Mail**
**Spam**
**Trash**

**Contacts**

▼ **Labels**
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
            Edit labels

▼ **Invite a friend**
Give Gmail to:

[ Send Invite ] 50 left
preview invite

# misc items

Inbox Contracts

☆ **Mike Gioja** ‹ More options  Mar 27

Hi David,

Few miscellaneous items:
1. I will send an email to Tim Clifford this weekend (4/1) informing
him that I have a new employer as of 4/4/05. I am obligated per my
severance agreement – however i do not have to inform him who the new
employer is -- can play this either way. What do you suggest?

2. Should I expect any new hire forms to complete this week for payroll, benefits, etc ... My son is in the middle of some medical and
dental activity and would like to have smooth transition.

3. Any expense forms you can send me to submit for the conference trip?

Thanks, Mike

**Reply  Forward**

PRIVILEGED -
ATTORNEY CLIENT

CONFIDENTIAL                                    MG000291

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/Pl...
**Workstream (2)**
            Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

**PRIVILEGED –
ATTORNEY CLIENT**

I will have Tammie Brown get you the insurance forms and new hire paperwork to fill out. She can also send a copy of the expense report form and policy for your review.

Hope you had a Happy Easter.

Best regards,

**David**
 - Hide quoted text -


——Original Message——
From: Mike Gioja
<mike.gioja@gmail.com>
Date: Sun, 27 Mar 2005 22:18:06
To:"Polansky, David –
Workstream"
<David.Polansky@workstreaminc
.com>
Subject: misc items

Hi David,

Few miscellaneous items:
1. I will send an email to Tim Clifford this weekend (4/1) informing
him that I have a new employer as of 4/4/05. I am obligated per my
severance agreement -- however i do not have to inform him who the new
employer is -- can play this either way. What do you suggest?

2. Should I expect any new hire forms to complete this week for payroll, benefits, etc ... My son is

**CONFIDENTIAL**

MG000292

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

in the middle of some medical and dental activity and would like to have smooth transition.

3. Any expense forms you can send me to submit for the conference trip?

Thanks, Mike

David Polansky
Workstream Inc

**Reply   Reply to all   Forward   Invite David to Gmail**

☆ **Mike Gioia** t More options  Mar 27

PRIVILEGED -
ATTORNEY CLIENT

Home address info:
217 Plattekill Road
Greenville, New York 12083
518-966-5233

Thanks — did have a nice Easter - weather finally warmed up. When i came back from Orlando had a foot of snow to deal with!

Thanks, Mike
 - Hide quoted text -

On Mon, 28 Mar 2005 03:27:40 +0000 GMT, David Polansky <david.polansky@workstreaminc

PRIVILEGED -
ATTORNEY CLIENT

> I will have Tammie Brown get you the insurance forms and new hire paperwork to fill out.  She

**Compose Mail**

**Inbox (2)**
Starred ✪
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▾ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/Pl...
**Workstream (2)**
          Edit labels

▾ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

can also send a copy of the expense report form and policy for your review.
>
> Hope you had a Happy Easter.
>
> Best regards,
>
> David
>
>
> ----Original Message----
> From: Mike Gioja
<mike.gioja@gmail.com>
> Date: Sun, 27 Mar 2005 22:18:06
> To:"Polansky, David - Workstream"
<David.Polansky@workstreaminc.com>
> Subject: misc items
>
> Hi David,
>
> Few miscellaneous items:
> 1. I will send an email to Tim Clifford this weekend (4/1) informing
> him that I have a new employer as of 4/4/05. I am obligated per my
> severance agreement — however i do not have to inform him who the new
> employer is — can play this either way. What do you suggest?
>
> 2. Should I expect any new hire forms to complete this week for
> payroll, benefits, etc ... My son is in the middle of some medical and
> dental activity and would like to have smooth transition.
>

CONFIDENTIAL

MG000294

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

Send Invite  50 left
preview invite

> 3. Any expense forms you can
send me to submit for the
conference trip?
>
> Thanks, Mike
>
> David Polansky
> Workstream Inc
>

**Reply   Reply to all   Forward**

☆ **David Polansky**  More options  Mar 27

**PRIVILEGED -
ATTORNEY CLIENT**

David
——Original Message——
From: Mike Gioja
<mike.gioja@gmail.com>
 - Hide quoted text -
Date: Sun, 27 Mar 2005 22:42:11
To:david.polansky@workstreaminc
.com
Cc:Tammie Brown
<tammie.brown@workstreaminc.com>
Subject: Re: misc items

**PRIVILEGED -
ATTORNEY CLIENT**

Home address info:
217 Plattekill Road
Greenville, New York 12083
518-966-5233

Thanks -- did have a nice Easter -
weather finally warmed up.
When i came back from Orlando had
a foot of snow to deal with!

http://gmail.google.com/gmail?&ik=457e5a6394&view=cv&search=inbox&th=102e925c0...  4/18/2005

**CONFIDENTIAL**                                    **MG000295**

**Compose Mail**

**Inbox (2)**
Starred ✪
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
    Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

Thanks, Mike

On Mon, 28 Mar 2005 03:27:40
+0000 GMT, David Polansky
<david.polansky@workstreaminc

> PRIVILEGED -
> ATTORNEY CLIENT

> I will have Tammie Brown get
you the insurance forms and new
hire paperwork to fill out. She
can also send a copy of the
expense report form and policy
for your review.
>
> Hope you had a Happy Easter.
>
> Best regards,
>
> David
>
>
> -----Original Message-----
> From: Mike Gioja
<mike.gioja@gmail.com>
> Date: Sun, 27 Mar 2005
22:18:06
> To:"Polansky, David -
Workstream"
<David.Polansky@workstreaminc
.com>
> Subject: misc items
>
> Hi David,
>
> Few miscellaneous items:
> 1. I will send an email to Tim
Clifford this weekend (4/1)
informing
> him that I have a new employer
as of 4/4/05. I am obligated per
my

CONFIDENTIAL

MG000296

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

> severance agreement --
however i do not have to inform
him who the new
> employer is -- can play this
either way. What do you
suggest?
>
> 2. Should I expect any new hire
forms to complete this week for
> payroll, benefits, etc ... My son
is in the middle of some medical
and
> dental activity and would like to
have smooth transition.
>
> 3. Any expense forms you can
send me to submit for the
conference trip?
>
> Thanks, Mike
>
> David Polansky
> Workstream Inc
>

David Polansky
Workstream Inc

**Reply  Forward  Invite David to Gmail**

☆ **Mike Gioja** t More options  Mar 27
Have few emails with Tim over
the past few weeks - will forward.
Other communications via short
aim discussions.
Only item of substance is the
agreements.
Best if he sends an email with
time he would like to connect --
pretty
flexible since most of the time
completing some projects around
the
house but cell/house phones
don't reach in a lot of places i'll
be

**CONFIDENTIAL**                                                    MG000297

**Compose Mail**

**Inbox (2)**
Starred ✮
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/Pl...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

working.

cell: 518-225-2341

Mike

On Mon, 28 Mar 2005 03:44:28 +0000
GMT, David Polansky
- Hide quoted text -
<david.polansky@workstreaminc
.com> wrote:

> PRIVILEGED -
> ATTORNEY CLIENT

>
> David
> ——Original Message——
> From: Mike Gioja
<mike.gioja@gmail.com>
> Date: Sun, 27 Mar 2005 22:42:11
> To:david.polansky@workstreaminc
.com
> Cc:Tammie Brown
<tammie.brown@workstreaminc.com>
> Subject: Re: misc items
>

> PRIVILEGED -
> ATTORNEY CLIENT

>
> Home address info:
> 217 Plattekill Road
> Greenville, New York 12083
> 518-966-5233
>
> Thanks -- did have a nice Easter -
weather finally warmed up.
> When i came back from Orlando
had a foot of snow to deal with!
>
> Thanks, Mike

CONFIDENTIAL                                        MG000298

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

>
> On Mon, 28 Mar 2005 03:27:40
+0000 GMT, David Polansky
>
<david.polansky@workstreaminc

|     PRIVILEGED -
| ATTORNEY CLIENT

> > I will have Tammie Brown get
you the insurance forms and new
hire paperwork to fill out. She
can also send a copy of the
expense report form and policy
for your review.
> >
> > Hope you had a Happy
Easter.
> >
> > Best regards,
> >
> > David
> >
> >
> > -----Original Message-----
> > From: Mike Gioja
<mike.gioja@gmail.com>
> > Date: Sun, 27 Mar 2005
22:18:06
> > To:"Polansky, David -
Workstream"
<David.Polansky@workstreaminc
.com>
> > Subject: misc items
> >
> > Hi David,
> >
> > Few miscellaneous items:
> > 1. I will send an email to Tim
Clifford this weekend (4/1)
informing
> > him that I have a new
employer as of 4/4/05. I am
obligated per my

CONFIDENTIAL                                        MG000299

**Compose Mail**

Inbox (2)
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/Pl...
Workstream (2)
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

> > severance agreement --
however i do not have to inform
him who the new
> > employer is -- can play this
either way. What do you
suggest?
> >
> > 2. Should I expect any new
hire forms to complete this week
for
> > payroll, benefits, etc ... My
son is in the middle of some
medical and
> > dental activity and would like
to have smooth transition.
> >
> > 3. Any expense forms you
can send me to submit for the
conference trip?
> >
> > Thanks, Mike
> >
> > David Polansky
> > Workstream Inc
> >
>
> David Polansky
> Workstream Inc
>

**Reply   Forward**

☆ **Brown, Tammie - Workstream**  More options  ✎ Mar 28
Morning Mike

Welcome to Workstream. I look forward to meeting and
working with you.  I have asked Tami Caudill our US
payroll/benefits manager to send you the new hire
paperwork.

Attached is the expense form you requested - please
let me know if you have any questions.  Please use the
code Corporate USA.

Thanks
Tammie

CONFIDENTIAL

MG000300

**Compose Mail**

**Inbox (2)**
**Starred ★**
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
           Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

<http://www.workstreaminc.com>
Tammie Brown
Vice President,
Human Resources

495 March Road
Suite 300
Ottawa, Ontario K2K 3G1

T 613 270 0619 x 263
F 613 270 0774
tammie.brown@workstreaminc.com
<mailto:tammie.brown@workstreaminc.com>
www.workstreaminc.com
<http://www.workstreaminc.com>
NASDAQ: WSTM

All the software and services you need to
address the entire employee lifecycle – from
recruit to retire – are online.
No software to install, integrate or frustrate.
We call it TalentCenter. You'll call it amazing.
  - Hide quoted text –


-----Original Message-----
From: Mike Gioja
[mailto:mike.gioja@gmail.com]
Sent: Sunday, March 27, 2005 10:42 PM
To: Polansky, David - Workstream
Cc: Brown, Tammie - Workstream
Subject: Re: misc items


    **PRIVILEGED –**
    **ATTORNEY CLIENT**


Home address info:
217 Plattekill Road
Greenville, New York 12083
518-966-5233

Thanks -- did have a nice Easter - weather
finally warmed up.

**CONFIDENTIAL**

MG000301

**Compose Mail**

**Inbox (2)**
**Starred** ✿
**Sent Mail**
**Drafts**
**All Mail**
**Spam**
**Trash**

**Contacts**

▼ **Labels**
**Albany chamber**
**attorney-client privil...**
**Contracts**
**Dr. Tobin**
**eBay Stuff**
**Exec Recruiters**
**HR Space**
**Monitoring Activites**
**Pine Ridge Farm**
**Resumes**
**Software Purchases**
**Taxes & Finance**
**Workscape**
**Workscape TRO/Pl...**
**Workstream (2)**
        Edit labels

▼ **Invite a friend**
Give Gmail to:

Send Invite  50 left
preview invite

When i came back from Orlando had a foot of snow to deal with!

Thanks, Mike

On Mon, 28 Mar 2005 03:27:40 +0000 GMT, David Polansky <david.polansky@workstreaminc

**PRIVILEGED - ATTORNEY CLIENT**

> I will have Tammie Brown get you the insurance forms and new hire paperwork to fill out. She can also send a copy of the expense report form and policy for your review.
>
> Hope you had a Happy Easter.
>
> Best regards,
>
> David
>
>
> ——Original Message——
> From: Mike Gioja <mike.gioja@gmail.com>
> Date: Sun, 27 Mar 2005 22:18:06
> To:"Polansky, David - Workstream" <David.Polansky@workstreaminc.com>
> Subject: misc items
>
> Hi David,
>
> Few miscellaneous items:
> 1. I will send an email to Tim Clifford this weekend (4/1) informing
> him that I have a new employer

CONFIDENTIAL

MG000302

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

as of 4/4/05. I am obligated per my
> severance agreement -- however
i do not have to inform him who the
new
> employer is -- can play this either
way. What do you suggest?
>
> 2. Should I expect any new hire
forms to complete this week for
> payroll, benefits, etc ... My son is
in the middle of some medical and
> dental activity and would like to
have smooth transition.
>
> 3. Any expense forms you can
send me to submit for the
conference trip?
>
> Thanks, Mike
>
> David Polansky
> Workstream Inc
>

_____

**2 attachments** — Download all
attachments

▤ **expenseClaim master.xls**
47K Download

▤ **Travel Policy rev.doc**
32K Download

Reply   Forward   Invite Tammie to Gmail

☆ **Mike Gioja** ↑ More options  Mar 28
Hi Tammie,

Look forward to working with you
as well. Thaks for the files.

Mike
- Hide quoted text -

CONFIDENTIAL

MG000303

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
            Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

On Mon, 28 Mar 2005 06:32:38 -0500,
Brown, Tammie - Workstream
<Tammie.Brown@workstreaminc.com>
wrote:
> Morning Mike
>
> Welcome to Workstream. I look forward to
meeting and working with you.  I have asked
Tami Caudill our US payroll/benefits
manager to send you the new hire
paperwork.
>
> Attached is the expense form you
requested - please let me know if you have
any questions.  Please use the code
Corporate USA.
>
> Thanks
> Tammie
>
> <http://www.workstreaminc.com>
Tammie Brown
> Vice President,
> Human Resources
>
> 495 March Road
> Suite 300
> Ottawa, Ontario K2K 3G1
>
> T 613 270 0619 x 263
> F 613 270 0774
tammie.brown@workstreaminc.com
<mailto:tammie.brown@workstreaminc.com>
> www.workstreaminc.com
<http://www.workstreaminc.com>
> NASDAQ: WSTM
>
> All the software and services you need to
address the entire employee lifecycle - from
recruit to retire - are online.
> No software to install, integrate or frustrate.
> We call it TalentCenter. You'll call it
amazing.
>
>

CONFIDENTIAL

MG000304

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruiters
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

Send Invite 50 left
preview invite

> ——Original Message——
> From: Mike Gioja
[mailto:mike.gioja@gmail.com ]
> Sent: Sunday, March 27, 2005
10:42 PM
> To: Polansky, David -
Workstream
> Cc: Brown, Tammie -
Workstream
> Subject: Re: misc items
>
> OK -- I will not send any emails
to Workscape and let the
attorney handle.
> Assume Workscape will nto be
informed this week?
>
> Home address info:
> 217 Plattekill Road
> Greenville, New York 12083
> 518-966-5233
>
> Thanks -- did have a nice
Easter - weather finally warmed
up.
> When i came back from
Orlando had a foot of snow to
deal with!
>
> Thanks, Mike
>
> On Mon, 28 Mar 2005 03:27:40
+0000 GMT, David Polansky
>
<david.polansky@workstreaminc
.com> wrote:
> > We should coordinate the
notice through our attorney that
will handle the case (same guy
that is handling Neil's case).
> >
> > I will have Tammie Brown get
you the insurance forms and new
hire paperwork to fill out.  She
can also send a copy of the
expense report form and policy

CONFIDENTIAL

MG000305

**Compose Mail**

**Inbox (2)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

for your review.
> >
> > Hope you had a Happy Easter.
> >
> > Best regards,
> >
> > David
> >
> >
> > -----Original Message-----
> > From: Mike Gioja <mike.gioja@gmail.com>
> > Date: Sun, 27 Mar 2005 22:18:06
> > To:"Polansky, David - Workstream" <David.Polansky@workstreaminc.com>
> > Subject: misc items
> >
> > Hi David,
> >
> > Few miscellaneous items:
> > 1. I will send an email to Tim Clifford this weekend (4/1) informing
> > him that I have a new employer as of 4/4/05. I am obligated per my
> > severance agreement -- however i do not have to inform him who the new
> > employer is -- can play this either way. What do you suggest?
> >
> > 2. Should I expect any new hire forms to complete this week for
> > payroll, benefits, etc ... My son is in the middle of some medical and
> > dental activity and would like to have smooth transition.
> > >

CONFIDENTIAL

MG000306

**Compose Mail**

**Inbox (2)**
Starred ☆
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
attorney-client privil...
Contracts
Dr. Tobin
eBay Stuff
Exec Recruitors
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes & Finance
Workscape
Workscape TRO/PI...
**Workstream (2)**
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite]  50 left
preview invite

> > 3. Any expense forms you
can send me to submit for the
conference trip?
> >
> > Thanks, Mike
> >
> > David Polansky
> > Workstream Inc
> >
>
>
>

**Reply   Forward**

**« Back to Inbox**   [ Archive ]   [ Report Spam ]   More Actions .

‹ **Newer 62 of 8**'

Get new mail notifications. Download the
**Gmail Notifier!**   Learn more

**You are currently using 47 MB (2%) of
your 2106 MB.**

Gmail view: **standard |** basic HTML
Learn more

Terms of Use – Privacy Policy –
Program Policies – Google Home
©2005 Google

http://gmail.google.com/gmail?&ik=457e5a6394&view=cv&search=inbox&th=102e925c0...  4/18/2005

**CONFIDENTIAL**                                                    **MG000307**

# Gmail

by Google  BETA

label:Workscape

mike.gioja@gmail.com | **New features!**

[ Search Mail ]   [ Search the ]

**Compose Mail**

**Inbox (1)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

**« Back to "Workscape"**   [ Remove label "Workscape" ]   [

# Hello   Workscape

☆ **Clifford, Tim**   More options   Mar 21

An update for you; I've told Tod Loughborrow. Analysts are scheduled next week.

How's the farming life? Bet you are getting a lot done. And how goes the employment musings? Any good conversations yet? (Rumor here is that you are going to Fidelity).

Tim

Tim Clifford

President & CEO

Workscape, Inc.

500 Old Connecticut Path

Framingham, MASS 01701

508-861-5574

**Human Resource Executive Magazine Honors Workscape's OneForce/Benefits as "HR Product of the Year" for 2004**

MG000136

## Compose Mail

**Inbox (1)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workspace
                Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

_-Coveted Award Marks Milestone as Workscape is Recognized for 7_

<http://www.workscape.com/HRE>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is intended only for the use
may contain information that is PRIVILEGEI
are not the intended recipient, you are he
dissemination, disclosure or copying of th
prohibited.  If you have received this con
destroy all copies of this message and its
immediately.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Reply  Forward  Invite Tim to Gmail**

☆ **Mike Gioja** t More options  Mar 21
Analysts keep getting pushed out
— over a month has past already
adn
of course everyone knows given
word on the street. Makes it
difficult.

Certainly getting a lot done on
the farm.

Always good conversations
happening and always rumors —
just like
workscape in general.

Mike
 - Hide quoted text -

On Mon, 21 Mar 2005 15:19:42 -
0500, Clifford, Tim
<Tim.Clifford@workscape.com>
wrote:
>
>
> An update for you; I've told Tod
Loughborrow. Analysts are

MG000137

**Compose Mail**

**Inbox (1)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

scheduled next
> week.
>
> How's the farming life? Bet you are getting a lot done. And how goes the
> employment musings? Any good conversations yet? (Rumor here is that you are
> going to Fidelity).
>
> Tim
>
> Tim Clifford
>
> President & CEO
>
> Workscape, Inc.
>
> 500 Old Connecticut Path
>
> Framingham, MASS 01701
>
> 508-861-5574
>
> Human Resource Executive Magazine Honors Workscape's OneForce/Benefits as
> "HR Product of the Year" for 2004
>
>  -Coveted Award Marks Milestone as Workscape is Recognized for Third
> Consecutive Year-
>
>
<http://www.workscape.com/HRE>
>
> ***********************************
***********************************
***********
> This message is intended only for the use of the intended recipient and may
> contain information that is

MG000138

**Compose Mail**

**Inbox (1)**
Starred ☆
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
        Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

PRIVILEGED and/or CONFIDENTIAL. If you are not
> the intended recipient, you are hereby notified that any use, dissemination,
> disclosure or copying of this communication is strictly prohibited. If you
> have received this communication in error, please destroy all copies of this
> message and its attachments and notify us immediately.
> *******************************
*******************************
**********

**Reply  Forward**

☆ **Mike Gioja** t More options  Mar 27
- Hide quoted text -
---------- Forwarded message ----------

From: Clifford, Tim
<Tim.Clifford@workscape.com>
Date: Mon, 21 Mar 2005 15:19:42 -0500
Subject: Hello
To: mike.gioja@gmail.com

An update for you; I've told Tod Loughborrow. Analysts are scheduled next week.

How's the farming life? Bet you are getting a lot done. And how goes the employment musings? Any good conversations yet? (Rumor here is that you are going to Fidelity).

Tim

Tim Clifford

President & CEO

MG000139

**Compose Mail**

**Inbox (1)**
Starred ☆
**Sent Mail**
**Drafts**
**All Mail**
**Spam**
**Trash**

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
      Edit labels

▼ Invite a friend
Give Gmail to:

[ Send Invite ] 50 left
preview invite

Workscape, Inc.

500 Old Connecticut Path

Framingham, MASS 01701

508-861-5574

Human Resource Executive
Magazine Honors Workscape's
OneForce/Benefits
as "HR Product of the Year" for
2004

-Coveted Award Marks Milestone
as Workscape is Recognized for
Third
Consecutive Year-

<http://www.workscape.com/HRE>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*
This message is intended only for
the use of the intended recipient
and·
may contain information that is
PRIVILEGED and/or
CONFIDENTIAL. If you
are not the intended recipient, you
are hereby notified that any use,
dissemination, disclosure or
copying of this communication is
strictly
prohibited. If you have received
this communication in error,
please
destroy all copies of this message
and its attachments and notify us
immediately.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*

MG000140

**Compose Mail**

**Inbox (1)**
**Starred** ★
**Sent Mail**
**Drafts**
**All Mail**
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
          Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

Reply  Forward

☆ **Mike Gioja** t More options  Mar 27

- Hide quoted text -
————— Forwarded message —————
————

From: Mike Gioja
<mike.gioja@gmail.com>
Date: Mon, 21 Mar 2005
17:41:09 -0500
Subject: Re: Hello
To: "Clifford, Tim"
<Tim.Clifford@workscape.com>

Analysts keep getting pushed out
-- over a month has past already
adn
of course everyone knows given
word on the street. Makes it
difficult.

Certainly getting a lot done on
the farm.

Always good conversations
happening and always rumors --
just like
workscape in general.

Mike

On Mon, 21 Mar 2005 15:19:42 -
0500, Clifford, Tim
<Tim.Clifford@workscape.com>
wrote:
>
>
> An update for you; I've told Tod
Loughborrow. Analysts are
scheduled next
> week.
>
> How's the farming life? Bet you
are getting a lot done. And how
goes the
> employment musings? Any

MG000141

**Compose Mail**

**Inbox (1)**
Starred ★
Sent Mail
Drafts
All Mail
Spam
Trash

**Contacts**

▼ Labels
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
   Edit labels

▼ Invite a friend
Give Gmail to:

[Send Invite] 50 left
preview invite

good conversations yet? (Rumor here is that you are
> going to Fidelity).
>
> Tim
>
> Tim Clifford
>
> President & CEO
>
> Workscape, Inc.
>
> 500 Old Connecticut Path
>
> Framingham, MASS 01701
>
> 508-861-5574
>
> Human Resource Executive Magazine Honors Workscape's OneForce/Benefits as
> "HR Product of the Year" for 2004
>
> -Coveted Award Marks Milestone as Workscape is Recognized for Third
> Consecutive Year-
>
>
<http://www.workscape.com/HRE>
>
> ******************************
******************************
***********
> This message is intended only for the use of the intended recipient and may
> contain information that is PRIVILEGED and/or CONFIDENTIAL. If you are not
> the intended recipient, you are hereby notified that any use, dissemination,
> disclosure or copying of this communication is strictly

MG000142

**Compose Mail**

**Inbox (1)**
**Starred ★**
**Sent Mail**
**Drafts**
**All Mail**
**Spam**
**Trash**

**Contacts**

▼ **Labels**
Albany chamber
Contracts
Dr. Tobin
eBay Stuff
HR Space
Monitoring Activites
Pine Ridge Farm
Resumes
Software Purchases
Taxes
Workscape
     **Edit labels**

▼ **Invite a friend**
**Give Gmail to:**

[ Send Invite ] 50 left
preview invite

prohibited. If you
> have received this
communication in error, please
destroy all copies of this
> message and its attachments
and notify us immediately.
> *******************************
********************************
***********

**Reply  Forward**

**« Back to "Workscape"**   [ Remove label "Workscape" ]   [

Visit settings to save time with **keyboard
shortcuts!**

**You are currently using 47 MB (2%) of
your 2104 MB.**

Gmail view: **standard** | basic HTML
Learn more

Terms of Use - Privacy Policy -
Program Policies - Google Home
©2005 Google

MG000143

## Clifford, Tim

**From:**      Mike Gioja [mike.gioja@gmail.com]
**Sent:**      Friday, April 01, 2005 9:51 PM
**To:**        Clifford, Tim
**Subject:**   Update

Hi Tim,

Per my agreement I am notifying Workscape that I will be starting with a new employer on
4/4/2005, Workstream, Inc.

Mike



# Workstream

COMPANY

About Us
Team
News
· Press Room
· Press Releases
· Awards
Events
Investors
Corporate Governance
Careers
Contact Us

SOLUTIONS
PRODUCTS & SERVICES
SUPPORT
PARTNERS
CUSTOMERS
RESOURCES CENTER

Case Study    Demo Tour
Webcast    White Paper

LIVE OPERATOR

Immediate product information or answers
to your questions are one click away.

LiveHelp



contact us    support    customer login



COMPANY

## 2005 PRESS RELEASE

## Workstream Expands Senior Management Team with Seasoned Public Company Executives and Additional Industry Expertise

Company Accelerates Growth with Appointment of New CFO, EVP of Technology and Operations and Senior Business Development Executive

**Ottawa, ON. - April 4, 2005** - Workstream Inc. (TM) (NASDAQ: WSTM), a provider of On-Demand Enterprise Workforce Management software today announced the appointment of three individuals to the Company's senior leadership team, Stephen Lerch as Chief Financial Officer and Chief Operating Officer, Michael Gioja as Executive Vice President of Technology and Operations and Neil McAdorey as Senior Director of Business Development.

"Today's appointments are evidence that the Company is committed to building long-term shareholder value by continuing to build out Workstream's senior team," said Michael Mullarkey, CEO and Chairman of Workstream. "In the last six months Workstream has announced the Workstream TalentCenter product suite, a new $1 Per Employee Per Month (PEPM) pricing model, significant new partnerships, continued customer momentum, a strong balance sheet and a solid commitment to building long-term shareholder value."

Stephen E. Lerch joins the Company as Chief Financial Officer and Chief Operating Officer. Mr. Lerch previously served in several executive management positions at Rewards Network Inc. (AMEX:IRN), an electronic commerce firm, from 1997 to 2004. Prior to Rewards Network, Mr. Lerch was a partner at PricewaterhouseCoopers LLP, in their Business Assurance Group (previously Coopers & Lybrand) where he worked from 1978 to 1997. Mr. Lerch holds a Bachelor degree in Accounting from the University of Notre Dame. Mr. Lerch will be responsible for Workstream's day-to-day financial and operational activities.

The Company also appointed Michael Gioja as Executive Vice President of Technology and Operations. Mr. Gioja has served in senior management positions at privately held HR software firms such as Workscape, Inc., BrassRing LLC and Fidelity Investments as well as at publicly traded firms including

IBM (NYSE: IBM), American Express (NYSE: AMEX), SAP AG (NYSE: SAP) and PeopleSoft (NASD: ORCL), which was recently acquired by Oracle Corporation.

While at PeopleSoft, Mr. Gioja reported directly to the CEO, and managed a global development organization of over 2,000 employees that successfully built and delivered the PeopleSoft 8.0 platform across all customers and product lines. Mr. Gioja holds a Bachelor degree in Computer Science from the State University of Oswego and is considered by many in the HR and technology community as one of the top in his field of technology integration and emerging technologies. Mr. Gioja will be responsible for managing Workstream's Research and Development team, data center operations and day-to-day technology and operational activities.

Neil McAdorey also joins the Company as Senior Director of Business Development focused on M&A and strategic global relationships. Mr. McAdorey previously served in senior management positions at Workscape, Edify Corporation and Cascade Technologies. Mr. McAdorey's nearly twenty years of industry experience includes product development, sales, channel management, business development and M&A. Mr. McAdorey has led strategic initiatives around Benefits and HR Outsourcing distribution models and has reported to both CEOs and CFOs in his prior roles. Mr. McAdorey holds a Bachelor degree from the University of Scranton, Pennsylvania.

"With over 25 years of considerable accounting, public company experience and strong relationships within the financial community, Stephen will help Workstream continue to deliver significant shareholder value," said Michael Mullarkey, CEO and Chairman of Workstream. "Michael at various times has lead significant innovative technology initiatives within our industry and his expertise and commitment to quality, will continue to drive Workstream to deliver on our vision and product expansion around the next generation of On Demand software solutions. Neil's unique experience will help Workstream move beyond our existing direct distribution model to include new significant revenue relationships with firms in the BPO space and beyond as well as to help us target our next meaningful M&A opportunities," commented Mullarkey.

Mr. Lerch replaces David Polansky who has decided to leave the Company to pursue other opportunities. Mr. Polansky will be transferring his duties over to Mr. Lerch. "David has played an important role in Workstream's growth," said Mullarkey, "His dedication over the past two years is greatly appreciated, and we would like to wish David all the best in his future endeavors."

## About Workstream Inc.

Workstream provides On-Demand Enterprise Workforce Management solutions and services that help companies manage the entire employee lifecycle - from recruitment to retirement. Workstream's TalentCenter provides a unified view of all Workstream products and services including Recruitment, Benefits, Performance, Compensation, Rewards and Transition. Access to TalentCenter is offered on a monthly subscription basis under an On-Demand software delivery model to help companies build high performing workforces, while controlling costs. With nine offices across North America, Workstream services customers including Chevron, Eli Lilly Canada, The Gap, Home Depot, Kaiser Permanente, Motorola, Nordstrom, Samsung, Sony Music Canada, VISA, and Wells Fargo. For more information visit www.workstreaminc.com or call toll free 1-866-470-WORK.

*This press release contains forward-looking statements within the meaning of the "safe harbor"*

Workstream

provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on the current expectations or beliefs of Workstream's management and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. The following factors, among others, could cause actual results to differ materially from those described in the forward-looking statements; inability to grow our client base and revenue because of the number of competitors and the variety of sources of competition we face; client attrition; inability to offer services that are superior and cost effective when compared to the services being offered by our competitors; inability to further identify, develop and achieve success for new products, services and technologies; increased competition and its effect on pricing, spending, third-party relationships and revenues; as well as the inability to enter into successful strategic relationships and other risks detailed from time to time in filings with the Securities and Exchange Commission.

Privacy

Tammie Brown
Workstream Inc.
Tel: 877-327-8483 ext.263
tammie.brown@workstreaminc.com

2004 © Workstream Inc. - All Rights Reserved

# LURIE & KRUPP, LLP

ONE McKINLEY SQUARE
BOSTON, MA 02109

PETER B. KRUPP
DAVID E. LURIE

TEL: [617] 367-1970
FAX: [617] 367-1971

SARA A. LAROCHE
THOMAS E. LENT

E-MAIL: dlurie@luriekrupp.com

April 4, 2005

## BY FAX (613-270-0776) AND OVERNIGHT DELIVERY

Mr. Michael Mullarkey
President and Chief Executive Officer
Workstream, Inc.
495 March Road, Suite 300
Ottawa, Ontario K2K 3GI

Re:  Workscape, Inc. / Michael Gioja

Dear Mr. Mullarkey:

This office represents Workscape, Inc. ("Workscape" or the "Company"). I write regarding Workstream, Inc.'s ("Workstream") hiring of Michael Gioja ("Gioja") and its interference with the contractual non-competition obligations owed by Gioja to Workscape.

Earlier today, Workstream issued a press release announcing Mr. Gioja's employment as Workstream's Executive Vice President of Technology and Operations. As you well know, Workstream is a direct competitor of Workscape.

Such employment is a material breach of Section 7(a) of Mr. Gioja's May 7, 2004 Employment Agreement (copy attached) with Workscape. Section 7(a) provides:

(a) No Competing Employment . . . the Executive agrees that for the period commencing on the date of this Agreement and ending on the second anniversary of the termination of the Executive's employment hereunder . . . (the "Restricted Period"), the Executive shall not participate or engage, directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder . . . partner, joint venturer, investor or otherwise, in any business activities if such activity competes with the Company's business activities . . . ."

On February 17, 2005, Mr. Gioja executed a Letter Agreement with Workscape (copy attached) whereby the Restricted Period during which he is barred from competing with Workscape was reduced from two years to one year.[1] The one-year Restricted Period remains in

---

[1] While Section 3(a) of the Letter Agreement states that the Restricted Period shall end on "February 18, 2005," this was a typographical error and should have read "February 18, 2006." As Mr. Gioja is well aware, in negotiating the Letter Agreement, Workscape proposed that the Restricted Period remain two years, he offered a six-month period, and Workscape and he compromised on a one-year period from February 18, 2005 to February 18, 2006. This was confirmed both in discussions between Mr. Gioja and Workscape's executives, as well as in emails between Rick Olin, Workscape's General Counsel, and Jennifer Goddard, the attorney who represented him in

## LURIE & KRUPP, LLP

Mr. Michael Mullarkey
April 4, 2005
Page 2

full force and effect. Under Section 9 of the Employment Agreement, the one-year Restricted Period will be extended for any periods during which he has been in violation of his non-competition obligations.

If Workstream continues to employ Mr. Gioja notwithstanding that such employment will cause a material breach of his contractual non-competition obligations to Workscape, it will be liable for intentional interference with contractual relations, civil conspiracy, and knowing and willful unfair and deceptive trade practices in violation of M.G.L. c. 93A, §§ 2 and 11. Such employment will cause irreparable harm to Workscape.

Accordingly, Workscape hereby demands that Workstream **immediately** cease and desist from any employment of Mr. Gioja, whether as Executive Vice President of Technology and Operations or in any other capacity. If Workstream does not do so, Workscape will pursue all available remedies to it, including without limitation injunctive relief, treble damages and attorney's fees.

Please confirm in writing by **5:00 p.m. on Tuesday, April 5, 2005** that Workstream is not employing Mr. Gioja and will not employ him prior to February 18, 2006.

Very truly yours,

David E. Lurie

Encl.
cc:    Rick Olin, Esq.

---

negotiating the Letter Agreement. See February 17, 2005 email from Rick Olin to Jennifer Goddard, stating "non-comp – agree to a compromise of 1 yr", and attaching draft deleting six-month period (to August 18, 2005) proposed by Gioja (copy attached).

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX COUNTY                                                    SUPERIOR COURT

                                                    )
WORKSCAPE, INC.,                                    )
                      Plaintiff,                    )
                                                    )       CIVIL ACTION NO. 05-1205
        v.                                          )
                                                    )
MICHAEL GIOJA,                                      )
                      Defendant.                    )
                                                    )

### ORDER

IT IS HEREBY ORDERED, on Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, as follows:

(1)     Defendant Michael Gioja is enjoined by way of a temporary restraining order from using or disclosing the confidential, proprietary and/or trade secret information acquired by him during his employment at Plaintiff Workscape, Inc.;

(2)     Defendant Michael Gioja is ordered by way of a temporary restraining order to immediately return to Workscape all Workscape property and materials, whether hard-copy or electronic, containing Workscape confidential, proprietary and/or trade secret information, to the extent Mr. Gioja has not already done so;

(3)     Defendant Michael Gioja is enjoined by way of a temporary restraining order from working for Workstream, Inc., while this order remains in effect;

(4)     Workscape agrees to pay Gioja the severance and related benefits set forth in the parties' February 15, 2005 Letter Agreement, subject to the terms and conditions therein, while this order remains in effect; and

(5)    This order shall be in effect from April 11, 2005 until further order of this Court;

it being understood and agreed that the parties shall schedule a trial within four weeks of the date

hereof.


Dated: April 15, 2005                              SO ORDERED:
Entered: April 19, 2005

                                                   _____
                                                   HON. RAYMOND J. BRASSARD


MIDDLESEX, ss.     **Commonwealth of Massachusetts**
                   SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

                   In testimony that the foregoing is a true copy on file
                   and of record made by photographic process, I hereunto
                   set my hand and affix the seal of said Superior Court
                   this nineteenth day of April, 2005.

                   Patricia A. McCann
                   _____
                   Assistant Clerk


2

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX ss.                                    SUPERIOR COURT
                                                 CIVIL ACTION
                                                 No. 05-1205


```
**********************
WORKSCAPE, INC.,        *
          Plaintiff     *
                        *
                        *
vs.                     *
                        *
                        *
MICHAEL GIOJA,          *
          Defendant     *
**********************
```

## **FINDINGS, RULINGS AND ORDER**

BEFORE: BRASSARD, J.


Wednesday
May 18, 2005
Cambridge, Massachusetts

APPEARANCES:

DAVID E. LURIE and THOMAS LENT, ESQS., for the Plaintiff

RICHARD LIEBERMAN and GARY LEUNG, for the Defendant


Patricia Bellusci
Official Court Reporter

| | |
|---|---|
| 1 | Wednesday |
| 2 | May 18, 2005 |
| 3 | Cambridge, Massachusetts |
| 4 | |
| 5 | THE COURT: Folks, let me say that the |
| 6 | matter here has been very well presented by both |
| 7 | counsel for the parties. I know you all have |
| 8 | worked diligently to get this complex matter to |
| 9 | trial on short notice, and the quality of the |
| 10 | work has been first-rate on both of your parts, |
| 11 | and certainly made the matter, in one sense, |
| 12 | easier for me; but in another, more difficult |
| 13 | because it's a close matter. |
| 14 | What I'm going to do is make a set of |
| 15 | findings of fact and conclusions of law here on |
| 16 | the record. I will ask the stenographer to |
| 17 | present a transcript of that, which you can |
| 18 | order, or the Court will order. And I may make a |
| 19 | few typographical-type corrections to it so that |
| 20 | it reads well. And that will stand as my |
| 21 | decision in the case. |
| 22 | I make all of these findings being |
| 23 | mindful, of course, of the burden of proof, and |
| 24 | on the basis of all of the credible evidence |

1        before me.

2                What I am going to do is make a set of

3        findings of my own, folks, based on the evidence:

4        the testimonial evidence and the documentary

5        evidence.  And then I will make a number of

6        allowances of requests for findings that you have

7        given to me.  Those findings of yours which I do

8        not adopt or allow, I deny.  Just so the record

9        is clear on that point.  But I'll begin first

10       with my own set of findings.

11               Workscape has some 350 employees.  It's

12       primary products in the Human Resources field are

13       benefits, performance and compensation.  These

14       products, or in the jargon of the industry,

15       solutions, are provided on what is called a

16       hosted bases by Workscape to its customers.

17               An important part of hosting is to be

18       sure that the products are available almost

19       always to the customers and to be sure that the

20       products are secure because oftentimes private

21       information is contained therein.

22               Workscape also provides what is called

23       a portal product, which is an entry point for

24       affected employees to enter into websites that

1      contain these products.

2      The customers of Workscape are, for the

3      most part, large companies, and some of them are

4      international companies, and some are located,

5      for example, in Canada.  But the primary focus of

6      Workscape is on its customers in the United

7      States.

8      Workscape sells its product, its

9      products, plural, excuse, me, directly to

10      employers through its own sales force.  It also

11      works with so-called partners such as IBM.  IBM

12      is a total HR outsourcer.  This means that it

13      provides a wide variety of human resources

14      programs or solutions to its customers.  Again,

15      in the jargon of the industry, it provides a

16      total solution.  However, companies like IBM turn

17      to companies like Workscape for a particular

18      product that Workscape may make.

19      Since its formation in 1999, Workscape

20      has acquired some seven other companies and their

21      products, and Workscape has itself, with its own

22      research and development group, built some

23      products of its own.

24      Some of these products are linked

1          together into a so-called platform.  For example,

2          the compensation and performance products are

3          tied together in what is called a pay-for-

4          performance product.

5                    There are other large companies in the

6          industry which are called ERPs.  This terms means

7          Enterprise Resource Producers or Enterprise

8          Resource Products.  These are large companies

9          which provide to other businesses the software

10         that is necessary for those other businesses to

11         run their entire business ranging from

12         manufacturing needs, to finance-type needs, to

13         human resource needs, and others, I am sure.

14         Again, smaller firms like Workscape may work with

15         these ERPs in an effort to place one or more of

16         the products of the smaller firms with these

17         large ERPs.

18                    A few years ago Workscape began to make

19         efforts to build a platform which incorporated

20         all of its products.  This platform came to be

21         known as the OneForce Five project.  It was

22         designed and built by Workscape at some very

23         substantial expense, bordering on twenty million

24         dollars.

1              The project involved a significant

2       amount of confidential information, including the

3       strategy of the company, its marketing wish list,

4       engineering estimates, cost estimates, product

5       management, the hosting input, and other kinds of

6       technical information relating to the so-called

7       integration.

8              Any business in this field, including,

9       in particular, Workscape, has a number of

10       confidentiality concerns. These concerns include

11       the following: The products of the company. How

12       they are built and maintained. The road map of

13       the company, that is to say, its vision as to

14       what its new products might be in the future.

15       The cost of products. How the technology of

16       those products will actually work. How the

17       hosting operation for these products will work.

18       This involves a matter of a number of

19       technological concerns including speed,

20       construction and design of hardware, the need to

21       have the product accessible or up regularly and

22       other such concerns.

23              Other confidentiality concerns involve

24       how to deploy these products or solutions to

1      customers; how to market and sell the products.

2      Another important concern is the pricing of

3      products for customers.  Other concerns involve

4      efforts being made along the lines of

5      partnerships with other larger companies, as

6      previously described.  Of course there are issues

7      relating to prospective sales in a so-called

8      pipeline.  And there are concerns about the

9      integration of the products into platforms or

10     suites, so-called.

11     Workscape has taken a number of steps

12     to try to protect the confidentiality of these

13     various points including having its employees

14     sign confidentiality agreements, and more

15     recently, non-disclosure agreements, and

16     assignments of inventions.  At times, products

17     are the subject of patents and the OneForce

18     product was the subject of a patent application.

19     Potential customers and partners are

20     also asked to sign non-disclosure agreements.

21     There are procedures for members of the public

22     having access to the physical plant of Workscape.

23     To get access to the data center, retina and

24     fingerprint scans are employed.  When an employee

8

1       leaves there are measures undertaken to have

2       material returned to the company, badges revoked

3       and passwords revoked.  There's also an ongoing

4       program to change passwords periodically in an

5       effort to maintain security.

6              Mr. Michael Gioja was hired by

7       Workscape in 2002, in December of 2002.  He

8       entered into an employment agreement which is one

9       of the exhibits in this case.  Mr. Gioja was a

10      highly compensated employee of Workscape,

11      including both salary and bonus.

12             The original employment agreement

13      contained a two-year non-compete, and had

14      provisions to the effect that if he was

15      terminated without cause, or if on his own he

16      left the company for what was defined to be good

17      reason, then the non-compete was for six months.

18             There is no provision for a severance

19      when the contract came to an end but if the

20      contract were terminated without cause there was

21      provision for a six-month severance which

22      mirrored the six-month non-compete in that

23      eventuality.

24             Mr. Gioja was represented by a lawyer

1     when he negotiated the employment agreement with

2     Workscape.  Mr. Gioja had been previously

3     recruited by Workscape in 2000, but for a variety

4     of reasons, the parties did not come together

5     with an agreement for Mr. Gioja to work there at

6     that time.

7             The original employment agreement was

8     replaced when it expired by another employment

9     agreement, also in evidence.  The employment

10    agreements, respectively, in an attachment to

11    each, seek to focus or define Mr. Gioja's duties

12    at Workscape.  This is so-called management by

13    objective.

14            Initially, Mr. Gioja's primary

15    responsibility was to take the OneForce project

16    over and to build a platform for that project.

17            Mr. Gioja was a member of the Workscape

18    Executive Committee.  That committee consisted of

19    those individuals who reported directly to the

20    CEO, Mr. Clifford.

21            As a member of the Executive Committee,

22    Mr. Clifford reported on his area and

23    participated in all aspects of the company's

24    business, including its strategic planning, its

1    finances and so forth.

2           From time to time, Mr. Gioja made

3    presentations to the Workscape Board of Directors

4    which met regularly.

5           Initially, Mr. Gioja had about 120 of

6    the employees of Workscape working under his

7    supervision, but several months after he began,

8    he also acquired responsibilities in the area of

9    services, and then was responsible for about two-

10   thirds of the total employment force.

11          At that point Mr. Gioja's title became

12   Executive Vice President for Products, Service

13   and Technology.

14          Again, in 2004, Mr. Gioja received a

15   new employment agreement which had very much the

16   same non-compete and severance provisions

17   described earlier in this opinion.

18          Mr. Gioja did not have responsibility

19   for sales, marketing, human resources or finance.

20          Mr. Gioja had significant access to

21   confidential information in a number of respects.

22   First, he had access to information about the

23   products.  For example, part of Mr. Gioja's

24   responsibility was to conduct a weekly meeting

1    with other people with respect to the work for

2    IBM, which was an important customer of

3    Workscape, and indeed, it's largest so-called

4    deployment of its compensation product.

5        In order to do his job effectively, Mr.

6    Gioja used a management technique which he

7    colloquially described as a, quote, deep dive,

8    close quote.  This is an effort on his part to

9    become intensively educated about a product, or

10   an issue, or an aspect of the work of Workscape.

11       Workscape acquired a performance

12   product from another company, Performaworks, in

13   2004.  Mr. Gioja then became responsible in

14   connection with that product for its technology,

15   for the people from the acquired company who

16   would ultimately work on this product at

17   Workscape, and for the integration of this

18   product.

19       Other kinds of confidential information

20   that Mr. Gioja had regular access to included the

21   portal product, the so-called road map for

22   products, and the integration of products.

23       He was also familiar with projections

24   as to so-called go-live dates for a product

1      coming to realization. He also had access to

2      confidential information that related to defects

3      in various of the products, and limitations of

4      the products. He was also familiar with

5      prospective deals that the company was

6      contemplating.

7                As a member of the Executive Committee,

8      he had some participation in making bids for

9      products, although that was not his

10     responsibility. For example, both Workscape and

11     Workstream are now competing for a compensation

12     project with General Motors, which is Workscape's

13     largest client.

14              Mr. Gioja also had some responsibility

15     for the management of Workscape clients. He was

16     the executive in charge of certain accounts, for

17     example, IBM.

18              Mr. Gioja's work, and therefore, access

19     to confidential information, also spanned hosting

20     issues and operations.

21              He had some responsibility for

22     financial issues as to his own area of the

23     company, again, a significant portion of the

24     employees, and more generally, as a member of the

1       Executive Committee, he was exposed to financial

2       issues on a broader basis.

3               Mr. Clifford testified, and I accept

4       his testimony, that in Mr. Gioja's two years of

5       work at Workscape, no one in the company had more

6       access to confidential sensitive information,

7       other than Mr. Clifford, no one had more access

8       than Mr. Gioja.

9               Workstream produces or makes available

10      to its customers a number of products, a number

11      greater than what Workscape does.  Workstream's

12      products, though, do include compensation,

13      performance management and benefits.

14              Workstream acquired a company called

15      Kadiri which had done compensation competition

16      with Workscape, and therefore, Workstream now

17      competes with Workscape in that field.

18              Both companies have made acquisitions

19      over the last couple of years in the performance

20      management field.

21              As to benefits, Workstream acquired a

22      company more recently and now host benefits, and

23      although it provides that product in a different

24      way than Workscape does, nonetheless, there is

14

1    competition between the two companies in that

2    product.

3              Finally, both companies provide a so-

4    called portal product, with Workstream having

5    acquired a company called Xylo in 2002.

6              I find that a customer would not buy,

7    for example, a compensation package from both

8    Workscape and Workstream.

9              During calendar year '05, there are at

10   least seven potential customers that both

11   Workscape and Workstream are competing for a

12   portion of those companies' business.

13             For example, both companies might

14   compete for various partners as well, for

15   example, IBM, which does this outsourcing

16   business, as do other firms.

17             In the performance area, Workscape

18   acquired a company called Performaworks in the

19   spring of '04, and Workstream acquired a company

20   called Perform in '03.

21             Although Workstream is located in

22   Canada, it does compete throughout the United

23   States for business.

24             In February of '05, Mr. Clifford

1      advised Mr. Gioja that Workscape would not be

2      renewing his contract when it came to an end in

3      May of '05.  Mr. Clifford said the company was

4      restructuring and that it would not go forward

5      with Mr. Gioja.

6              The first discussion was relatively

7      brief and during it Mr. Gioja inquired about a

8      severance and Mr. Clifford responded that there

9      was no obligation to pay a severance when there

10     was a non-renewal of contract, but that there

11     would be payment of the salary for the remaining

12     three months, from February through May, of the

13     contract.

14             When the parties met again, a couple of

15     days later, the focus of the discussion was on a

16     couple of issues.  One was the length of the non-

17     compete agreement, and the other was severance.

18             Workscape took the position that the

19     length of the non-compete should be two years,

20     and Mr. Gioja took the position that it should be

21     six months in accord with the termination without

22     cause provisions.  The parties at this time each

23     had lawyers who also took those positions.

24             At the meeting between Mr. Gioja and

1    Mr. Clifford, they agreed on a compromise of one

2    year. Part of that compromise included the

3    provision of six-months severance, and that

4    severance would begin in February '05 and run,

5    presumably, until August of '05. There was also

6    agreement to pay Mr. Gioja's moving expenses.

7                During this negotiation, which lead

8    ultimately to a separation agreement, an exhibit

9    in evidence, Mr. Gioja was represented by the

10   same lawyer and law firm who had previously

11   represented him in connection with the employment

12   agreement.

13               Over the two years and two or three

14   months of his employment, Mr. Gioja was, again,

15   highly compensation and received benefits which

16   totaled in excess of six hundred thousand

17   dollars.

18               Not long after leaving Workscape Mr.

19   Gioja eventually agreed with Workstream to work

20   for it. Workstream issued a press release to the

21   effect that Mr. Gioja would have a title very

22   similar to the title he held at Workscape, and

23   that he would be responsible for research and

24   development, data center operations, and the day-

1    to-day technology and operational activities of

2    Workstream.

3    Mr. Clifford felt that this was a

4    violation of the agreements that Workscape

5    entered into with Mr. Gioja. While at Workscape

6    Mr. Gioja did work extensively with the

7    technology of Workscape including its software,

8    the technology used to construct platforms and

9    solutions, and the technology for running the

10   hosting operations. He also had close

11   relationships with some of the largest clients of

12   Workscape.

13   Mr. Clifford testified, and I find this

14   evidence to be persuasive, that a substantial

15   client will not take the word of a salesman or

16   other lower-level representative of a company

17   about technology services that a large company is

18   buying. Rather, Mr. Clifford's testimony is to

19   the effect, such a large company will insist upon

20   seeing the chief technology officer and being

21   assured by that person of the quality of the

22   services it is buying.

23   When Mr. Gioja began his negotiations

24   with Mr. Clifford as to his departure it became

1    clear to Mr. Gioja that Mr. Clifford wished him

2    to depart immediately, that is to say, he would

3    not in fact work out the - he would not in fact

4    work the remaining three months of his contract

5    but would instead leave the company immediately.

6         During these initial conversations, Mr.

7    Clifford asked Mr. Gioja to be quiet and silent

8    about his departure until terms had been worked

9    out between them.  Mr. Clifford advised that if

10   he were not silent that Mr. Gioja would

11   jeopardize references from Workscape and its

12   principal stockholder and he would also

13   jeopardize salary continuation.

14        During this same conversation, Mr.

15   Clifford told Mr. Gioja that he was not being

16   terminated for his performance, but that all had

17   not gone well in that regard despite some

18   important contributions by Mr. Gioja.

19        I will make some more detailed findings

20   on the subject of other employees and the

21   circumstances under which they left the employ of

22   Workscape later on in this decision.

23        A number of employees have left

24   Workscape in the last year.  They include some of

1         the key people at the company.  For example,

2         Betsy Zikakis, the Vice President of Worldwide

3         Marketing and a member of the Executive

4         Committee, was asked to leave - pardon me, she

5         asked to leave.

6                  Let me restate that.  Ms. Zikakis, the

7         Vice President of Worldwide Marketing and a

8         member of the Executive Committee was asked to

9         leave.  She did so under an agreement which

10        provided that she would work part-time for six

11        months and receive a severance on that same

12        order.  She left without a non-compete.  She was

13        leaving to raise a young child. Her focus at the

14        company was on marketing, narrowly, and not on

15        the building or the selling of products.

16                  Mr. Nazzaro, Bill Nazzaro, a Vice

17        President and the Director of Product

18        Engineering, also left.  He, too, had no non-

19        compete.  He had not had an employment contract,

20        and accordingly, had no non-compete while he was

21        working.  He managed the writing of the code but

22        was not charged with strategic planning.

23                  His strength and talent was in building

24        the product if given clear and detailed

1    directions as to how to do so.  When he left, no
2    non-compete was obtained from him but there was a
3    non-disclosure agreement.

4    Rich Jackson, the Vice President for
5    Benefits Outsourcing, was also terminated.  A
6    thirteen-week severance and non-compete was
7    obtained from Mr. Jackson.  He had had detailed
8    knowledge of all of the customers and ran
9    servicing in an important area of Workscape's
10   business, the benefits' area.

11   Mr. Clifford testified that Mr. Jackson
12   was involved with issues that would be resolved
13   in the course of the next three months and that,
14   therefore, a more lengthy non-compete was not
15   necessary.  That explanation is not entirely
16   persuasive.  Mr. Clifford also testified that it
17   is difficult to get a non-compete when someone is
18   on the way out if the company does not already
19   have one.  This testimony I find credible.  Mr.
20   Clifford testified that he did get the non-
21   compete described from Mr. Jackson in exchange
22   for the severance.

23   Mr. Neil McAdorey, who reported to the
24   Chief Financial Officer, also left the company.

1   There was no non-compete, but he had been exposed

2   to some sensitive information before his

3   resignation.  Mr. Clifford testified that his

4   responsibilities were narrow and that they were

5   sufficiently insulated by virtue of a non-

6   disclosure agreement and by the sending of a

7   letter from an attorney to Mr. McAdorey when he

8   went to work for Workstream.

9          Mr. Philip Douglas was the Chief

10  Financial Officer of Workscape and a member of

11  its Executive Committee.  He had about fifteen

12  people who worked for him.  His strength was in

13  the financial area.  He does not know and did not

14  know how to build a platform, for example, or how

15  to run products or host operations.  His longer,

16  I believe, two-year non-compete was reduced to

17  six months.

18          Mr. Hoskar is still with the company

19  and is still a member of its Executive Committee.

20  He is involved with sales and with sales only.

21  He spends much of his time outside of the company

22  on that mission.  He signed a six-month non-

23  compete as part of an executive bonus plan which

24  was part of an effort to retain key employees

1    when the company, Workscape, was giving serious

2    consideration to an effort to sell itself.

3         Again, I will make some more detailed

4    findings by virtue of allowing some of the

5    requests for findings on the subject of these

6    various employees later in this decision.

7         The OneForce Five release occurred in

8    January of '04, and at that time Mr. Gioja's

9    responsibility shifted to a certain extent and he

10   now spent much of his time on service and

11   implementation of various areas of the business.

12        Again, Ms. Zikakis, Mr. Douglas, Mr.

13   Hoskar, were all on the Executive Committee.

14   Others of the employees who left the company were

15   not on the Executive Committee and were junior,

16   so-called, to Mr. Gioja.

17        Mr. Clifford testified, and I find this

18   testimony to be credible, that if one was not

19   going to be a member of the Executive Committee

20   one was not offered an employment contract.  Mr.

21   Clifford also testified that if a company asked

22   for a non-compete, typically it must give

23   something, for example, often an employment

24   agreement.

1           A number of the employees at Workscape

2     did not have employment contracts but did sign

3     non-disclosure agreements.

4           Again, a number of employees, as part

5     of the retention package in connection with the

6     possible sale of Workscape, did sign non-competes

7     in exchange for a bonus arrangement.

8           Like Mr. Clifford, Mr. Gioja testified

9     at great length.  Mr. Gioja received a Bachelor

10    of Science degree in 1979 in Computer Science.

11    He has had a long and distinguished career in

12    this field at a variety of companies.  He worked

13    for some twelve years at IBM until 1991.  He then

14    worked for two years at American Express where he

15    also did considerable work in the field of

16    platform applications and the like.  He then

17    worked for two years at Fidelity where he worked

18    on the PeopleSoft platform and provided

19    capabilities for Fidelity in that regard.   In

20    particular, his job was to oversee the

21    construction of what was called the CHAPS

22    platform.  Today, Fidelity itself does human

23    resources outsourcing.

24          Mr. Gioja testified, and I find his

1    testimony credible, that a company like Workscape

2    - pardon me, Workstream, sees companies like

3    Fidelity as partners, that is to say, someone to

4    whom certain software might be provided.

5           Mr. Gioja explained that Workscape

6    offers both software and outsourcing.   He

7    testified, and I accept his testimony, that

8    Workscape has or had fifty or sixty people who

9    worked in benefits outsourcing.  This means that,

10   among other things, they fielded phone calls from

11   employees of the client company and acted in

12   effect as an in-house benefits department. Mr.

13   Gioja explained that Workstream does not offer

14   this service.

15          After working for Fidelity, Mr. Gioja

16   worked for SAP America, a large ERP.  Mr. Gioja

17   explained very carefully the distinctions between

18   so-called best-of-breed companies which work on a

19   single solution as distinct from a large ERP

20   which offer a broad range of products to its

21   customers.

22          PeopleSoft, more recently, has been

23   acquired by Oracle, and Oracle offers an entire

24   suite of products including a dozen or more

1    applications that cover the entire process.

2               After working at SAP America, Mr. Gioja

3    worked for Internet Capital Group, where he

4    worked on a marketplace platform for E-Commerce.

5    Then he worked at BrassRing, where he was the

6    President of that company, which was a best-of-

7    breed company in E-Recruiting.

8               Over the course of these some twenty-

9    three years of experience before joining

10   Workscape, Mr. Gioja acquired not only management

11   skills and experience, but the particular core

12   skill of developing large-scale enterprise

13   platforms and bringing them to market.

14              At Workscape, Mr. Gioja's initial

15   responsibility was bringing a new platform to

16   market, building it and bringing it to market

17   successfully, on budget and on time.

18              His general methodology when tackling a

19   new job is to perform, first, an organizational

20   assessment as well as a related accountability

21   matrix.   These two efforts are related efforts;

22   allow him to drive accountability and delegation

23   across the company.

24              He also performs technology

1    assessments. This is part of the so-called deep

2    dive process that he engages in, and then he

3    determines how to reach targets.

4         In working on the new platform which

5    was launched in about December of '03, Bill

6    Nazzaro was a key person and the person with the

7    most detailed knowledge of the product itself.

8         After the product was launched, Mr.

9    Gioja's work shifted to services and

10   implementation. Here he received significant

11   assistance from Rich Jackson.

12        Mr. Gioja testified, and I credit his

13   testimony, that at the time he left Workscape,

14   Workscape was in some doubt about pursuing its

15   performance product. The company was

16   experiencing difficulty with its implementation,

17   its pricing, and was more generally experiencing

18   the need for cash.

19        While it appears on all the evidence

20   that the performance product is still available

21   at Workscape and is still among its so-called

22   suite of products, it does not appear at the

23   moment to have the importance that the benefits'

24   product has, and the compensation product has.

1              Mr. Gioja testified, and I credit his

2       testimony, that Mr. Clifford did not prefer

3       dissension between himself and Mr. Gioja in front

4       of the other members of the Executive Committee,

5       but rather, that Mr. Clifford preferred such

6       disagreements to be in private.

7              The two gentlemen also had some

8       disagreements particularly in '04 about the MBO's

9       or management by objectives prescription that

10      applied to Mr. Gioja.  At least in part, Mr.

11      Gioja believed that the objectives assigned to

12      him were unachievable for a variety of reasons,

13      and that, therefore, he was being set up to fail.

14             Mr. Gioja testified that he agreed to

15      the one-year non-compete at the time of

16      separation because, in effect, he did not have a

17      choice.  I find his testimony credible on the

18      level of his assessment of his negotiating

19      strength in light of the employment agreement,

20      but I do not find as a matter of fact that in any

21      meaningful sense he or his lawyer were under

22      duress.  The agreement was voluntarily entered

23      into.

24             At a follow-on meeting in February of

1    '05 with Mr. Clifford, Mr. Gioja did mention to

2    Mr. Clifford that when he left he would consider

3    pursuing employment with some of the

4    organizations that were potential buyers earlier

5    for Workscape itself.  Those potential buyers

6    included a range of companies, including IBM,

7    Hewitt and Workstream.

8                 Mr. Gioja explained at some length the

9    distinctions he perceives between the business of

10   Workscape and that of Workstream.  Workstream is

11   aiming toward what it calls a talent center

12   platform, which is a so-called suite of a wide

13   variety of products that would service customers

14   for all of their needs in human resources ranging

15   from so-called hire to retire.

16                Both Mr. Gioja and, by deposition, the

17   President of Workstream, Mr. Mullarkey, were at

18   some pains to point out that the products of

19   Workstream are mature and that further

20   enhancement or development of those products is

21   not envisioned; that Workstream has already

22   invested significant sums in those products and

23   does not plan on further changes or investments.

24   I credit that testimony to some extent but not

1    fully. The field is obviously one of constant

2    evolution. The competition in the field, based

3    on the evidence that I have heard, appears to be

4    intense. It is not conceivable to me that any

5    company could simply, in effect, sit still.

6    Mr. Gioja testified, and I do not fully

7    credit this testimony, that at Workstream he will

8    have no responsibility for client services; that

9    there is to be a job split at Workstream with Mr.

10    Gioja working on the platform only and Mr. Kevin

11    Jackson being responsible for client services,

12    client care, management, implementations,

13    development, support, enhancement and the like.

14    Mr. Gioja also testified that the

15    Workstream platform is already developed and

16    draws a distinction to the OneForce work he did

17    at Workscape where his obligation was to actually

18    build the OneForce platform. Mr. Gioja contends

19    that his work at Workstream will not be like that

20    but, rather, will involve only integration of an

21    already developed or so-called mature platform.

22    Mr. Gioja agreed with so much of the

23    press release issued by Workscape to the effect

24    that his obligations or duties - pardon me, the

1 press release issued by Workstream. Mr. Gioja

2 agreed with that part of the press release that

3 said he would manage R&D, and would manage -

4 would be responsible for the data center. He did

5 not agree, or appeared to me, not to agree on

6 that part of the Workstream press release that

7 spoke about his being responsible for day-to-day

8 technology and operations. He said that many of

9 the technology operations would be done by Mr.

10 Kevin Jackson.

11    There are eight direct-reports to the

12 CEO at Workstream, and Mr. Gioja would be one of

13 them, and accordingly, will be on the Executive

14 Committee there.

15    Mr. Gioja said that as part of his work

16 on the Executive Committee he expects not to

17 discuss business competition, and not to discuss

18 finances, and that he would not have input on

19 those matters. He said that in his one

20 experience at a Workstream Executive Committee

21 meeting, the meeting appears to be more of a

22 status meeting rather than a strategic

23 discussion.

24    I do not accept that evidence as

1    persuasive. It is simply not imaginable to me

2    that the Executive Committee of a company in this

3    field would not address important issues in all

4    aspects of the business at meetings of the

5    Executive Committee.

6              Mr. Gioja also testified that although

7    he is responsible for research and development,

8    that responsibility does not extend to the

9    products of Workstream, but rather, only to the

10   platform that incorporates those products.

11             He testified that he would not need to

12   understand the products, in relation to his

13   responsibilities for the platform, he would not

14   need the details. These - this testimony also

15   does not ring true in my evaluation of all the

16   evidence.

17             I do not find on all the evidence that

18   in any meaningful way Mr. Gioja is simply a

19   skillful technician. At one point in his

20   testimony he described that he no longer would be

21   intimately involved with the so-called

22   architecture of a platform. I think he spoke of

23   that in reference to the OneForce platform, that

24   his days of being an architect were long gone.

1      My evaluation of the evidence is that he cannot

2      be fairly described as being any sort of simple

3      technician.  I recognize that these technicians

4      are highly skilled people and do not mean to

5      denigrate their work in any way, shape or form.

6      What I do mean to say is that Mr. Gioja has

7      reached a level of expertise, experience and

8      capability that goes well beyond that of any

9      skillful technical person.

10      As a senior member of Workstream he

11      will, of necessity, be exposed to a wide variety

12      of problems relating to most, if not all, of the

13      aspects of the business of Workstream.

14      Both Workscape and Workstream provide

15      hosted, that is to say, on-demand applications.

16      Mr. Gioja testified that work particular to

17      customers would be handled by Mr. Kevin Jackson.

18      He said that he would try, he, Mr. Gioja, would

19      be involved only on the delivery of products and

20      not their functionality, and that enhancement of

21      products would not fall under the R&D group; that

22      he, Mr. Gioja, would be interested only in the

23      thought process, not in the content or

24      appropriateness of the product.

1        These distinctions I find on all the

2     evidence to be stilted, and to essentially

3     emasculate the give and take across borders that

4     must prevail in a business atmosphere.

5        Mr. Gioja also testified that he does

6     not need to understand all of the capabilities of

7     the product to do his job on the platform.  While

8     that appears to be true, it describes a very fine

9     line, one that I think is, at the end of the day,

10    not workable or manageable.

11       Mr. Gioja said that the business

12    posture of Workstream is to follow the so-called

13    eight-twenty rule, which means that the company

14    does not strive to achieve a hundred percent of

15    the problems of any customer, but rather,

16    something more like eighty percent, but to do so

17    at a low cost per employee per month.   He

18    distinguishes this from a so-called best-of-breed

19    company like Workscape, in his judgment, which

20    appears to strive to put forward one or two or

21    three products which have extremely deep

22    capability, that is to say, providing a hundred

23    percent of the solution to a narrow problem.

24       With respect to the distinctions Mr.

34

1    Gioja seeks to draw between the platform work and

2    not getting involved in the details of products,

3    I do note that he also says that his methodology

4    is what he calls trust by verify. He makes his

5    own assessments by so-called deep dive. However,

6    he says he does not have to understand the

7    functionality per se.

8         I find that his own description of his

9    philosophy here, i.e., to trust by verifying, is

10   at odds at least to some extent with his

11   conclusion that he does not need to understand

12   functionality per se.

13        Mr. Gioja does concede that he will

14   have responsibility for the hosting area,

15   something he also did at Workscape.

16        Mr. Gioja says that he will not be

17   involved in the product road map nor concerned

18   about the specific content of that road map.

19   However, despite what I am certain will be his

20   good faith, it will be a difficult distinction to

21   live with day to day. This is embodied to some

22   extent in Exhibit 80 at pages 20 and 23, where

23   Kevin Dobbs, in March, sent an email to Mr.

24   Gioja, which in part talked about an urgent

1    request from somebody else in the company for a

2    product road map for another customer. Mr.

3    Dobbs, in his email, expressed discomfort with

4    signing a contract about future functionality

5    when we're working through functionality.

6                 That prompted a response from Mr. Gioja

7    to the effect that he agreed and that it was

8    dangerous to commit to future functionality

9    especially without any plans or baseline to

10   ensure predictability.

11                This exchange, while brief, makes

12   clear, in my judgment, that no matter how much

13   good faith Mr. Gioja has, and I am sure that he

14   does, that day-to-day in the hurly-burly of life,

15   the kinds of line drawing that he and Mr.

16   Mullarkey envision, at trial or in a deposition,

17   are simply not workable.

18                Mr. Gioja attended a Workscape user

19   conference for three or four days in March, in

20   Orlando.  Workscape - Workstream I mean.

21   Workstream customers were there.  They gave

22   presentations and they gave their views on the

23   talent center.  Mr. Gioja, however, maintains

24   that he will not meet with customers and will

36

1    excuse himself in any dialogues about individual

2    customers.

3    Exhibit 79, at page 95, is an email

4    between people at Workstream on which Mr. Gioja

5    was copied, which, in part, concern hot issues

6    for GM and Motorola. Mr. Gioja said he did not

7    engage or respond to this email. The very fact

8    that it would be sent to him, however, makes

9    clear that, again, this line drawing, at best,

10   would be problematic and much more likely would

11   simply be not doable.

12   Mr. Gioja also maintains that he will

13   have no role in customer service, support or

14   care. There is no document, however, which exits

15   at Workstream to the effect that he will not have

16   client support responsibilities.

17   While this is certainly not dispositive

18   and while I certainly recognize that Mr. Gioja

19   was only at Workstream for a week, nonetheless,

20   if that is what the status of things is at the

21   beginning of an effort to manage a number of

22   difficult distinctions, then how they would be

23   managed over a period of time would appear to be

24   troublesome.

1          Mr. Gioja did concede in his testimony

2     that at Workscape he was privy to a large amount

3     of confidential information that went across a

4     wide variety of issues.

5          I want to turn to the proposed findings

6     of fact and conclusions of law from the two

7     parties here.  I'll begin with Workscape's

8     proposed findings of fact and conclusions.

9     Again, I want to make it clear, if I do not allow

10    a finding, I am denying it, or at least, at a

11    minimum, I'm uncomfortable with it because of the

12    way it's worded and so I will not make it a part

13    of my decision.

14          I allow the following proposed findings

15    of fact by Workscape.  Number 1, number 2.

16    Number 3 with the exception of the word

17    comprehensive.  Number 4 through number 34. I

18    allow request number 35, but add that Workstream

19    emphasizes a suite of products much more so than

20    Workscape does, and that Workstream's suite is

21    broader.

22          I allow request number 36.  I allow

23    request number 37, but add before 37A, the word

24    some, so that it reads, "Some third-party

1    industry publications and market analysts equate

2    Workstream and Workscape." I do not allow the

3    word "often" in that request.

4              I allow request number 38, but after

5    the words "in addition," I would include the

6    words "to some extent."

7              I allow request 39 and 40, and all of

8    request 41 with the exception of the last

9    sentence on request 41.

10             I allow request 42. I allow only that

11   part of request number 43 that relates to

12   subparagraph F.

13             I allow request number 47 through 54,

14   and I allow the first sentence only of request

15   number 55.

16             I allow request 56 through 58 - pardon

17   me. Going back to request number 58, which is a

18   long request. I allow all of it with the

19   exception of the first paragraph in 58A that

20   relates to Ms. Zikakis. Otherwise, I allow all

21   of request number 58.

22             I also allow request 59 through 63.

23   And I allow the following proposed conclusions of

24   law, but only in the respects that I will

1    indicate here on the record.

2         Workscape has met the requirements for

3    injunctive relief. Specifically, it has

4    demonstrated that it will prevail and has

5    prevailed on the merits; that irreparable harm

6    will result from the denial of an injunction; and

7    that the plaintiff's irreparable harm outweighs

8    any harm the opposing party would suffer if the

9    injunction were granted.

10        I conclude as a matter of law that Mr.

11   Gioja freely entered into the separation

12   agreement. I conclude that the separation

13   agreement should be reformed by the Court to

14   reflect February 18, 2006 as the mutually agreed

15   end-date for Mr. Gioja's non-compete obligation.

16        I conclude that the separation

17   agreement was a negotiated resolution in

18   settlement of disputes between Workscape and Mr.

19   Gioja. The separation agreement is supported by

20   adequate consideration.

21        I conclude that the non-compete

22   covenant within the separation agreement is

23   enforceable under Massachusetts law to protect

24   Workscape's legitimate business interest;

1       specifically, its confidential information and

2       good will.

3       I conclude that the information

4       acquired by Mr. Gioja as to products, development

5       strategies and additional significant business

6       information is bound to influence his work for

7       Workstream.

8       I allow requested conclusion of law

9       number 16 in its entirety as well as number 19,

10       21, 23, 26, 28 - that should be and 28, Madam

11       Stenographer.

12       I am aware that the Boulanger v.

13       Dunkin' Donuts case exists and that the Supreme

14       Judicial Court has determined that the content of

15       other employee agreements is not relevant because

16       an employer may reasonably decide which persons

17       pose the greatest risk of using confidential

18       information competitively.

19       I also allow requested conclusion of

20       law number 36. And to that I will add that I

21       have considered the departure situations of all

22       of the various employees who have left Workscape.

23       Not all of their situations can be perfectly,

24       rationally distinguished from that of Mr. Gioja.

1    I further conclude, however, that as <u>Boulanger</u>

2    teaches, this is a matter to be left largely in

3    the hands of an employer which must make these

4    difficult decisions on the ground, and which must

5    consider a number of factors, including

6    feasibility, expense and the like.

7    I allow request number 47 and 49. I

8    also allow request number 51.

9    With respect to request number 52, I

10   allow it as follows, only. "Mr. Gioja left

11   Workscape on February 18th, 2005 and joined

12   Workstream as its Executive Vice President,

13   Technology and Operations, on April 4, 2005. Mr.

14   Gioja worked for one week for Workstream prior to

15   the injunction."

16   I conclude that the public interest

17   would not be adversely affected by a permanent

18   injunction.

19   As to Mr. Gioja's proposed findings of

20   fact and conclusions of law, I allow the

21   following. Paragraphs 1 through 13 are allowed.

22   I allow paragraph 15 as well as 19, 26, 29, 30,

23   31, 33, 34.

24   With respect to request number 35, I

1    allow all of it with the exception of the last

2    sentence.

3               I allow request number 52.  I allow as

4    well request number 65, 66, 82, 83, 97, 98, 99,

5    100, 101, 102, 103.

6               With respect to request number 104, I

7    allow it with the exception of a bit of a word

8    change in the third line.  I strike the words

9    "rather than" and insert in their place the words

10   "and to," that's T-O.

11              I allow request of law number 22.  I

12   add to that the following.  A termination without

13   cause under the provisions of the contracts here

14   within the last six months of the employment

15   agreement term would be, in many respects, the

16   equivalent of six-months notice that the contract

17   would not be renewed.  Those two events would be

18   similar in practical impact from the point of

19   view of employee compensation.  The employee

20   would be out of work; would get six-months pay.

21   However, the two events would have very

22   different, arguably, outcomes with respect to a

23   non-compete agreement.  There is no good reason

24   in terms of protecting a legitimate business

1    interest why that ought be so. There is, in

2    other words, not a principle distinction between

3    those two scenarios. I have considered that.

4         I have also considered that the market

5    here is rapidly changing, and I have considered

6    very carefully what is necessary to protect the

7    legitimate interest of Workscape as to its

8    confidential information and customer good will.

9         I have also very carefully considered

10   the impact on an individual, Mr. Gioja, with

11   respect to his efforts to work.

12        I have, as I have indicated, considered

13   the situation of other employees, being very

14   mindful of what the Supreme Judicial Court has

15   said to the effect that these are decisions, as

16   long as they are reasonably made - and they are

17   here - for a company to exercise and not for a

18   court to do.

19        Accordingly, I enter the following

20   permanent injunction.

21        The Court hereby orders that Mr. Gioja,

22   (A), is permanently enjoined from using or

23   disclosing the confidential, proprietary and/or

24   trade secret information acquired by him during

1      his employment at Workscape. (B), shall

2      immediately return to Workscape all Workscape

3      property and materials containing confidential,

4      proprietary and/or trade secret information.

5      And, (C), is permanently enjoined from working

6      for Workstream, Incorporated until August 25th,

7      2006.

8              MR. LIEBERMAN: Your Honor, do you mean

9      '06 or '05?

10             THE COURT: August 25, 2005, excuse me.

11             I choose that date because I take into

12     account one week of working at Workstream.  I

13     also choose it because it seems to me that a six-

14     month term is more appropriate; more properly

15     serves the legitimate business needs of

16     Workscape.

17             Because I have reduced, in accordance

18     with case law, the length of the non-compete

19     covenant which had been very expressly negotiated

20     between capable parties represented by capable

21     counsel, I conclude that I must correspondingly

22     reduce the severance obligation of Workscape

23     which was part and parcel of that same careful

24     negotiation.  Accordingly, I limit the obligation

1    of Workscape to Mr. Gioja under the severance to

2    three months.

3         Counsel, that concludes my findings of

4    fact and conclusions of law.  I know that you may

5    have some further specific requests.  The hour is

6    fairly late at the moment, but I'm glad to

7    consider any of those while the matter is fresh

8    in my mind.  But I'm also, of course, well aware

9    that in no way at all do I intend to circumscribe

10   or preclude any of the rights that you both have,

11   both in this court and otherwise.  So if there

12   was something on either of your minds at the

13   moment, I'd be glad to consider it.

14         Anything on your end, Mr. Lurie?

15         MR. LURIE: Not at this time, your

16   Honor.

17         THE COURT: And Mr. Lieberman?

18         MR. LIEBERMAN: No, your Honor.

19         THE COURT: Okay.

20         Folks, as I said, I'll make some

21   arrangements with the court stenographer as to

22   how we'll do this.  What I may have her do is to

23   draft this up.  Again, I may tinker with it ever

24   so slightly to be sure I said Workscape when I

1        meant Workscape and not Workstream, for example,

2        and then I'll ask her to prepare a final

3        transcript, and I gather both of you might order

4        a copy of that.

5                    Would that be agreeable to you,

6        gentlemen?

7                    MR. LURIE: Yes.

8                    MR. LIEBERMAN: Yes.

9                    THE COURT: And I'll have the

10       stenographer place a photocopy in the Clerk's

11       file - in the file in the case so that it will

12       stand as my decision in the case.

13

14

15

16

17

18

19

20

21

22

23

24

47

**C E R T I F I C A T E**

I, Patricia Bellusci, do hereby certify that

the foregoing transcript, pages 2 through 47,

is a complete, accurate and true record of my

voice recorded tapes taken in the

aforementioned matter to the best of my skill

and ability.

*Patricia Bellusci*

Patricia Bellusci

Official Court Reporter

The foregoing certification does not apply to

any reproduction of the same by any means

unless under the direct control and/or

direction of the certifying reporter.