UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              )
WORKSCAPE, INC.,                              )
              Plaintiff,                      )
                                              )
       v.                                     )          Civil Action No. 05 11481MEL
                                              )
WORKSTREAM, INC.,                             )
              Defendant.                      )
_____)

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)**

Defendant Workstream, Inc. ("Workstream"), by and through its attorneys McGuireWoods LLP and Sanzone & McCarthy LLP, respectfully submits this Memorandum of Law in support of its motion to dismiss the Complaint pursuant to F.R.C.P. 12(b)(6).

Each of Plaintiff Workscape's three counts against Workstream in the case at bar— intentional interference with contractual relations; the commission of unfair and deceptive trade practices under Mass. G.L. c. 93A §§ 2, 11; and civil conspiracy—must be dismissed by this Court for failure to state a claim. Workscape's Complaint does not sufficiently allege intentional interference for four reasons, each of which is fatal to the cause of action: (1) the action is based on a non-competition agreement that has been held by a Massachusetts Superior Court to be *unenforceable* as written; (2) Workstream did not knowingly induce a breach of Workscape's third-party contractual relations; (3) Workstream's alleged conduct was not through an improper means, nor made in furtherance of an improper motive; and (4) Workscape has failed to plead recoverable damages. Workscape's Complaint likewise fails to state a cause of action under Mass. G.L. c. 93A §§ 2, 11 because Massachusetts' unfair trade practices statute does not encompass disputes arising from an employment relationship, including non-competition

agreements.  Last, Workscape's Complaint fails to state a claim for civil conspiracy because there are no allegations that Workstream exercised some peculiar form of coercion over Workscape, or that Workstream has assisted or encouraged others to commit a tort against Workscape, as required by the common law pleading elements.

All of Workscape's claims arise out of Workstream's hiring of Michael Gioja, a former Workscape executive, and the impact of Gioja's new employment on a non-competition agreement executed between Gioja and Plaintiff.  (Complaint at ¶ 1).  In a state court suit brought by Workscape to enjoin Gioja from accepting a position with Workstream, the trial court found that Gioja's non-competition agreement was unenforceable as written under Massachusetts law.  *Workscape v. Gioja*, Middlesex Superior Court, No. MICV2005-1205.  This Complaint, which attempts to hold Workstream liable for hiring Gioja, who was party to an *unenforceable* non-compete, is deficient on its face.

### The Superior Court's Findings of Fact and Conclusions of Law.

Plaintiff's Complaint incorporates the Superior Court's findings as part of its allegations. Specifically, on April 4, 2005, Gioja was hired by Defendant Workstream as an Executive Vice President of Technology and Operations.  (Complaint at Ex. J, 5/18/05 Tr. at 16, 38; Ex. 1, Workscape's Proposed Findings of Fact, ¶ 43(f).)[1]  Three days later, Workscape sued Gioja in Middlesex Superior Court, Civil Action Number MICV2005-1205, seeking damages and a permanent injunction prohibiting Gioja from working for Workstream through February 18, 2006.  An expedited bench trial was conducted from May 10, 2005 to May 13, 2005.

---

[1] At a May 18, 2005 hearing, the Superior Court orally adopted portions of Workscape and Gioja's Proposed Findings of Fact and Conclusions of Law, which the court supplemented with its own oral rulings on the record. Because Workscape's Complaint referenced the Superior Court's 5/18/05 findings, but did not provide those Proposed Findings of Fact and Conclusions of Law adopted by the court, complete copies of each party's Proposed Findings of Fact and Conclusions of Law are attached hereto as Exhibit 1.  At a June 20, 2005 hearing on Workscape's motion to indefinitely extend the court's injunctive relief pending Workscape's appeal, the Superior Court further clarified and expanded upon its May 18, 2005 findings for the record.  A copy of the 6/20/05 transcript is attached hereto as Exhibit 2.

On May 18, 2005, the Superior Court issued its findings of fact and conclusions of law, declaring the issues presented by the case to be a "close matter." (Complaint at Ex. A, B, and J at 5/18/05 Tr., p. 43.) The Superior Court ruled that Workscape's one year non-competition covenant with Gioja was unenforceable under Massachusetts law for four reasons: (1) a one year non-competition period was broader than necessary to protect Workscape's confidential information and customer goodwill in light of the sliding-scale six month non-competition period provided for by Gioja's Amended Employment Agreement in the event of his termination by Workscape without cause; (2) Workscape operates in a market that is subject to rapid change, and consequently any Workscape confidential information or goodwill would soon lack value; (3) Gioja's efforts to find work would be adversely impacted if he were enjoined from joining Workstream for one year; and (4) evidence of the non-competition agreements (or lack thereof) executed between Workscape and other members of its senior-level management team who had left the firm around the same time as Gioja demonstrated that a one year non-competition period was not necessary to protect Workscape's legitimate business interests. (Complaint at Ex. J, 5/18/05 Tr. at pp.42-43; Ex. 1, Gioja's Proposed Conclusions of Law, ¶ 22; Ex. 2, 6/20/05 Tr. at 11.)[2]

---

[2] The trial court expressly held that: "In Gioja's case, Workscape itself determined that a one-year Restricted Period was not necessary to protect its confidential information and goodwill because Workscape provided for a six-month Restricted Period (in the case of a termination without cause) in Gioja's amended employment agreement, which was executed in late 2004 only two or three months before Gioja was terminated. The circumstances by which Gioja was terminated would not affect the underlying business interest for the length of a non-compete agreement. That Workscape provided a six month period for Gioja demonstrates that it believed it was adequately protected by such a period. A termination without cause under the provisions of the contracts here within the last six months of the employment agreement term would be, in many respects, the equivalent of six-months notice that the contract would not be renewed. Those two events would be similar in practical impact from the point of view of employee compensation. The employee would be out of work; would get six-months pay. However, the two events would have very different, arguably, outcomes with respect to a non-compete agreement. There is no good reason in terms of protecting a legitimate business interest why that ought to be so. There is, in other words, not a principle distinction between these two scenarios. I have considered that. I have also considered that the market here is rapidly changing, and I have considered very carefully what is necessary to protect the legitimate interest of Workscape as to its confidential information and customer good will. I have also very carefully considered the impact on an individual, Mr. Gioja, with respect to his efforts to work." (Complaint at Ex. J, 5/18/05 Tr. at pp. 42-43.)

**ARGUMENT**

I.    **Workscape's Complaint Fails to State a Cause of Action for Intentional Interference with Contractual Relations.**

On a Rule 12(b)(6) motion to dismiss, this Court "must take well-pled factual allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993).    On the other hand, "bald assertions, unsupportable conclusions, or opprobrious epithets" should not be considered or credited by this Court.  *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir.1987).  In order to sufficiently plead an action for intentional interference with contractual relations under Massachusetts law, a plaintiff must allege facts establishing that:  (1) it had an enforceable contract with a third party; (2) the defendant knowingly induced the third-party to break the contract; (3) the defendant's interference was improper in motive or means; and (4) that the plaintiff was harmed by the defendant's actions.  *See Ayash v. Dana-Farber Cancer Institute*, 443 Mass. 367, 822 N.E.2d 667, 690 (2005); *W. Oliver Tripp Co. v. American Hoechst Corp.*, 34 Mass.App.Ct. 744, 751-52, 616 N.E.2d 118, 124 (1993); *Ratner v. Noble*, 35 Mass.App.Ct. 137, 138-39, 617 N.E.2d 649, 650 (1993) (no submissible intentional interference claim where plaintiff suffered no pecuniary loss); *Tech Plus, Inc. v. Ansel*, 59 Mass.App.Ct. 12, 18-19, 793 N.E.2d 1256, 1263 (2003) (same).

Count I of the Complaint does not satisfy any of the four elements necessary to state a claim for intentional interference.  First, Count I is concededly based upon the one year non-competition agreement executed between Workscape and Gioja upon his termination from the

---

At a June 20, 2005 hearing on Workscape's motion to indefinitely extend the court's injunctive relief pending Workscape's appeal, the Superior Court further clarified its decision:  "The factors there were numerous … they certainly included what was my sense of what was needed in this very fast moving field of endeavor to protect Workscape's interest.  It certainly included, as well, my sense of what Workscape has done with other senior employees at the company, senior management people."  (Ex. 2, 6/20/05 Tr. at p. 11.)

company.  Because that agreement was determined by the Superior Court to be unenforceable as

a matter of Massachusetts law, Workscape cannot establish that Workstream interfered with an

enforceable agreement between Workscape and a third-party.  Second, as demonstrated by the

Superior Court's judgment, the Complaint fails to sufficiently allege that by hiring Gioja,

Workstream knowingly induced Gioja's breach of his Separation Agreement with Workscape

because the contract, on its face, created significant doubts as to its enforceability.  Third, even

taking all of Workscape's well-pled facts as true, Workstream's decision to retain Gioja as an

executive did not amount to an improper business method, nor does Count I sufficiently allege

that Gioja's hiring was in furtherance of an improper commercial purpose.  Workstream's

conduct was further protected by the business competitor's privilege set forth in the

RESTATEMENT OF TORTS, § 768(1).  Fourth, Count I fails to plead any injury other than the

amount of Workscape's attorneys' fees incurred in its unsuccessful attempt to have the Superior

Court enforce Workscape's one year non-competition agreement against Gioja.  It is black letter

law that attorney's fees are not recoverable in actions for intentional interference, and Count I

accordingly fails to properly allege the requisite element of damages as well.

> **A.    Workscape's claim fails because it is based on a non-competition agreement that has been held by a Massachusetts Superior Court to be unenforceable as written.**

Both Massachusetts law and common sense dictate that a plaintiff cannot maintain an

action for intentional interference with a contractual relationship where the contract is not legally

enforceable as written.  *Cusick v. Carver*, No. 1588, 2005 WL 873743 at *3 (Mass.App.Div.

April 8, 2005) (affirming summary judgment for defendants where plaintiff broker had no

contractual rights to a commission that could be the basis for his intentional interference claim);

*see also Wozniak & Padula, P.C. v. Gilmore, Rees, Carlson & Cataldo, P.C.*, No. 1594, 2005

WL 851085 (Mass.App.Div. April 8, 2005) (affirming dismissal of intentional interference count based on plaintiff's legal representation of third party because third-party was free to discharge plaintiff with or without cause, thereby extinguishing plaintiff's contractual interests).  In this case, the one year non-competition covenant Workscape sought to enforce against Gioja in the *Workscape v. Gioja* matter—the same contractual interest which Workscape claims to be the foundation of its intentional interference claim—was void and unenforceable as drafted.

In Massachusetts, post-employment restraints "are scrutinized with particular care." *Oceanair, Inc. v. Katzman*, 2002 Mass. Super. LEXIS 60 at *27 (Mass.Super. 2002).  A non-competition agreement is only enforceable if it is narrowly tailored to protect the employer's legitimate business interests.  *Ikon Office Solutions, Inc. v. Arthur Belanger*, 59 F. Supp. 2d 125, 1258 (D.Mass. 1999).  Indeed, non-competition covenants must be no "wider than is necessary for the protection to which [the former employer] is entitled."  *Wilson v. Clarke*, 470 F.2d 1218, 1221 (1st Cir. 1972) (interpreting Massachusetts law).  Massachusetts law recognizes only a narrow range of legitimate business interests—namely, the protection of business goodwill and the protection of confidential or trade secret information.  *Banner Indus. v. Bilodeau*, 2003 WL 831974 at *2 (Mass.Super. Feb. 27, 2003).  By contrast, insulating an employer from the stress and strain of ordinary competition is not a legitimate business interest.  *Oceanair, Inc.*, 2002 Mass. Super. LEXIS 60 at *27 (Mass.Super. 2002); *Richmond Bros., Inc. v. Westinghouse Broad. Co., Inc.*, 357 Mass. 106, 111, 256 N.E.2d 304, 307 (1970).

Consistent with this framework, the Superior Court determined in *Workscape v. Gioja* that Workscape's one year non-competition provision was overbroad and unenforceable, and reformed the provision to a duration of six months.  (Complaint at Ex. J, 5/18/05 Tr. at pp. 34-44).  Under Massachusetts law, an unenforceable non-competition covenant may be modified by

the court to last for only as long as it is necessary to protect a former employer's confidential business information and customer goodwill. *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778, 308 N.E.2d 481, 485 (1974).

The Superior Court's findings are binding on Workscape in the case at bar and consequently, Count I fails to state a claim for intentional interference with contractual relations because the agreement that Workscape sought to enforce against Gioja in the Superior Court was rejected as overbroad, and declared unenforceable on its terms. As a result, the one year non-competition provision contained in Gioja's Separation Agreement cannot serve as the basis of Workscape's action for intentional interference.

*Static Control Components, Inc. v. Darkprint Imaging*, *Inc.*, 240 F.Supp.2d 465 (M.D.N.C. 2002), and other cases, make this precise point on facts materially identical to those at bar. In both *Static Control* and the case *sub judice*, the plaintiff sued a competitor for tortious interference with contractual relations based on the competitor's hiring of the plaintiff's former employee. By joining the competitor, the former employee allegedly violated her non-competition agreement. 240 F.Supp.2d at 470. The interference claim was tried to a jury which delivered a verdict in favor of the plaintiff. *Id*. at 470-71. After the trial, the defendant moved for judgment as a matter of law on the plaintiff's tortious interference claim, since the non-competition covenant at issue was overbroad, and therefore invalid. The district court agreed and accordingly entered judgment for the defendant on the tortious interference claim. *Id*. at 475.

Similarly, in *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660, 665 (Tex. 1990), the Texas Supreme Court held that unenforceable non-compete agreements cannot support a tortious interference claim. The court stated: "covenants not to compete which are

unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference." *Id.   See also Nalco Chemical Co. v. Hydro Technologies, Inc.*, 148 F.R.D. 608 (E.D.Wis. 1993) (dismissing intentional interference claim against competitor who hired plaintiff's former employees in violation of their employment agreements once appellate court determined the nondisclosure and non-compete provisions were unenforceable); *Manhattan Associates, Inc. v. Rider*, 2002 WL 1774056 (W.D.Ky. Aug. 1, 2002) (same); *Zep Manufacturing Co. v. Harthcock*, 824 S.W.2d 654 (Tex.App.Ct. 1992) (same).

That the Superior Court in the present case reformed Gioja's non-competition period from one year to six months, and issued a permanent injunction to that effect does not alter the deficiencies of the intentional interference claim.  An action for intentional interference must be supported by a contract which is enforceable as written; the mere fact that the Superior Court exercised its discretion to re-write the parties' agreement is of no consequence since *every* non-competition covenant that is void as overly broad could be capable of enforcement, so long as it is reformed by a court that is willing to use its judicial discretion to substitute terms that are sustainable under state law.  For instance, it would be inconsistent with the common law of tortious interference to subject a company to tort liability for its hiring of an individual bound by a patently unenforceable non-competition agreement—say, a non-compete with a ten year duration—on the ground that the covenant *could* be enforced if reformed by a court to a six month period.  If that were the case, no employee with a deficient non-competition agreement would be hired for fear by the new employer that it could be successfully sued if *any* aspect of the non-competition agreement survived through reformation by the court.

An analogous example is *Zep Manufacturing*, 824 S.W.2d 654, where a non-compete was held unenforceable because of its lack of geographic limitation.  The plaintiff sought damages

for tortious interference from a competitor who had hired the employee bound by the covenant. The court, however, rejected the plaintiff's argument that its tortious interference claim was still actionable because it was based partly on other enforceable noncompete covenants—"[a]n action for *damages* may not be predicated upon the breach of an *unenforceable* noncompete clause." 824 S.W.2d at 663-64 (emphasis in original and added.)

This result is correct and proper because non-competition agreements are viewed negatively by courts as they limit employees' freedom to work. Consequently, prospective employers like Defendant Workstream must not be deterred from hiring employees covered by defective non-competition agreements because they fear intentional interference suits if any portion of the non-competition agreement is sustained. Such a result would significantly chill the rights of employees to obtain employment where they are covered by an impermissibly broad non-compete covenant, as in this case.

**B.** **Workscape's claim fails because the Complaint does not adequately allege that Workstream knew Gioja would breach his non-competition covenant by joining Workstream.**

Even drawing all reasonable inferences from the Complaint's allegations, the second element of a tortious interference claim that "Workstream and Mr. Gioja *understood* that Mr. Gioja's employment with Workstream would be a breach of his one-year non-competition obligation to Workscape" is not well-pled. (Complaint at ¶ 40.) The Superior Court's findings, which are incorporated as part of the Complaint, state that the case regarding the alleged breach of a non-competition agreement was a "close matter." (Complaint at Ex. J, p. 2.) Because of the language employed by the Separation Agreement—which did not preclude Gioja from joining a Workscape competitor so long as his "business activities" were not competitive—it would not have been apparent to Workstream that hiring Gioja would result in a breach of those terms. On

this point, the court in *Workscape v. Gioja* explicitly found that Gioja had attempted from the start to limit his job responsibilities at Workstream in "good faith" to avoid breaching the non-competition covenant. (Complaint at Ex. J, 5/18/05 Tr. at p. 34.) Further, due to Workscape's scrivener's error, the Separation Agreement actually provided that the non-competition period would end on February 18, <u>2005</u>, two and a half months before Workstream had even hired Gioja. (Complaint at Ex. B, Sec. 3(a).) Last, and most significantly, Gioja and Workstream's interpretation of the non-competition provision was validated by the Superior Court's finding that the covenant was overly broad and therefore unenforceable as written. (Complaint at Ex. J, 5/18/05 Tr. at pp. 42-43; Ex. 1, Gioja's Proposed Conclusions of Law, ¶ 22.) Thus, the pleadings that incorporate the above do not satisfy the intentional interference component of Workstream *knowingly* violating a contract. This deficiency alone vitiates the intentional interference claim.

> **C.    Workscape's claim fails because even if all of its allegations are accepted as true, Workstream did not act with an improper motive or employ an improper means when it hired Gioja.**

A plaintiff cannot recover for intentional interference unless the defendant's interference was achieved through an improper means or was driven by an improper motive. *W. Oliver Tripp Co.*, 34 Mass.App.Ct. at 751-52. Workscape's allegations concerning Workstream's conduct in hiring Gioja do not rise to the level of "improper means" or "improper motive." Far from the "threats, misrepresentations of fact, or defamation" that courts have held to constitute an improper interference with contract, *Banta Corp. v. Total Graphics*, *Inc.*, No. 9301390, 1994 WL 878941 at *4 (Mass.Super. Dec. 1, 1994), the Complaint merely alleges that:

- Workstream hired Gioja knowing that Gioja had executed a one year non-competition agreement which prohibited him from engaging in "competing business activities." (Complaint at ¶ 35.)

10

- Workstream indemnified Gioja against any legal action based on Workscape's belief that Gioja's employment was in violation of the non-competition agreement. (Complaint at ¶ 39.)

- Workstream and Gioja, to avoid a breach of the non-competition agreement, sought to structure Gioja's future job responsibilities such that he would not be engaging in "competing business activities." (Complaint at ¶ 47.)

- Workstream's attorney assisted Gioja in giving notice to Workscape of his new employment, a notice that was later provided in full compliance with the terms of the Separation Agreement. (Complaint at Ex. D, MG000291, MG000305.)

- Workstream and Gioja "conspired to orchestrate a crafty stratagem," by which they would induce Workscape to sue Gioja. (Complaint at ¶ 56.)

- Workstream and Gioja timely produced Gioja's Workstream employment agreement to Workscape during the course of discovery. Workstream and Gioja did not produce the agreement earlier. (Complaint at ¶ 67.)

- Once Workscape filed suit, Gioja's legal expenses were shouldered by Workstream per their agreement, and after a full trial on the merits, Gioja obtained a judgment from the Superior Court which Workscape has since sought to appeal. (Complaint at ¶ 58.)

Nothing in these allegations came close to the improper means or motive standard necessary to maintain this action. Indeed, these allegations do not set Workstream's actions apart from the ordinarily permissible "rough and tumble standards of commercial competition." *Hunneman Real Estate Corp. v. Norwood Realty*, 54 Mass.App.Ct. 416, 427, 765 N.E.2d 800, 808 (2002); *see also Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 623 (10th Cir. 1995) ("in the context of a claim for tortious interference with prospective economic advantage, 'wrongful means' refers to conduct such as 'physical violence, fraud, civil suits, and criminal prosecutions'").

As previously noted, the non-competition covenant did not *per se* bar Gioja from working for a competing company, so there was nothing on the face of the agreement that prohibited Workstream from hiring Gioja. Indeed, the Superior Court determined that the case was a "close

matter" and ultimately held that the covenant's terms were unenforceably broad.  (Complaint at Ex. A, B, and J at 5/18/05 Tr., at p. 43.)  Gioja's indemnification by Workstream and his retention of counsel cannot serve as probative evidence of wrongdoing.  As for the allegation that Gioja attempted to circumscribe his Workstream responsibilities so as to avoid a breach of the non-competition covenant, the Superior Court's explicit finding (which is incorporated in the pleadings) that Gioja had attempted to define his Workstream job duties in "good faith" obviates any claim of wrongful means or motive.  (Complaint at Ex. J, 5/18/05 Tr. at p. 34.)   And Workscape's naked allegations regarding Workstream's "crafty stratagem"—the gist of which was that Workstream intended to encourage Workscape to sue Gioja, thereby endangering his future role as a member of Workstream's senior level management team, and further requiring Workstream to allocate a significant amount of its own assets towards Gioja's ensuing legal fees—do not meet the wrongful means and motive standard and further are so specious on their face that they cannot possibly serve as a basis for a properly plead intentional interference claim. *Chongris v. Bd. of Appeals*, 811 F.2d at 37 (bold or unsupportable assertions in a complaint should not be considered).

### 1.    Gioja's indemnification by Workstream cannot serve as evidence of Workstream's improper means or motive.

The Complaint's allegations concerning Gioja's indemnification by Workstream and his retention of legal counsel cannot show improper means or motive.  Indeed, indemnification and use of counsel is not even admissible as evidence of liability. *See Curtis Manufacturing Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 94, 100 (D.N.H. 1995) (ruling that an indemnification agreement was inadmissible evidence of liability insurance, and could not be used to prove whether an individual infringed or misappropriated the plaintiff-corporation's patent).  Under Massachusetts law, a plaintiff is ordinarily forbidden from presenting evidence at trial "that the

defendant is insured against liability." *Goldstein v. Gontarz*, 364 Mass. 800, 808, 309 N.E.2d 196, 202 (1974). As a result, evidence of liability insurance cannot be used to prove that a party acted wrongfully. *See McDaniel v. Pickens*, 45 Mass.App.Ct. 63, 66, 695 N.E.2d 215, 217 (1998) (noting that both Massachusetts law and the Federal Rules of Evidence bar the use of a defendant's liability insurance to prove that the defendant "'acted negligently or otherwise wrongfully'"), quoting FED. R. EVID. 411. Consequently, Gioja's indemnification by Workstream or use of counsel simply has no probative import on the issue of whether Workstream's decision to hire Gioja was an improper means, or made with an improper motive, and cannot support a properly pled cause of action.

### 2. Workstream's hiring of Gioja falls within the competitor's privilege.

Workscape specifically pled that Workstream was motivated by a competitive reason. (Complaint at ¶¶ 47, 82.) Workstream's actions are accordingly shielded by the competitor's privilege set out in section 768(1) of the Restatement of Torts, and adopted by Massachusetts courts. *See Hunneman Real Estate Corp.*, 54 Mass.App.Ct. at 428-29, 765 N.E.2d 809-10, citing section 768(1) comment g, at 43: "If [the interfering party's] conduct is directed, at least in part, to [advancing his competitive interest], the fact that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper." Thus, there is no improper means or motive to make out a tortious interference claim if the defendant's conduct was directed, at least in part, towards advancing its own competitive interest. *Bueller v. Carey*, No. 00-P-1318, 2003 WL 193958 at *2 n.5 (Mass.App.Ct. Jan. 23, 2003) (unpublished decision).

For example, in *Occusafe, Inc.*, 54 F.3d at 623 (10th Cir. 1995), the court held that the defendant's hiring of the plaintiff's industrial hygienists in violation of their noncompete

agreements fell well within the competitor's privilege contained in section 768(1) of the Restatement because "the defendant's hiring of plaintiff's industrial hygienists was directly related to and in furtherance of defendant's interest in [its] competition [with the plaintiff.]"  *See also IT Network, Inc. v. Shell*, 21 F.Supp.2d 1280 (D.Kan. 1998) (dismissing claim for competitor's intentional interference with the plaintiff's contractual relationships with its former employees based on the competitor's privilege).

The Complaint here alleges:  "Workstream intended to deprive Workscape of the benefits of the Separation Agreement with Mr. Gioja, and divert the benefits of Mr. Gioja's employment to Workstream, in part *due to the existence of the competitive business relationship between Workstream and Workscape.*"  (Complaint at ¶ 82); *see also* Complaint ¶ 47.  The sum and substance of these allegations are that Workstream hired Gioja to advance its competitive purposes in violation of the non-competition agreement between Gioja and Workscape, which is protected by Massachusetts law.  Consequently, Count I fails under the competitor's privilege.

> **3.    Public policy, which courts consider when determining the existence of an improper means, does not favor the imposition of tort liability against a new employer based on an arguably unenforceable non-competition agreement.**

Massachusetts courts have adopted the seven-factor analysis applied by the Restatement (2d) of Torts to assess whether interference has been improper.  *Id*.  The factor relevant for purposes of this litigation is "the social interests in protecting the freedom of action of the actor and the contractual interests of the other."  RESTATEMENT (SECOND) OF TORTS, § 767(e).  Non-competition agreements are strongly disfavored by the law because they are restraints of trade that infringe upon an individual's basic right to work.  Public policy dictates that such post-employment restrictions may not be used to prohibit an individual from applying his general skills and knowledge in an effort to earn a livelihood. *J.T. Healy & Son v. James A. Murphy &*

*Son*, 357 Mass. 728, 740, 260 N.E.2d 723 (1970). "An employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment. The employee may achieve superiority in his particular department by every lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer." *Club Aluminum Co. v. Young*, 263 Mass. 223, 226-267 (1928).

In sum, there is a significant societal interest in favor of permitting a new employer to hire an individual without fear of tort liability if a meritorious (and eventually successful) challenge can be brought to the enforceability of the individual's post-employment restraint. Failing to uphold this social interest would have a chilling effect on the labor market because no reasonable employer would risk the costs of litigation inherent in hiring an individual bound by a non-compete covenant, even where the employer could do so in good faith, given the serious questions surrounding the legitimacy of the restrictive covenant. *See Intertek Testing Services NA, Inc. v. Curtis-Straus LLC*, No. 98903F, 2000 WL 1473126 at *11 (Mass.Super. Aug. 8, 2000) (holding that since a "prospective employer who is seeking to hire an employee burdened by a non-compete agreement may not be certain whether that agreement is enforceable until the matter is litigated," it cannot be an unfair or deceptive trade practice to retain that employee).

D. **Workscape's claim fails to sufficiently allege that it has sustained actual damages as a result of Workstream's alleged misconduct.**

Actionable damages are the fourth requisite element of an intentional interference with contractual relations claim. *W. Oliver Tripp Co.*, 34 Mass.App.Ct. at 751-52, 616 N.E.2d at 124. Under the "American Rule," attorneys' fees may not be recovered by a winning party except when specially provided for by statute or by contract. *See Chartrand v. Riley*, 354 Mass. 242, 243-244, 237 N.E.2d 10 (1968). Since Workscape only seeks its attorneys' fees expended in its

suit against Gioja in Superior Court, it has failed to allege a cognizable pecuniary harm, a pleading element necessary to maintain Count I.  *Ratner*, 35 Mass.App.Ct. at 138-39 (no submissible claim for intentional interference where plaintiff suffered no "pecuniary loss" as a result of defendant's alleged conduct).

## II.     Workscape's Complaint Fails to State a Cause of Action Under Mass. G.L. c. 93A.

A Chapter 93A cause of action may not be maintained where, as in this case, it arises from an employment agreement, particularly an alleged breach of a non-competition agreement *regardless of whether the non-compete is valid or invalid*.  Chapter 93A, § 2(a) of the Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  A practice is "unfair or deceptive" if it is:  "(1) within the penumbra of some common-law, statutory, or other established concept of unfairness; and (2) immoral, unethical, oppressive, or unscrupulous."  *Thermo Web Systems, Inc. v. Beebe*, No. Civ.A. 00-40170-NMG, 2001 WL 311295 at *2 (D.Mass. Mar. 15, 2001).

It is well-established that disputes between employers and employees fall beyond the scope of § 11 of the unfair trade practices statute.  *Informix, Inc. v. Rennell*, 41 Mass.App.Ct. 161, 162-63, 668 N.E.2d 1351, 1353 (1996); *Thermo Web Systems*, 2001 WL 311295 at *3; *Armstrong v. Rohm and Haas Co.*, 349 F.Supp.2d 71, 83 (D.Mass. 2004); *Burgess v. McLaughlin Transportation System*, No. CIV.A.97-2086 B, 1998 WL 374914 at *2 (Mass.Super. Jun. 10, 1998).  "[Employment] disputes are principally 'private in nature' and do not occur in the ordinary 'conduct of trade or commerce' as contemplated by the protections of Chapter 93A."  *Armstrong*, 349 F.Supp.2d at 83, quoting *Manning v. Zuckerman*, 388 Mass. 8, 14, 444 N.E.2d 1262 (1983).  It is of no import that the employment relationship no longer exists at the

time the alleged unfair conduct occurred, so long as that conduct arose from the employment

relationship. *Armstrong*, 349 F.Supp.2d at 83; *Burgess*, 1998 WL 374914 at *2.

In *Intertek Testing*, 2000 WL 1473126 (Mass.Super. 2000), the court applied these

principles to an unfair trade practices claim wholly analogous to the action at issue here.  The

*Intertek Testing* plaintiff alleged that the defendant had known that the plaintiff's employees

were bound by non-compete agreements, but nonetheless induced them to join the defendant's

competing business.  The court ruled against the plaintiff, holding that:

> If the actual willful breach of a non-compete agreement by an employee is
> not actionable under c. 93A because the claim arose from the employment
> relationship, then the conduct of a third party to induce such a breach must
> also not be actionable because this claim, too, arose from the employment
> relationship.  This is especially so here, where the critical issue in
> determining whether [the defendant] induced such breach is whether the
> non-compete agreements themselves are enforceable.

2000 WL 147316 at *11.  The Court stressed that a contrary rule would have a chilling effect on

the labor market:

> Courts will enforce such agreements only when they have a legitimate
> business purpose and are reasonable in time, space, and scope, based on
> all the circumstances.  As a result, a prospective employer who is seeking
> to hire an employee burdened by a non-compete agreement may not be
> certain whether that agreement is enforceable until the matter is litigated.
> If c. 93A applied to these disputes, with its provision for treble damages
> and the allowance of attorneys fees, the delicate, uncertain balance that
> presently applies to these cases would be dramatically altered.  A
> competitor who is contemplating hiring an employee with a non-compete
> agreement may find the financial risk of litigation so great that such
> employees may effectively be unable to find work in their field, regardless
> of the reasonableness of their non-compete agreement.

*Id*. (Emphasis added.)  Significantly, a 93A action regarding any non-competition agreement

cannot be maintained, regardless of whether the non-compete is valid or not.  Thus, the instant

case presents a far stronger situation for dismissal because:

- The Separation Agreement on its face did not plainly preclude Workstream from hiring Gioja because the non-competition covenant employed amorphous and ambiguous language that merely restricted Gioja from engaging in "competing business activities." *See* Argument I(B), *supra*.

- If prohibited from joining Workstream, Gioja may not have found other work in his field, which was a dynamic and rapidly changing industry, or at his past level of compensation, due to his high level of experience and age.

Thus, even taking all well-pled allegations of the Complaint as true, the Separation Agreement, on its face, would have elicited a significant and reasonable doubt in Gioja and Workstream's minds, as to its enforceability. The "competing business activities" prohibition was undefined, and in any event, did not *per se* preclude Gioja from joining a Workscape competitor. According to the Separation Agreement, the non-competition period ended on February 18, 2005, one and a half months before Workstream hired Gioja. The non-competition covenant had an unlimited geographic scope, and the full extent of Workscape and Workstream's competition in the marketplace, as viewed by the non-competition covenant, was unclear. Lastly, after a full trial on the merits, the Superior Court's decision in *Workscape v. Gioja* ultimately vindicated Workstream's decision to hire Gioja. Under *Intertek Testing*, a c. 93A action could not lie *even if* there was a wholly enforceable non-compete. In the present case, there was not an enforceable non-compete agreement as written.

## III.    Workscape's Complaint Fails to State a Cause of Action for Civil Conspiracy.

"Civil conspiracy is a very limited cause of action in Massachusetts." *Carroll v. Xerox Corp.*, 294 F.3d 231, 243 (1st Cir. 2002), quoting *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass. 1985). Civil conspiracy takes two forms under Massachusetts law, neither of which supports Plaintiff's pleadings in this case. The first type of civil conspiracy "occurs when the conspirators, acting in unison, exercise a peculiar power of coercion over the plaintiff that they would not have had if they had acted alone." *Robinson v. Bodoff*, 355 F.Supp.2d 578, 585

(D.Mass. 2005).   The second form of civil conspiracy "ascribes liability to those who substantially assist or encourage others to commit torts."   *Id*.   Under both variants, proof of intentional conduct is required.   *Id*.

Workscape does not allege that Workstream, acting in unison with Gioja, had at its disposal "some peculiar power of coercion" over Plaintiff Workscape.   When a conspiracy "merely lies on the basis of mere force of numbers acting in unison[,] it must be shown that there was some peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in a like relation to the plaintiff would not have had." *Deslauries v. Shea*, 300 Mass. 30, 33 (1938).   Workscape does not claim that it was coerced to take any action in light of the concerted action of Workstream and Gioja.   Workscape instead alleges that it needed to file suit against Gioja to enforce its alleged contract rights.   Gioja and Workstream, however, did not need to "act in unison" to force Workscape to do this.   Indeed, the notion that Workstream, acting alone or in concert, *wanted* Workscape to sue Gioja defies logic.   Workscape cannot sustain a civil conspiracy cause of action on such specious allegations.   *Copperbeech Partnership, Ltd. v. Seegel, Lipshutz and Wilchins, P.C*, No. 020484A, 2004 WL 1431052, at *3 (Mass.Super. May 5, 2004) (judgment for defendant on civil conspiracy claim where "[t]he particular combination of defendants in this case—here a law firm and its client—cannot be said to have some particular power of coercion over the plaintiff as opposed to the individual actions of the two defendants separately.")

As for the second variant of conspiracy, assistance or encouragement to commit a tort, the Complaint merely alleges that Workstream offered assistance and encouragement to Gioja to breach his Separation Agreement.   (Complaint at ¶ 95.)   Even if the Superior Court's decision in *Workscape v. Gioja* is ignored, Gioja's mere breach of his non-competition covenant does not

amount to a tort. *Robinson*, 355 F.Supp.2d at 585 (civil conspiracy liability for "those who substantially assist or encourage *others* to commit torts") (emphasis added.) Nor can the alleged intentional interference serve as a basis for Workscape's civil conspiracy claim. (Complaint at ¶ 95.) Workscape and Gioja could not have committed, *in concert*, the tort of intentional interference with a contractual relationship because Gioja was legally incapable of intentionally interfering with his own contract. Count III accordingly fails to state a claim for civil conspiracy. In sum, Workstream's alleged conduct does not approach "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Cusick v. Carver*, 2005 WL 873743 at *4 (affirming judgment for defendant on civil conspiracy claim).

## CONCLUSION

While Defendant appreciates the liberal pleading standards in federal court, this Complaint is so lacking that to permit it to go forward would constitute an egregious waste of both the Court and the parties' resources. For the foregoing reasons, this Court should dismiss Workscape's Complaint in its entirety in accordance with F.R.C.P. 12(b)(6).

Respectfully submitted,
DEFENDANT WORKSTREAM, INC.,
By Its Attorneys,

/s/ Christopher W. Sanzone

| | |
|---|---|
| Of Counsel (Admitted *Pro Hac Vice*) | Christopher W. Sanzone, Esq. (BBO#633109) |
| Richard E. Lieberman, Esq. | John T. McCarthy, Esq. (BBO#641406) |
| Gary Y. Leung, Esq. | **Sanzone & McCarthy, LLP** |
| McGuireWoods LLP | 888 Worcester Street, Suite 110 |
| 77 West Wacker Drive, Suite 4100 | Wellesley, MA 02482 |
| Chicago, IL 60601 | (781) 239-9989 |
| (312) 849-8100 | |

Dated: September 13, 2005

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, S.S.                          SUPERIOR COURT DEPARTMENT
                                         OF THE TRIAL COURT
                                         CIVIL ACTION NO. 05-1205

_____
                                    )
WORKSCAPE, INC.,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )
                                    )
MICHAEL GIOJA,                      )
                                    )
            Defendant.              )
_____)

### DEFENDANT MICHAEL GIOJA'S
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Michael Gioja submits the following proposed findings of fact and
conclusions of law.

**Gioja's 25 years of experience with software platforms and the HRMS industry.**

1.      Defendant Michael Gioja has over 25 years of experience in software and
technology services, with 12 years of particular focus on human resources information
technology with an emphasis on creating or extending large software platforms.

2.      Gioja has a bachelor's degree in computer science from the State University
of New York, Oswego campus.

3.      From 1979 to 1991, Gioja worked at IBM, initially as a programmer and
later in management positions.  At IBM, Gioja worked on all aspects of IBM's UNIX-based
platform:    product   management,   product   development,   product   build,   UNIX

configuration, and quality testing.  As Gioja's responsibilities at IBM grew, his efforts focused on bringing IBM's platform to the commercial market.

4.    Gioja was next employed by American Express from 1991-1993.  Gioja was hired to head the company's initiative to rebuild its customer service call center software platform.  Since American Express intended to move to a UNIX-based platform, Gioja was well-suited for this role, based on his past experience with IBM's UNIX platform.  At American Express, Gioja created a new platform and software architecture for American Express's existing and anticipated customer service software applications.

5.    Gioja joined Fidelity Investments in 1993 and worked with that firm until 1995.  Gioja was responsible for Fidelity's CHAPS initiative—Combined Human Resources and Payroll System—an effort to bring Fidelity's human resources operations in-house.  Fidelity had been using a variety of software products in the human resources area.  Gioja was responsible for creating a platform that integrated all of these different human resources software applications.  At Fidelity, Gioja built a new software platform by evaluating the platform options offered by Oracle, SAP, and PeopleSoft, and developing from those products a particularized solution to meet Fidelity's needs.

6.    Gioja next worked for SAP AG from 1995 to 1999.  SAP AG is an "ERP," or Electronic Resources Provider.  These companies provide software services which meet the breadth of a corporation's business operational needs, including human resources services and record keeping or "HRMS"(Human Resources Management Services).  At SAP AG, Gioja worked on HRMS product offerings that the company had developed for the European market, with the aim of leveraging SAP's HRMS package of products, which included compensation planning, performance management, payroll, benefits, training,

event management, rewards, and recruiting products, for sale in the United States market. SAP AG's HRMS products were marketed as a package or suite to meet a business customer's human resources needs from employee "hire" to "retire." As an ERP, SAP AG had an extensive set of human resources products, but unlike "best of breed" vendors who offered only one to three human resources products, the HRMS product suite was not easily adaptable to the needs of a particular customer.  "Best of breed" vendors, on the other hand, endeavor to sell individual human resources products which are the "best" suited to meet particularized customer requirements among the variety of software alternatives in the marketplace.

7.    Gioja subsequently worked for PeopleSoft as an Executive Vice President of Products and Technology from 1999-2000.  Like SAP AG, PeopleSoft was an ERP company.  Gioja was responsible for all of PeopleSoft's ERP software, including the HRMS dimension of its business software suite.  Gioja ran a business initiative in which features were added to PeopleSoft's existing software platform so that customers could access its software platform via the Internet.

8.    In 2000, Gioja joined Internet Capital Group as the private equity firm's Chief Technology Officer.  ICG had acquired or invested in a number of Internet and technology firms with the goal of integrating all of them together into a "market-place" platform called, "Market Maker In A Box."  Gioja was responsible for and completed this platform project during his stay with ICG.

9.    Gioja next went to work for a BrassRing in 2001.  BrassRing was a "best of breed" vendor selling a human resources recruiting product over the Internet.  While at BrassRing, Gioja was responsible for sales of BrassRing's product and for product

3

partnerships with other technology firms. On the technical side, Gioja was responsible for renovating the architecture of BrassRing's software platform.

**Gioja joins Workscape.**

10.    In December 2002, Gioja accepted a position with Workscape as Executive Vice President of Products and Technology. In this position, he reported to the company's Chief Executive Officer and served on the company's Executive Committee.

11.    At that time, Gioja possessed a technical and management skill-set that he had developed during his 23 years as a technology executive, particularly: (1) expertise in developing large-scale software platforms and bringing those platforms to the commercial market; (2) nearly 12 years of specific experience in HRMS applications; and (3) general management experience.

12.    Gioja was hired by Workscape to build a new platform for its human resources software applications.

13.    Gioja's December 2002 Employment Agreement with Workscape contained a provision which articulated his responsibilities as product engineering; product management; and IT operations, and required him to maintain a "tight focus" on those areas in connection with the development of Workscape's new software platform. This "tight focus" provision limited Gioja from assuming responsibilities in other areas of Workscape's business operations, notwithstanding Gioja's past experience in operational areas beyond those described by the "tight focus" clause.

14.    Gioja's duties at Workscape regarding the platform development were essentially the same as his past professional experiences creating and developing software platforms for SAP AG, PeopleSoft, ICG, and BrassRing.

4

15.     **When working on Workscape's platform, Gioja applied a methodology that he had developed through the course of his career: an organizational assessment, followed by a technical assessment.**

16.     Workscape's Vice President of Worldwide Marketing, Betsy Zikakis, set certain product requirements for that platform, or marketing requirements. Workscape's product management team then developed technical specifications, and these specifications were further developed by Workscape's product development division. Gioja and his technical team created Workscape's software platform, "OneForceFive," which was completed and launched by December 2003.

17.     After completion of the OneForceFive platform, Gioja's primary responsibilities involved the technical implementation Workscape's products; that is, the installation, configuration, and customization of Workscape's software product for use by a specific customer.

**Workscape's business.**

18.     During Gioja's tenure at the company, Workscape provided human resources services in three areas: (1) compensation planning software; (2) performance management software; and (3) human resources outsourcing in the benefits area.

19.     **Workscape's human resources outsourcing business ("HRO") provided both technology and business process outsourcing services to clients who wished to completely outsource their health and welfare benefits administration. Specifically, Workscape offered benefits enrollment and benefits administration, including call center capabilities (manned by Workscape employees in Boise, Idaho), COBRA administration, flexible**

spending account administration, and software to its customers. **Effectively, Workscape would serve as the customer's benefits department.**

20.    Workscape's competitors in the benefits HRO outsourcing business include Fidelity, AON, Hewitt, and ADP.

21.    Workscape also provided two human resources software products: compensation planning and performance management solutions, both were offered on a hosted basis.

22.    The performance management human resource product was acquired when Workscape bought a company named Performaworks in 2004. Prior to buying Performaworks, Workscape did not have a performance management product.

**Workscape's current business.**

23.    The Chairman of Workscape, Patrick Hackett, testified that Workscape will not be acquiring new products from other technology firms or buying new companies in the HRMS area in the near term. Consistent with this, Workscape's Chief Financial Officer until March 2005, Phillip Douglas, testified that in light of Workscape's cash position at the time that he left the company, additional capital financing would be necessary if Workscape planned to acquire other product lines or develop new product lines through in-house research and development.

24.    Workscape's Chairman also testified that the performance management software product, which was added to Workscape by the 2004 Performaworks acquisition, has been unprofitable, and that as of May 2005, the performance management software product had been eliminated or deemphasized. As of mid-February 2005, when Gioja left, Workscape was no longer selling its performance management software product.

25.    As a result of the effective elimination of Workscape's performance management software product, at this time Workscape's product line is limited to: (1) the compensation

software product (sold on a stand alone basis); and (2) benefits HRO services product, which is offered as part of the benefits HRO outsourcing business.

26.    **In late 2004, Workscape retained the Goldman Sachs investment banking firm for the purpose of selling Workscape.  A number of potential buyers looked at Workscape, including Fidelity, PeopleSoft, Workstream, Kronos, Hewitt, IBM, and Accenture.**

27.    Workstream attempted to buy Workscape, but did not follow the accepted protocol of working through Goldman Sachs, Workscape's investment banker.

28.    Because of the manner in which Workstream and its CEO, Michael Mullarkey, tried to acquire Workscape, Clifford developed negative feelings and ill-will towards Mullarkey and Workstream.

**Gioja's departure from Workscape.**

29.    **In early 2005, Workscape decided to realign its business and reduce the number of its employees, including a number of executives.**

30.    **During Gioja's Workscape employment, Clifford told him that he should not challenge or disagree with him in the presence of other Workscape executives.  Clifford admonished Gioja that such discussions should only be held in private.**

31.    **Gioja had certain "MBO's," or Management By Objectives at Workscape whereby if these objectives were accomplished, a bonus would be awarded to him.  Gioja disagreed with many of the MBO's set by Clifford, claiming that a number of these goals could not be realistically accomplished.  Gioja and Clifford had contentious discussions regarding Gioja's MBO's in 2004.**

32. Clifford retained negative feelings about Gioja based on a job offer that Workscape had made to Gioja in 2000 which Gioja accepted and later retracted.

**33. In late 2004, Gioja executed an Amended Employment Agreement with Workscape with a back-dated May 9, 2004 to May 9, 2005 term.**

34. **Approximately two months later in February of 2005, Clifford informed Gioja that his position was being eliminated because Workscape was moving to a flatter executive organization. Clifford told him that things had not gone completely smoothly, but that Gioja had made some contributions to the company. Gioja was told by Clifford that his employment agreement would not be renewed by Workscape.**

35. **Clifford told Gioja not to discuss either his termination or the terms of his departure with other individuals in the company. Clifford said that if Gioja did, he would be jeopardizing his referencing and severance payments from the company.** Clifford understood that Gioja was concerned about having good references when looking for another job. Gioja felt that these comments were threats.

36. Gioja's work at Workscape ended immediately and he was not permitted to serve out the remaining quarter (3 months) of his one-year employment agreement. His job responsibilities were immediately removed and he left the organization shortly thereafter.

37. During their discussions about a severance agreement, Gioja told Clifford that he considered his departure from Workscape to be a termination without cause, not a non-renewal of his employment agreement.

38. The nature of Gioja's departure from Workscape was a termination without cause, not a contract non-renewal. In a contract non-renewal, Gioja would have worked until the end of

his contract term.  Here, Workscape told Gioja that his employment was over three months before the contract ended, and immediately stripped him of his duties and responsibilities.

39.    Several days after Clifford told Gioja of his termination, Gioja told Clifford that his job search would encompass both the local and nationwide market and that he would seek employment with Workscape's potential buyers in late 2004 and 2005.  Clifford knew that Fidelity, PeopleSoft, Workstream, Chronos, Hewitt, IBM, and Accenture were the potential buyers and responded positively.  At no time did Clifford tell Gioja that it would be inappropriate for him to seek or accept a job with Workscape's potential buyers, including Workstream.

### Gioja's Restricted Period.

40.    When Gioja joined Workscape in December 2002, he executed an eighteen-month employment agreement that provided for a two-year Restricted Period limiting Gioja's post-Workscape employment rights, except in the case of Gioja's termination without cause or Gioja's resignation for good reason in which the employment agreement provided for a six-month Restricted Period.

41.    This employment agreement was subsequently renewed effective May 9, 2004 (executed late 2004) with the same Restricted Period terms as the initial agreement.

42.    Both Gioja and Clifford understood that a termination without cause would result in a six month Restricted Period.

43.    The Restricted Period referenced in Secton 7(a) of Gioja's Amended Employment Agreement provides, in pertinent part, that:

> [During the Restricted Period] *the Executive shall not participate or engage,* directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation, or other entity, whether as an employee, agent, officer, director, shareholder (except for

the ownership of a less than 5% stock interest in a publicly-traded corporation), partner, joint venturer, investor or otherwise, *in any business activities if such activity competes with the Company's business activities*, including, without limitation, those expressly proposed to be undertaken by the Company or any of its subsidiaries as of the termination of the Executive's employment.

44.    Clifford and Gioja both understood this provision to mean that Gioja had the right to work for a competitor of Workscape as long as the specific work that he performed did not directly compete with Workscape.

45.    Workscape and Clifford, having reviewed Gioja's BrassRing non-competition provision at the time that he hired Gioja in 2002, were familiar with unambiguous contract language which broadly prohibits an employee from joining any business competitor of Workscape.   The BrassRing non-competition provision stated that Gioja cannot work for a business "that competes with BrassRing."

46.    Clifford acknowledged that Gioja's Restricted Period agreement with Workscape, which Clifford signed, did not preclude Gioja from working for a competitor:

> Q.    So your—the way you see it is both Hosker and Gioja have the right to work for a competitor as long as the specific work they're doing for that competitor doesn't directly compete with Workscape?
>
> [Mr. Clifford]
>
> A.    I think that's the spirit . . .

47.    On February 18, 2005, Gioja and Workscape executed a severance agreement. That agreement provided, among other things, that Gioja would be paid three months severance beyond the May 9, 2005 termination date provided for in his Amended Employment Agreement; and that the Restricted Period referenced in section 7(a) of that agreement would terminate on February 18, 2006.

48.     Gioja felt he had no choice but to agree to the one year Restricted Period in the severance agreement because positive, and not negative, references from Clifford and Workscape's investors were necessary for Gioja's post-Workscape employment search.

49.     On March 21, 2005, Clifford emailed Gioja about Gioja's future professional plans. He made particular reference to rumors that Gioja was joining Fidelity, a company which competed with Workscape in the benefits human resources outsourcing area. Clifford's email conveyed, and Gioja understood, that Clifford had no objection to Gioja working for Fidelity.

50.     At the TRO hearing, Workscape's counsel represented that Gioja was free to work for "all the companies that he worked for before," some of whom are considered by Workscape to be competitors. These companies include PeopleSoft and SAP AG, companies that compete with Workscape. Workscape's attorney also stated that Workscape did not seek to enjoin Gioja from working for anybody, but just Workstream.

**Gioja and Workstream discuss Gioja's potential employment.**

51.     After leaving Workscape, Gioja was contacted by an industry analyst who subsequently advised Workstream that Gioja had left Workscape and was seeking a job. Gioja was contacted by Mullarkey and the two discussed potential opportunities for Gioja at Workstream.

52.     **During these conversations, Gioja and Mullarkey discussed Workstream's recently implemented business strategy to offer a comprehensive suite of human resources applications. Gioja also learned that Workstream had recently acquired and planned to continue to acquire various human resources products with the goal of bringing a broad assortment of "hire to retire" human resources applications to customers on one integrated software platform. Gioja learned that Workstream currently had an array of products**

which comprise its human resources management software suite, including workforce planning, recruiting, benefits enrollment, communicator, performance, compensation, non-cash compensation, outplacement, and job boards. In that respect, Workstream is similar to ERP providers but provides its products on a hosted basis (users can access their information on demand from Workstream's hosted servers). Gioja also learned that Workstream markets all of its software products as a unitary and integrated HRMS suite. To promote the HRMS suite, Workstream recently announced a $1 per employee pricing plan in which companies with a minimum number of employees may purchase the full suite at the cost of $1 for each employee per month.

53.    Mullarkey informed Gioja that he was expanding his management team to advance Workstream's business plan and that as part of that strategy, Workstream needed to hire an executive to exclusively supervise and direct the extension of Workstream's existing software platform to integrate Workstream's recent product acquisitions and human resources applications that Workstream planned to acquire in the future. Mullarkey determined that Gioja's past experience, including his work with PeopleSoft and SAP AG, would make him a good fit for Workstream's technical needs.

**Gioja is hired by Workstream.**

54.    Before accepting employment with Workstream, Gioja gave close consideration to the Restricted Period agreement with Workscape. Based on his discussions with Mullarkey, Gioja concluded that his employment with Workstream would not violate that provision. Gioja and Mullarkey agreed that Gioja's responsibilities at Workstream would be the extension of Workstream's current platform—i.e., the integration of Workstream's existing and future acquired HRMS software products into a unitary platform suite. Gioja determined that his

12

Workstream job duties would relate to Workstream's business strategy to provide a "Hire to Retire" suite of integrated solutions to its customers, a segment of the market that Workscape is not competing in. Gioja concluded that his employment with Workstream would not violate the Restricted Period agreement he had with Workscape.

55.    Gioja accepted a job offer from Workstream after attending a Workstream user conference in late March 2005. Gioja's official start date was April 4, 2005 when his salary commenced. Gioja provided written notice to Workscape that he had accepted a job with Workstream.

56.    Gioja worked one week for Workstream before this Court issued a temporary restraining order enjoining his employment until a full trial on the merits.

### Gioja's job duties at Workstream.

57.    Gioja will be working with Workstream's Product Research and Development team in Ottawa, Canada.

58.    Gioja and Workstream agreed to limit his job activities to the development and extension of Workstream's existing software platform. As Workstream's Executive Vice President of Products and Technology, Gioja will be responsible for the development of Workstream's software platform and will be devoted to the integration of Workstream's various HRMS applications into an already existing platform, as well as the integration of applications that Workstream will acquire in the future.

59.    At Workstream, Gioja will be extending an existing software platform rather than building a software platform from scratch, as he did at Workscape. In his job at Workstream, Gioja will employ the same platform methodology that he has used throughout his career at a number of companies. It would be counter-productive to Workstream for Gioja to use any

proprietary information regarding Workscape's platform because the objectives for the two platforms are different, and Gioja is working on an existing platform at Workstream, rather than creating a brand new platform as he did for Workscape.

60.    Workstream's human resources software applications are mature products and for the foreseeable future, extending at least until the end of his Restricted Period, Gioja's duties will not include research and development on adding or improving the functions of the human resources applications.    Workstream's compensation planning product, in particular, was acquired in May 2004 from Kadiri.    Kadiri had just spent a year and a half of research and development to create a robust and broad compensation product which would not require further development from a functionality standpoint.    This was the principal reason that Workstream acquired Kadiri.

61.    Workstream has no plans to develop the features or functionality of its performance management or benefits enrollment products; Workstream will be working on software interfaces which integrate these stand-alone human resources applications into Workstream's platform.    This is consistent with Workstream's "80-20%" business strategy, which focuses on meeting nearly all of its customers human resources needs from hiring to retirement, rather than catering to their customer's specific requirements for a single customized HRMS product.

62.    Any "outward-facing" responsibilities—i.e., client strategy, services, and implementation—would not be within Gioja's job duties at Workstream.    Gioja will not be responsible for client management, client product implementations, client development, client support, or client customization work.

63.    Kevin Jackson is Workstream's Chief Information and Integration Officer. In that role, Jackson is responsible for all of Workstream's customer-facing operational issues, including customer care, trouble tickets, product implementation, and Workstream's professional services team. Any customization of Workstream's products to meet specific customer needs will also be handled by Jackson. Jackson will further supervise any expansion in Workstream's hosting operations. Workstream's responses to Requests For Proposal ("RFP's") from potential clients will be prepared by Jackson. Jackson is also responsible for assessing production costs and expenses in connection with Workstream bids for additional business. In addition, if clients or potential clients require a product demonstration, Jackson is the Workstream executive who would walk those customers through the technical data.

64.    Kevin Dobbs is the Workstream Vice President responsible for product strategy and marketing. The development of Workstream's product road map falls within the Dobbs' purview, as does product pricing.

**Workstream and Workscape do not compete in the "Hire to Retire" HRMS suite segment of the market.**

65.    Workstream offers a broad suite of HRMS software solutions called "Talent Center" and plans to continue to acquire new applications for that software suite. As a suite provider, Workstream plans to sell all of its products to customers as a unitary and integrated package on a single platform, which Gioja will be charged with ensuring.

66.    In situations where a customer only wants to buy an individual Workstream software product, Workstream will accommodate the customer. However, Workstream's business is a software suite approach, where the entire suite of Workstream's products is purchased by a customer for a flat $1 per employee fee.

15

67.    In contrast, Workscape is a "best of breed" provider of compensation planning software product.

68.    HRO benefits firms, like Workscape, effectively serve as a company's benefits department, offering enrollment and administration.

69.    Workstream, by contrast, sells an entire suite which includes a benefits enrollment component.    Workstream does not provide benefits outsourcing services, i.e., a benefits administration call center, COBRA administration services, flexible spending account services, or any other services replicating a company's in-house benefits department.

70.    While Workscape and Workstream both offer a compensation planning application, Workstream's compensation product is merely one component of its suite, while Workscape offers it as an individual software product.

71.    Gioja's development work on Workstream's product suite strategy will relate to Workstream's business activities in a different segment of the market than Workscape.

72.    Workscape does not compete in the "Hire to Retire" HRMS suite market.    If Workscape's products are purchased by a customer, each of these HRMS product offerings must be separately implemented.    Workscape's products are not integrated.

73.    Gioja's work in enhancing Workstream's software platform is solely for the purpose of Workstream's business strategy of selling its "Hire to Retire" integrated software suite solutions.

74.    By contrast, at the time Gioja left Workscape, and thereafter, Workscape was retrenching its HRMS software offerings, effectively eliminating its performance management product.

**Workscape's competitors.**

16

75.     From a broad perspective, the HRMS industry is a highly fragmented marketplace with at least dozens of competitors including BrassRing, Callidus, Mindsolve, Pilat NAI, SuccessFactors, Softscape, Taleo, Authoria, Emcentrix, Exxceed, Kenexa, RecruitMax, Synygy, Kronos, Lawson, Oracle/PeopleSoft, SAP AG, ACS, EDS, Fidelity, and Hewitt.   Workscape acknowledges that its competitors are, among others, SuccessFactors, Kenexa, Workstream, AIM/Authoria, viaPeople, PeopleSoft, SAP AG, Hewitt, and Fidelity.

76.     The "Hoover's Report" on Workscape does not list Workstream as a competitor.

**Gioja does not possess any Workscape property or confidential materials.**

77.     Gioja does not possess any business property, documents, or other papers belonging to Workscape.

78.     As an experienced management executive, Gioja is capable of segmenting his knowledge of Workscape's business during the course of his future professional endeavors. Gioja has done so in the past and will continue to do so in the future.

79.     Gioja is bound by and testified that he will comply with the non-disclosure and confidentiality provision contained in his Workscape employment agreement.

80.     In addition, even if Gioja had any intent to use any knowledge that he gained of Workscape's OneForceFive platform in his new position with Workstream, such an effort would be counter-productive to Workstream, as platform solutions are unique and are driven by the particular business requirements and goal of each specific company utilizing them.

81.     Gioja could not replicate the OneForceFive platform, even if he desired to do so as he does not have the technical skill or knowledge of the components of that platform to do this.

**If Gioja is out of work, his prospects for another job will be diminished.**

17

82.    The HRMS marketplace is a rapidly changing and fiercely competitive landscape.

83.    If a technology executive does not continue to maintain a current role with emerging technologies, he or she will rapidly lose value in the marketplace.

84.    The HRMS industry is currently trending towards market consolidation and many other technology executives have, like Gioja, been down-sized.  As a result, competition for quality executive positions is fierce.

**Many key Workscape executives with the same or greater access to Workscape confidential information and customer goodwill have left the company with either no Restricted Period agreement or a Restricted Period of a more limited duration than Gioja's One-Year Restricted Period.**

85.    The Workscape executives who have left the company within the last year— former executives with the same or greater access to business information concerning pricing, competitive marketing strategy, current and future product specifications, potential and existing customers and partners, and existing and anticipated technological information about Workscape's technology and software functionality, as well as infrastructure design and capability—have either no Restricted Period agreement with Workscape, or Restricted Period agreements of a more limited duration than Gioja's.

86.    In order to protect its confidential information and customer goodwill in each of these areas, Workscape determined that it was not necessary to impose Restricted Periods beyond the time periods (if any) imposed on these other executives with comparable, if not greater, access to proprietary information and customer goodwill as Gioja.

87.    Clifford testified that he determined that it was not worth the cost to Workscape of paying severance, or even worth it to ask these employees for non-competition agreements

with any Restricted Period (or in the few cases where there were Restricted Periods contained in an employment agreement, Restricted Periods any longer than those imposed).

88.    When Clifford executed Gioja's Restricted Period agreement, Clifford determined that in the event of Gioja's termination without cause, the six-month Restricted Period provided for in Gioja's employment agreement provided the necessary protection for any Workscape confidential business information and customer goodwill that Gioja had access to or knowledge of in his job at Workscape

89.    Gioja had the longest Restricted Period of anyone who has departed Workscape in the past year.  Gioja's One-Year Restricted Period is twice as long as the next longest Restricted Period agreement imposed on any Workscape employee who has left Workscape in the past year.

90.    Of the 13 Executive Committee, Vice President, and Director-level executives who have departed from Workscape in the last nine months, only three employees were bound by any non-competition agreement.

91.    William Nazzaro played an integral role in the development and rollout of Workscape's OneForceFive platform technology.  Before being terminated from Workscape, Nazzaro had been Workscape's Vice President of Products and Technology.  With respect to the OneForceFive platform project, Nazzaro was responsible for program management, product testing, and product rollout.  Nazzaro was intimately involved in the preparation of a patent application that Workscape filed for its OneForceFive platform technology.

92.    While Gioja led the overall effort to develop Workscape's platform, he was not disclosed as an author of the patent, nor would it have been appropriate for him to do so.  Gioja was not involved in the technical details of the platform development.  It was Nazzaro who directly supervised all of the programming and architectural work necessary to build the

OneForceFive platform. Nazzaro was responsible for the OneForceFive platform's technical architecture and was also responsible for product delivery and rollout, as well as budget issues for research and development. In terms of the working internals and how the OneForceFive platform actually worked, Nazzaro had a greater degree of knowledge than Gioja.

93.    Gioja later recommended to Clifford that Nazzaro be promoted to Chief Technical Officer. Nazzaro was also a member of Workscape's Operating Committee, which outlined, coordinated, and executed company objectives, including the margin improvement objective for the WorkForce Management product line, the creation of web services through an IBM partnership, and the Workscape product roadmap. The Operating Committee was comprised of a group of eight or nine executives. These executives included the Executive Committee and three or four other key executives like Nazzarro. As for sales and client interaction, Nazzaro was often responsible for product demonstrations and sales calls. When Workscape put itself up for sale in late 2004, Nazzaro had access to and assisted in the preparation of Workscape's sale book, which contained a substantial amount of Workscape confidential information, including financials, how the company had progressed from 1999 to 2005, Workscape's product pipeline, backlog, future revenues, net operating losses, client list, and product technology. Nazzaro also made a presentation to a potential buyer of Workscape during that sales process.

94.    Nazzaro's employment with Workscape was terminated by the company in January 2005. Clifford provided a severance package with Nazzaro, but that severance package did not contain a non-competition provision. Clifford did not regard such a non-competition agreement as necessary to protect Workscape's business interests.

95.    Michael Marfise was formerly Workscape's Vice President of Product and Program Management. Marfise was responsible for early-stage product development and

worked with both Workscape's marketing and product technology divisions. In that capacity, Marfise was privy to Workscape proprietary information relating to both its marketing strategy, and current and future product specifications. Marfise left Workscape without a non-competition agreement in place.

96.     Kathy Wagner was Workscape's Director of Product Quality and Release Services. In that role, Wagner had knowledge of and access to all of the OneForceFive platform's source code. Clifford did not impose a non-competition agreement on Wagner upon her resignation from Workscape.

97.     **Phillip Douglas was Workscape's Chief Financial Officer until early March 2005. Douglas was the number two man in Workscape's executive organization, behind only Timothy Clifford, Workscape's CEO. When it came to running Workscape, Clifford and Douglas were considered by the organization as Workscape's most significant executives. Douglas was responsible for Workscape's financial and cash management; financial planning and forecasting; operational and sales support activities; business development; investor relations; facilities administration and purchasing; and legal affairs. Douglas had knowledge of Workscape's sensitive pricing information, business plan strategies, major strategic initiatives, and its channel partnership with IBM and other companies.**

98.     **Under the terms of his original employment agreement, Douglas was subject to a two-year non-competition provision. When he learned that his position was being eliminated, Workscape's CFO, Douglas, requested that his non-competition agreement be reduced from two years. Clifford, after discussions with Workscape's board, concluded**

that a six-month non-competition was appropriate. Douglas's employment agreement was amended accordingly, although Workscape was under no legal obligation to do so.

99.     Betsy Zikakis was formerly Workscape's President of Worldwide Marketing. Zikakis was responsible for all of Workscape's marketing operations. Zikakis was a member of the company's Executive Committee and was one of only a handful of executives that directly reported to Clifford. As a result, Ms. Zikakis was "absolutely" privy to very confidential information, including Workscape's business strategies.

100.     Earlier in 2004, Workscape had embarked on the "Arizona" project, which was a business evaluation of what it would take to develop a next-stage "killer" compensation planning product. The Arizona project was not pursued when, after the initial evaluation, Workscape decided that development would have consumed an enormous amount of financial resources. Zikakis was responsible for developing the Arizona project roadmap.

101.     When terminated by Workscape, Zikakis received 6 months severance pay. Clifford did not impose a non-competition agreement of any length with Ms. Zikakis as part of her severance package.

102.     Andrew Hoskar is currently Workscape's Senior Vice President of Sales and a member of the firm's Executive Committee. Hoskar played a role in most of Workscape's strategic planning, including marketing and finance issues. Hoskar had access to all of Workscape's confidential, proprietary, and sensitive business information on company sales. In addition, Hoskar had intimate knowledge of Workscape's customer goodwill and pricing information. Hoskar directly reported to Clifford, but has been

terminated and will be leaving Workscape in May 2005, as part of Workscape's current reduction in force initiative.

103.    Prior to November 2004, Hoskar had no non-competition agreement with Workscape. At that time, Hoskar assented to a six-month non-competition period in order to participate in a change-of-control bonus plan that was provided by Clifford to a select group of Workscape executives. Clifford has testified that this bonus plan was designed to alleviate concerns that a potential buyer might have about an exodus of Workscape executives to its competitors following Workscape's sale. In exchange for bonus payments that were conditioned on Workscape's sale, certain Workscape executives agreed to six-month non-compete agreements. Hoskar was one of these executives.

104.    The change-in-control bonus plan, along with the negotiation of these non-competition agreements, was primarily implemented to make Workscape a more attractive acquisition rather than [and] to protect any confidential or proprietary business information that was within Hoskar's knowledge. Nonetheless, Clifford believed that at the end of his six-month Restricted Period, Hoskar could join Workstream as Vice President of its Sales Division, with no resulting detriment to Workscape.

105.    Deidre Moore was Workscape's Director of Strategic Communications. Moore was terminated by Workscape in the Summer of 2004. Moore was provided with a severance package, but Clifford did not believe that it was necessary for Workscape to request a Restricted Period agreement in exchange.

106.    Jo Ellen Collins was Workscape's Director of Channel and Customer Marketing. Collins was also terminated as part of Workscape's reduction in marketing expense initiative. Collins was privy to internal Workscape information on marketing for both Channel and overall

operations. Collins certainly had access to some proprietary and confidential marketing information during her tenure at Workscape. Workscape did not impose a Restricted Period agreement on Collins at the time of her termination.

107. Rich Jackson was Workscape's Vice President of Benefits Outsourcing until he was terminated in March of 2005. Jackson was terminated as part of Workscape's overall reduction in force. Jackson formerly ran Workscape's services operation, and he had an intimate detail of every single one of Workscape's customers and a tremendous amount of customer goodwill. Jackson had contact with nearly all of Workscape's clients, including IBM. Jackson ran product implementation for the IBM account. Clifford provided a 13-week Restricted Period agreement with Jackson to protect Workscape from Jackson's knowledge of its highly proprietary and confidential business information on customers and product information.

108. Greg Gagliano was Workscape's Director of Workforce Management. Before leaving Workscape, Gagliano had been responsible for the product delivery and implementation of Workscape's Workforce Management software, a product which comprises the bulk of its revenues. Gagliano was responsible for the technical implementation of the Workforce Management product to fit each customer's particular needs and specifications. Gagliano dealt directly with Workscape's customers and had intimate knowledge of who those customers were. Gagliano left Workscape without a non-compete and now works for Fidelity, which competes with Workscape in the benefits market.

109. Neil McAdorey was Workscape's Manager of Channel Alliances. McAdorey left Workscape in early 2005. Once McAdorey was subsequently hired by Workstream, Clifford became concerned with the situation, as McAdorey had knowledge of sensitive and confidential Workscape business information. Clifford had not, however, imposed a Restricted Period

agreement with McAdorey as part of his severance package. Clifford made no effort to seek a non-compete agreement with McAdorey.

110.    Meg Norberg was a Vice President in Workscape's Finance Division. Ms. Norberg was terminated by the company and had no Restricted Period agreement.

111.    Joe Tagliareni had been Workscape's Vice President of Planning and Budgeting. Tagliareni was privy to and had knowledge of Workscape's research and development budget. Tagliareni resigned from Workscape without a Restricted Period agreement in place.

## PROPOSED CONCLUSIONS OF LAW

Michael Gioja, for his proposed conclusions of law, states as follows:

**GIOJA'S WORK AT WORKSTREAM WILL NOT VIOLATE THE RESTRICTED PERIOD AGREEMENT BECAUSE HIS WORK ON EXTENDING WORKSTREAM'S PLATFORM DOES NOT COMPETE WITH WORKSCAPE'S BUSINESS.**

1.    Gioja will not violate the Restricted Period agreement by working at Workstream. Gioja's job at Workstream will be to extend Workstream's software platform, work that solely relates to Workstream's "Hire to Retire" HRMS software suite business. Gioja's development work on Workstream's HRMS platform to support its suite is an activity that does not compete with Workscape because Workscape does not market a "Hire to Retire" HRMS software suite.

2.    Under Massachusetts law, post-employment restraints like the Restricted Period agreement advanced by Workscape in this case "are scrutinized with particular care...." Oceanair, Inc. v. Katzman, 2002 Mass. Super. LEXIS 60 at *27 (Mass. Super. 2002).

3.    This Court must construe any ambiguity in the Restricted Period provision against the drafter, Workscape. See Sentry Ins. v. Firnstein, 14 Mass. App. Ct. 706, 442 N.E.2d 46, 46-47 (Mass. App. Ct. 1982); Lanier Professional Servs., Inc. v. Ricci, 192 F.3d 1, 5 (1st Cir. 1999).

When the contract meaning is in doubt, contract terms must be construed against their drafter. Cereva Networks, Inc. v. Lieto, 2001 WL 1228040 at *4 (Mass. Super. Oct. 12, 2001).

4.    The parties agree that under the terms of the Restricted Period agreement, Gioja has the right to work for a competitor of Workscape as long as the specific work that he performs in his new job does not directly compete with Workscape's business activities.

5.    Workscape and Workstream do not compete in the end-to-end, "Hire to Retire" segment of the HRMS market. Workscape only offers compensation planning and HRO benefits products. This is a "best of breed" approach, in which the seller provides isolated, stand-alone, non-integrated products, but markets these products as the "best" application available. Workstream, on the other hand, is going to market with an "80-20%" business strategy which focuses on meeting all of its customer's HRMS needs, rather than catering to the specific requirements of each particular customer for one stand-alone product. Workscape does not compete in the "Hire to Retire" segment of the HRMS market.

6.    Gioja's job duties at Workstream will be limited to the extension of its existing software platform—i.e., the integration of Workstream's past and future HRMS application acquisitions. Gioja will only be responsible for developing the software interfaces needed to integrate all of Workstream's HRMS applications (including those listed above) into a single software platform.

7.    Gioja will have no "outward-facing" responsibilities at Workstream. He will not be responsible for client management, client product implementations, client development, client support, or client customization work. Gioja will have no business relationship with IBM or GM at Workstream. All of these outward-facing functions, as well as responsibility for Workstream's product roadmap, pricing, in-house human resources, and finance, will be

managed by other Workstream executives.   Gioja will not be developing the features or functionality of Workstream's individual HRMS applications (including compensation planning, benefits, and performance management), and Workstream has no plans to do so at least within the period of Gioja's Restricted Period.

8.     Under Massachusetts law, Gioja has the right to use his expertise in developing and bringing large-scale software platforms to market—developed at PeopleSoft, SAP AG, BrassRing, and Workscape—for his new employer, Workstream.   The Restricted Period agreement may not prevent Gioja from using skills he learned or refined during the course of his career.  Richmond Bros., Inc. v. Westinghouse Broad. Co., Inc., 256 N.E.2d 304, 307 (1970); J.T. Healy & Son v. James A. Murphy & Son, 357 Mass. 728, 740, 260 N.E.2d 723 (1970).  As stated by the court in Massachusetts Supreme Court in Club Aluminum Co. v. Young, 263 Mass. 223, 226-27 (1928), quoted with approval by Lajoie Investigation, Inc. v. Griffin, 1996 WL 1186792 at *2 (Mass. Super. 1996) (J. Brassard):

> An employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment.   The employee may achieve superiority in his particular department by every lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer.

9.     Consequently, Gioja's employment at Workstream, in the job described by Gioja and Mullarkey, does not contravene the prohibition contained in section 7(a) of Gioja's Workscape employment agreement.

**EVEN IF GIOJA'S JOB DUTIES AT WORKSTREAM COMPETED WITH WORKSCAPE'S BUSINESS, THE ENFORCEMENT OF THE RESTRICTED PERIOD AGREEMENT WOULD ILLEGALLY STIFLE COMPETITION, GIVEN THE NATURE OF GIOJA'S JOB DUTIES AT WORKSTREAM.**

10.     Even if Gioja's new job violated the literal language of the contract, enforcement of the contract would be based on the asserted competitive status between Workstream and Workscape and not any legitimate business interest that Workscape may have in protecting its confidential information or goodwill from being used by Gioja in his new job responsibilities. Massachusetts law prohibits the enforcement of a non-competition agreement whose sole purpose is to inhibit competition.

11.     Under Massachusetts law, a non-competition agreement is only enforceable if it is narrowly tailored to protect the employer's legitimate business interests. Ikon Office Solutions, Inc. v. Arthur Belanger, 59 F. Supp. 2d 125, 128 (D.Mass. 1999) (citing Bowne of Boston, Inc. v. Levine, 1997 WL 781444 at *2 (Mass. Super. Nov. 25, 1997)). Massachusetts law recognizes only a narrow range of legitimate business interests—namely, the protection of business goodwill and the protection of confidential or trade secret information. Banner Indus. v. Bilodeau, 2003 WL 831974 at *2 (Mass. Super. Feb. 27, 2003). The burden of persuasion on the enforceability of a non-competition covenant rests with the employer. Lajoie v. Griffin, 1996 WL 1186792 at *2 (Mass. Super. Mar. 11, 1996) (Brassard, J.).

12.     In Massachusetts, an employer may not lawfully enforce a post-employment restraint if its only result would be to stifle competition in the marketplace is not a legitimate business interest. Lajoie Investigations, Inc. v. Griffin, 1996 WL 1186792 at *2 (Mass. Super. 1996). Insulating an employer from the stress and strain of ordinary competition is not a legitimate business interest. Oceanair, Inc., 2002 Mass. Super. LEXIS 60 at *27; Richmond Bros, Inc. v. Westinghouse Broad. Co., Inc., 357 Mass. 106, 111, 256 N.E.2d 304, 307 (1970). A non-competition covenant that is designed solely to protect an employer from ordinary competition is unenforceable. Lajoie, 1996 WL 1186792 at *2.

13.    Under Massachusetts law, "a non-competition agreement may not be used to 'prevent [an employee] from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of employment.'" Lajoie Investigations, Inc. v. Griffin, 1996 WL 1186792 at *2 (Mass. Super. 1996), quoting Club Aluminum Co. v. Young, 263 Mass. at 226-27.

14.    Gioja will not use any Workscape proprietary information to Workscape's detriment at his new job with Workstream. Gioja has worked on software platforms for a quarter of a century. During that time, Gioja developed his own methodology to approaching platform problems and for formulating technical solutions which meet a company's specialized software platform needs. That expertise was developed at several technology firms, including PeopleSoft, SAP AG, BrassRing, IBM, and Workscape. Gioja will employ this general methodology and the skills and expertise acquired through the course of his career in extending Workstream's software platform.

15.    The use of any of Workscape's specific proprietary information regarding Workscape's OneForceFive platform in Gioja's new position with Workstream would be counter-productive. Platform solutions are unique—each business will require a different platform technology based on its particular commercial requirements. In addition, Gioja supervised the development of a platform from scratch at Workscape. This initiative is substantially different from his responsibilities at Workstream, where a significant amount of resources have been expended to develop an already existing platform, which Gioja will extend to integrate Workstream's recent and future HRMS application acquisitions. Gioja's knowledge of Workscape proprietary technical information has no application to his new duties at Workstream.

16.    Gioja's new position with Workstream will not require client contact in any capacity. Gioja will not be responsible for client management, client product implementations, client development, client support, or client customization work. Given Gioja's Workstream job duties, his access to Workscape's customer goodwill will not be used to Workscape's detriment.

17.    Consequently, Gioja's job activities at Workstream involve neither Workscape's confidential information nor its customer goodwill.

18.    To enforce a non-competition agreement, Workscape must show that there is defined Workscape confidential information or customer goodwill that will be used by Gioja in his new position, to the detriment of Workscape. For example, this Court's decision in Cereva Networks, Inc. v. Lieto, 2001 WL 1228040 (Super. Mass. Oct. 12, 2001), involved a sales executive who was responsible for "all aspects of Cereva's [his prior employer] sales initiatives," encompassing "all of Cereva's major customers, and prospects." The Cereva defendant took the same position with a competitor. This Court found that the non-competition agreement at issue in Cereva protected Cereva's "legitimate business interest"—its established customer goodwill. Id. In this case, by contrast, Gioja's present job to extend Workstream's software platform does not implicate either: (1) Workscape's customer goodwill; or (2) Workscape's proprietary information. In his new position, Gioja would use the general skills and expertise in software platform work that he has acquired and enhanced during his entire career. Thus, the only basis to enforce the Restricted Period agreement would be to stifle full and fair competition in the human resources technology marketplace. This is not a legitimate business purpose under Massachusetts law. Lajoie Investigations, Inc. v. Griffin, 1996 WL 1186792 at *2 (Mass. Super. 1996); Ikon Office Solutions, 59 F. Supp. 2d at 128; Banner Indus., 2003 WL 831974 at *2.

30

19.     In his job on Workstream's platform, Gioja cannot use any of the proprietary information or customer goodwill he obtained at Workscape to Workscape's detriment and as a result, the Restricted Period agreement is not based on a legitimate business interest and instead would, if enforced, stifle competition in the HRMS marketplace.    Such a post-employment restraint cannot be enforced under Massachusetts law, and the Restricted Period agreement is therefore unenforceable.

## EVEN IF ENFORCEABLE, THE ONE-YEAR RESTRICTED PERIOD IS NOT NARROWLY TAILORED AND IS BROADER THAN NECESSARY TO PROTECT WORKSCAPE'S LEGITIMATE BUSINESS INTERESTS AND SHOULD BE LIMITED IN LENGTH.

20.     Even if enforceable, the Restricted Period agreement must be both narrowly tailored and necessary to advance Workscape's legitimate business interests.    <u>Ikon Office Solutions, Inc. v. Arthur Belanger</u>, 59 F. Supp. 2d at 128.    The One-Year Restricted Period cannot be "<u>wider than is necessary</u> for the protection to which [the company] is entitled." <u>Wilson v. Clarke</u>, 470 F.2d 1218, 1221 (1st Cir. 1972) (interpreting Massachusetts law) (emphasis added.)   Where confidential business information or customer goodwill is likely to become obsolete with the passing of time, a non-competition agreement must be of a length that is only as long as necessary to advance the employer's interest in protecting that information or goodwill. MASSACHUSETTS SUPERIOR COURT MODEL CIVIL JURY INSTRUCTIONS, §12.1 at p. 12-7.   Where the terms of a post-employment non-competition agreement go beyond what is necessary to protect an employer's legitimate business interest, this Court may only enforce the agreement to the extent necessary to protect the employer's legitimate business interest. MASSACHUSETTS SUPERIOR COURT MODEL CIVIL JURY INSTRUCTIONS, §12.1 at p. 12-8 n.5, <u>citing</u> F. Tinio, Annotation, "Enforceability, Insofar as Restrictions Would Be Reasonable, of Contract Containing Unreasonable Restrictions on Competition," 61 A.L.R.3d 391 (1975).

21.    This Court has the authority to modify the length of the Restricted Period agreement to last for only as long as it is necessary to protect Workscape's confidential business information and customer goodwill.  <u>All Stainless</u>, 364 Mass. at 773.  The Massachusetts model jury instructions provide that:

> For example, suppose an employer required the employee to enter into a post-employment non-competition agreement solely to protect certain confidential business information which was <u>likely to become obsolete</u> in a few weeks or months, and the agreement which the employer actually required the employee to sign provided that it would continue for several years rather than a few months.  In such a case, you could <u>treat the agreement as continuing for only so long as necessary to protect the employer's confidential business information rather than for the full period of time stated in the agreement</u>.

MA SUPERIOR COURT MODEL CIVIL JURY INSTRUCTIONS, §12.1 at p. 12-7 (emphasis added.)

22.    **In Gioja's case, Workscape itself determined that a one-year Restricted Period was not necessary to protect its confidential information and goodwill because Workscape provided for a six-month Restricted Period (in the case of a termination without cause) in Gioja's amended employment agreement, which was executed in late 2004 only two or three months before Gioja was terminated.  The circumstances by which Gioja was terminated would not affect the underlying business interest for the length of a non-compete agreement.    That Workscape provided a six month period for Gioja demonstrates that it believed that it was adequately protected by such a period.  [A termination without cause under the provisions of the contracts here within the last six months of the employment agreement term would be, in many respects, the equivalent of six months notice that the contract would not be renewed.  Those two events would be similar in practical impact from the point of view of employee compensation.  The employee would be out of work, would get six months pay.  However, the two events would**

32

have very different, arguably, outcomes with respect to a non-compete agreement. There is

no good reason in terms of protecting a legitimate business interest why that ought be so.

There is, in other words, not a principle distinction between those two scenarios. I have

considered that.]

23.    Gioja, like other of Workscape's former executives, executed a confidentiality

agreement which prohibits Gioja from disclosing any of Workscape's confidential business

information. This non-disclosure agreement is designed to and will fully protect Workscape's

proprietary information. Clifford determined that similar non-disclosure agreements adequately

protected Workscape proprietary information known by other executives who have left

Workscape without any Restricted Period.

24.    The length of Gioja's Restricted Period is longer than necessary to protect

Workscape's confidential information and goodwill, as evidenced, in part, by the fact that all of

the Workscape executives who have left the company within the last year—former executives

with the same or greater access to business information concerning pricing, competitive

marketing strategy, current and future product specifications, potential and existing customers

and partners, and existing and anticipated technological information about Workscape's

technology and software functionality, as well as infrastructure design and capability—have

either no Restricted Period agreement with Workscape, or Restricted Period agreements of a

more limited duration than Gioja's. Gioja had the longest Restricted Period of any of the 13

executives who have departed Workscape in the past year. Gioja's One-Year Restricted Period

is twice as long as the next longest Restricted Period agreement imposed on any Workscape

employee who has left Workscape in the past year. The One-Year Restricted Period imposed on

Gioja by Workscape is not narrowly tailored to Workscape's interest in protecting its

confidential business information or customer goodwill as evidenced by the fact that other executives terminated during the same timeframe as Gioja possessed the same, or more, knowledge of Workscape's proprietary information or customer goodwill and left Workscape with zero or a substantially shorter Restricted Period.  See Gateway 2000, Inc. v. Kelley, 9 F. Supp. 2d 790, 795-97 (E.D.Mich. 1998) (finding that "other employees' agreements indicate that [the defendant's non-competition] agreement was overbroad" where employees with equal or greater knowledge of the plaintiff's product road map were bound by less restrictive non-competition agreements).

25.     In order to protect the same confidential information and customer goodwill in each of these areas, Workscape determined that it was not necessary to impose Restricted Periods beyond the time periods (if any) imposed on these other executives with comparable, if not greater, access to proprietary information and customer goodwill as Gioja.   Clifford determined that it was not worth the cost to Workscape of paying severance, or even worth it to ask these executives for non-competition agreements with any Restricted Period (or in the few cases where there were Restricted Periods contained in an employment agreement, Restricted Periods any longer than those imposed).

26.     Workscape did not deem it necessary to impose any Restricted Period to protect proprietary product technology information in the possession of other executives.   When Workscape terminated its Vice President of Products and Technology, William Nazzaro, Workscape provided a severance package that did not include any Restricted Period agreement. Nazzaro was one of the chief architects of the OneForceFive platform and was disclosed as an author of that technology on Workscape's patent application.  Nazzaro had greater technical knowledge of the OneForceFive platform than Gioja.   Nazzaro was also a member of

Workscape's Operating Committee, which was privy to nearly all of Workscape's confidential strategic initiatives. Nazzaro had access to Workscape's sales book, a confidential document prepared for potential Workscape buyers which contained all of the proprietary information necessary to fully inform a buyer on Workscape's business.

27.    The other executives with comparable access to Workscape's proprietary product technology information were not asked to execute a Restricted Period agreement: Workscape's Vice President of Product and Program Management (Marfise); Workscape's Director of Product Quality and Release Services (Wagner); and Workscape's Director of Workforce Management (Gagliano).

28.    Workscape did not deem it necessary to impose any Restricted Period to protect proprietary marketing information in the possession of other executives. When Workscape terminated its Vice President of Worldwide Marketing, Betsy Zikakis, Workscape negotiated a severance package that did not include any Restricted Period. Zikakis was a member of the Executive Committee and directly reported to Workscape's CEO. As an Executive Committee member, Zikakis had access to confidential information across the breadth of Workscape's operations—finance, products and technology, marketing, and sales. Zikakis was responsible for Workscape's product roadmap, as well as all other aspects of Workscape's marketing plans, including customer focus groups and public relations. Zikakis has greater knowledge than Gioja of Workscape's proprietary marketing information, including Workscape's product roadmap.

29.    The other executives with comparable access to Workscape's proprietary marketing information were not asked to execute a Restricted Period agreement: Workscape's Director of Strategic Communications (Moore); and Workscape's Director of Channel and Customer Marketing (Collins).

30.     Workscape did not deem it necessary to impose a one-year Restricted Period to protect proprietary financial and price structure information in the possession of other executives.     When Workscape terminated its Chief Financial Officer, Phillip Douglas, Workscape negotiated a severance package which reduced the two-year Restricted Period contained in Douglas's employment contract to six months, even though Workscape was under no legal obligation to do so.  Workscape determined that all of the proprietary information that Douglas had knowledge of was fully protected by a six month Restricted Period.  Douglas was the number two man in Workscape's executive organization, behind only Workscape's CEO Clifford.  As an Executive Committee member, Douglas had access to confidential information across the breadth of Workscape's operations—finance, products and technology, marketing, and sales.   Douglas has greater knowledge than Gioja of Workscape's proprietary financial information, including its pricing structure and cost margins.

31.     The other executives with comparable access to Workscape's proprietary financial information were not asked to execute a Restricted Period agreement:  Workscape's Vice President of Finance (Norberg); and Workscape's Vice President of Planning and Budgeting (Tagliareni).

32.     When Workscape terminated its Vice President of Benefits Outsourcing, Rich Jackson, Workscape negotiated a severance package which included a thirteen-week Restricted Period.  Workscape determined that Jackson had knowledge to an intimate detail of every single one of Workscape's customers and a tremendous amount of customer goodwill.  Jackson had contact with nearly all of Workscape's clients, and was responsible for product implementation on the IBM account.  Workscape determined that a 13-week Restricted Period fully protected its legitimate business interest in protecting customer goodwill because Jackson's customer

goodwill and knowledge of confidential business information would be obsolete once that 13-week timeframe elapsed.   Jackson has greater access than Gioja to Workscape's customer goodwill, including any goodwill stemming from Workscape's business relationship with IBM.

33.     Workscape's Senior Vice President of Sales had greater access than Gioja to Workscape's customer goodwill as well as greater knowledge of the company's sales strategies and business plans, and pricing information, but Hoskar was asked to execute a Restricted Period agreement of a far more limited duration than Gioja's one-year agreement.

34.     Gioja's one-year Restricted Period is "wider than necessary" to protect Workscape's legitimate business interests.   Workscape determined that it could adequately protect proprietary information known by former executives with comparable if not greater access to each of these areas than Gioja by imposing either no Restricted Period agreement or a Restricted Period of a more limited duration than Gioja's.

35.     Based on the above evidence, a Restricted Period ending as of the date of this Court's decision in this trial will protect Workscape's legitimate business interests.

## THE RESTRICTED PERIOD AGREEMENT IS UNENFORCEABLE UNDER MASSACHUSETTS LAW BECAUSE IT CONTAINS NO GEOGRAPHIC RESTRICTION.

36.     Under Massachusetts law, a non-compete covenant must have a reasonable and limited geographic scope.   All Stainless v. Colby, 364 Mass. 773, 779 (1974) (under Massachusetts law, a non-compete covenant must have a reasonable and limited geographic scope).

37.     The Restricted Period agreement is unenforceable because it lacks any geographic restriction.

38.    The international extension of the non-compete covenant to cover Gioja's work in another country (Canada) is patently unreasonable. See Wordwave, Inc. v. Owens, 2004 WL 3250472 at *4 (Mass. Super. 2004) (voiding non-compete covenant covering New England, which exceeded former employee's sales territory); Neeco, Inc. v. Computer Factory, Inc., 1987 WL 16161 at *3 (D.Mass. 1987) (restrictive covenant barring employee from working for any competing IBM dealer or reseller within the New England area held unreasonably broad where the employee had only a limited role in the employer's customer relations); Kroeger v. The Stop & Shop Cos., Inc., 13 Mass. App. Ct. 310, 317-18, 432 N.E.2d 566, 571 (held, geographical restriction barring employment with competitors doing business east of the Mississippi river was overbroad and therefore unenforceable).

39.    Because the Restricted Period agreement lacks any geographic restriction, Workscape may not enforce it against Gioja for a job in Ottawa, Canada.

**IN THE ALTERNATIVE, THIS COURT SHOULD AMEND THE RESTRICTED PERIOD AGREEMENT TO LIMIT GIOJA'S JOB DUTIES AT WORKSTREAM TO THE EXTENSION AND INTEGRATION OF WORKSTREAM'S SOFTWARE PLATFORM.**

40.    If this Court finds that Gioja's Restricted Period agreement is overly broad, it may amend that agreement by inserting reasonable and feasible terms. All Stainless, 364 Mass. at 773 (limiting enforcement of non-competition agreement covering New England and New York to the more limited sales territory serviced by employee prior to his termination).

41.    If this Court enforces the Restricted Period agreement, the Court should amend the agreement such that Gioja is permitted to work at Workstream for the remainder of the Restricted Period exclusively on the extension of Workstream's software platform to integrate Workstream's existing HRMS software applications, as well as those applications that will be acquired in the future, as described by Gioja and Mullarkey; and prohibit Gioja from any job

responsibilities involving client contact, client management, client product implementations, client development, client support, client customization work, or other non-platform work.

Respectfully submitted,

DEFENDANT MICHAEL GIOJA,
By His Attorneys,

_____

Christopher W. Sanzone, Esq. (BBO#633109)
John T. McCarthy, Esq. (BBO#641406)
**SANZONE & MCCARTHY, LLP**
888 Worcester Street, Suite 110
Wellesley, MA  02482
(781) 239-9989

Of Counsel (Admitted *Pro Hac Vice*):

Richard E. Lieberman, Esq.
Gary Y. Leung, Esq.
**McGuireWoods LLP**
77 West Wacker Drive, Suite 4100
Chicago, Illinois  60601
(312) 849-8100

Dated:  May 16, 2005

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, S.S.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.  05-1205

|  |  |
|---|---|
| WORKSCAPE, INC.<br>          Plaintiff, | ) ) ) ) |
| v. | ) ) |
| MICHAEL GIOJA<br>          Defendant. | ) ) ) ) |

## WORKSCAPE INC.'S AMENDED PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Workscape, Inc. ("Workscape") submits the following proposed findings of fact

and conclusions of law:

### PROPOSED FINDINGS OF FACT

Workscape, for its proposed findings of fact, states as follows[1]:

**Workscape Inc.**

1.      **Plaintiff Workscape, Inc. is a privately-held corporation with a principal**

**place of business in Marlborough, Massachusetts.**

2.      **Workscape designs, develops, markets and sells a range of comprehensive**

**human resource ("HR") technology, products and related software applications and**

**services.  Workscape products and web-based HR solutions and software applications are**

**delivered primarily on a hosted basis.**

---

[1] The proposed findings of fact are supported by, among other things, the testimony of Workscape's President and
CEO Timothy Clifford and Defendant Michael Gioja.  In the event that additional testimony or documentary
evidence supports a finding of fact, an appropriate citation has been provided.

3.      Since its inception in 1999, Workscape has invested substantial time, resources and money to develop its technology, software solutions and application products, and to train its technical sales support, engineering, marketing, product and sales employees.  Through in-house development, as well as the acquisition of small, niche vendors, Workscape has developed a comprehensive product suite that delivers employee and manager self-service HR applications, including benefits administration, compensation planning, performance management, and portal applications.

4.      Workscape has customers nationwide.  Workscape's software, technology and solutions, as well as its services, are currently used by several Fortune 500 companies such as General Motors, IBM, DaimlerChrysler, FedEx, Cendant, CIGNA, Staples, Home Depot and Tyco.

5.      Generally, Workscape's software, technology and solutions, as well as its services, are used to complement, supplement or enhance its customers' broad software applications that in most instances have been provided by an Enterprise Resource Provider ("ERP") such as Oracle (Peoplesoft) or SAP.  Workscape's HR products and related software applications and services provide its customers functionality, customization or configurability to support a customer's unique business processes and are integrated into multi-vendor software environments to ensure protection of existing technology investments.

6.      Workscape sells its HR technology, products and services directly to customers as well as through distribution and strategic partners.  Distribution and strategic partners are entities, such as industry-leading technology companies, that extend the value of Workscape's technology solutions with complementary products to ensure a

2

smooth delivery of integrated software products to common customers or incorporate

Workscape's technology with other software and hardware, depending on their needs.

**Workscape's Efforts To Protect Its Confidential and Proprietary Information**

7.    Workscape takes strict measures to prevent its confidential and proprietary

information from being disclosed to competitors.  These measures include, but are not

limited to:

(a)    Workscape requires its employees and executives, as a condition of their

employment, to execute confidentiality and non-competition agreements.

(b)    Workscape requires its employees, executives, distribution and strategic

partners and potential clients and customers to enter into nondisclosure agreements.  For

example, the non-disclosure agreement for Workscape's employees states in relevant part:

> *Maintaining Confidential Company Information.*  I agree at all times during
> the term of my employment and thereafter (i) to hold in strictest confidence,
> (ii) to use, except for the benefit of the Company, or (iii) to disclose to any
> person, firm or corporation, without the written authorization of the Board
> of Directors of the Company, any trade secrets, confidential knowledge, date
> or other proprietary information of the Company.

(See Trial Exhibit No. 8, Workscape Form Nondisclosure Agreement).

(c)    Workscape also requires its departing employees to immediately return to

Workscape all Company owned materials and documents and property and all materials in

the employee's possession or control relating to work done for the Company including any

and all devices, records, data, notes, reports, proposals, lists, correspondence,

specifications, drawings, blueprints, sketches, materials, equipment, other documents or

property, together with all copies thereof (in whatever medium recorded) belonging to the

Company, its successors or assigns.

(d)     In addition, Workscape restricts access to Workscape's workplace in multiple ways, including but not limited to the following:

i.     In order to enter Workscape offices, Workscape employees are required to display and carry a photographic identification badge.  This badge is considered Workscape property and must be surrendered to Workscape when an employee resigns or their employment is otherwise terminated.

ii.     Non-Workscape employees are only permitted on the Workscape premises when accompanied by a Workscape escort.  Non-Workscape employees must manually sign in and out of a log book.

iii.     If a Workscape employee resigns or his or her employment or is otherwise terminated, and unless special arrangements have been made, that individual's identification badge is immediately deactivated, their email account is closed and computer system access privileges are immediately revoked.

(e)     Employees further agree that any property on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company personnel at any time with or without notice.

(f)     In addition, Workscape frequently marks documents containing Workscape confidential and proprietary information with the legend "Confidential" or "Workscape Confidential".

(g)     In addition, Workscape takes enforcement measures when it deems it appropriate, such as a lawsuit.

8.    Workscape employed such confidentiality measures at its offices in Framingham and Natick, Massachusetts, as well as its new facilities in Marlborough, Massachusetts and other facilities in St. Louis, Missouri and Boise, Idaho.

## Defendant Michael Gioja's Employment by Workscape

9.    In December 2002, Gioja accepted a full-time Executive Vice President, Products and Technology position at Workscape, with general responsibilities for the executive management of product engineering, product management and informational technology ("IT") operations.

10.    In connection with his employment at Workscape, Gioja signed an employment agreement (the "2002 Employment Agreement") that contained confidentiality and non-competition obligations.  (Trial Exhibit No. 11, 2002 Employment Agreement).

11.    The term of the 2002 Employment Agreement was eighteen months, from December 9, 2002 through May 8, 2004, which term would renew for one-year periods upon written notice by Workscape.  (See 2002 Employment Agreement, § 2).

12.    In the event that Gioja was terminated without Cause (as defined in the agreement), he was to receive six months of severance pay (§ 6(f)) and would be subject to a non-competition term (§ 7(a)) of six months.  However, the 2002 Employment Agreement specifically provided that if the Company elected not to renew the agreement, upon expiration of its term, Gioja would not receive any severance pay (§ 18) and would be subject to a non-competition period of two years (§ 7(a)).

13.    In 2004, Workscape and Gioja agreed to extend Gioja's employment.  As of May 7, 2004, Gioja and Workscape executed an Amended and Restated Employment

8.    Workscape employed such confidentiality measures at its offices in Framingham and Natick, Massachusetts, as well as its new facilities in Marlborough, Massachusetts and other facilities in St. Louis, Missouri and Boise, Idaho.

## Defendant Michael Gioja's Employment by Workscape

9.    In December 2002, Gioja accepted a full-time Executive Vice President, Products and Technology position at Workscape, with general responsibilities for the executive management of product engineering, product management and informational technology ("IT") operations.

10.    In connection with his employment at Workscape, Gioja signed an employment agreement (the "2002 Employment Agreement") that contained confidentiality and non-competition obligations.  (Trial Exhibit No. 11, 2002 Employment Agreement).

11.    The term of the 2002 Employment Agreement was eighteen months, from December 9, 2002 through May 8, 2004, which term would renew for one-year periods upon written notice by Workscape.  (See 2002 Employment Agreement, § 2).

12.    In the event that Gioja was terminated without Cause (as defined in the agreement), he was to receive six months of severance pay (§ 6(f)) and would be subject to a non-competition term (§ 7(a)) of six months.  However, the 2002 Employment Agreement specifically provided that if the Company elected not to renew the agreement, upon expiration of its term, Gioja would not receive any severance pay (§ 18) and would be subject to a non-competition period of two years (§ 7(a)).

13.    In 2004, Workscape and Gioja agreed to extend Gioja's employment.  As of May 7, 2004, Gioja and Workscape executed an Amended and Restated Employment

Agreement (the "Employment Agreement"). <u>See</u> Trial Exhibit No. 1. Under the

Employment Agreement, Gioja served as Executive Vice President, Products, Services and

Technology. In this capacity, Gioja's duties included those previously performed,

including without limitation, the executive management of Workscape's product

engineering, product management, hosting and IT operations, but also now officially

included the executive management of Workscape's professional services organization,

which were duties that he had assumed in or about August 2003.

     14.     Throughout the negotiations relating to the terms and conditions of the

Employment Agreement, as well as the 2002 Employment Agreement, Gioja was

represented by counsel.

     15.     Pursuant to the Employment Agreement, Gioja's employment with

Workscape was to continue for a term ending on May 6, 2005, unless earlier terminated.

Thereafter, Gioja's employment term was to extend automatically for consecutive one-year

periods unless either party delivered no less than thirty (30) days written notice prior to an

anniversary date of its election not to renew the Employment Agreement (§ 2).

     16.     Section 7(a) of the Employment Agreement states in relevant part:

> <u>No Competing Employment</u>. The Executive [Gioja] acknowledges
> that the agreements and covenants contained in this Section 7 are essential to
> protect the value of the Company's business and assets and by his
> employment with the Company, the Executive will obtain knowledge,
> contacts, know-how, training and experience regarding the Company and its
> proprietary information, and there is a substantial probability that such
> knowledge, know-how, contacts, training and experience could be used to the
> substantial advantage of a competitor of the Company and to the Company's
> substantial detriment. Therefore, the Executive agrees that for the period
> commencing on the date of this Agreement and ending on the second
> anniversary of the termination of the Executive's employment period
> hereunder, except in the event of termination by the Company without Cause
> or by the Executive with Good Reason such period shall end on the date that
> is six months after the termination of the Executive's employment (either

such period, as applicable, is hereinafter referred to as the "Restricted Period"), the Executive shall not participate or engage, directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder (except for the ownership of a less than 5% stock interest in a publicly-traded corporation), partner, joint venturer, investor or otherwise, in any business activities if such activity competes with the Company's business activities, including, without limitation, those expressly proposed to be undertaken by the Company or any of its subsidiaries as of the termination of the Executive's employment.

(Trial Exhibit No. 1 (emphasis added)).

17.    In Section 8 of the Employment Agreement, Gioja specifically agreed, without limiting Workscape's remedies, that in the event of his breach of any of the covenants contained in Section 7, "there is no adequate remedy at law, that it will not be possible to measure the damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm."  (Trial Exhibit No. 1).

18.    Gioja further agreed in Section 9 of the Employment Agreement that in the event he breached Section 7 of the Employment Agreement, the non-competition period would be extended automatically, with the duration of such extension equaling "any and all periods during which [he] shall be found by a court to have been in violation of the covenants."  (Trial Exhibit No. 1).

<u>Gioja's Acquisition and Use of Workscape's Confidential Information</u>

19.    Gioja was a highly compensated senior member of the executive committee who was responsible for two-thirds of the company's approximately 350 employees, and as such, was privy to a wide array of confidential and proprietary information and customer and partner goodwill.

7

20.    From May 7, 2004 until February 15, 2005, Gioja served as the Executive Vice President, Products, Services and Technology at Workscape. Prior to that, from December 9, 2002 to May 6, 2004, Gioja served as Executive Vice President, Products and Technology at Workscape. In connection with his employment, Gioja served as one of five Executive Committee members at Workscape, reported directly to Workscape's CEO Timothy Clifford, and routinely provided presentations during Workscape's quarterly Board of Directors' meetings.

21.    As the Executive Vice President, Products, Services and Technology, Gioja was responsible for product engineering, research and development and the operational and technical administration of Workscape's professional services and hosting and internal infrastructures.

22.    Gioja has admitted that as the Executive Vice President, Products, Services and Technology at Workscape, he had access to and acquired a great deal of highly confidential and proprietary information and customer and partner goodwill.

23.    Gioja has admitted that during his employment at Workscape, he acquired a great deal of highly confidential information regarding potential and existing customers and partners of Workscape, including the identities of potential and existing customers and partners of Workscape, and contact information for potential and existing customers of Workscape. Much of that information is confidential and proprietary to Workscape.

24.    Gioja has admitted that during his employment at Workscape, he acquired a great deal of highly confidential information regarding the current and future product specifications, the existing and anticipated technological information about Workscape's

technology and software functionality, as well as its hosting infrastructure design and capability.  Such information is confidential and proprietary to Workscape.

25.    Gioja has admitted that during his employment at Workscape, he acquired a great deal of highly confidential information regarding the prices and fee structure for Workscape's products and services, as well as the profit margins and cost structure of Workscape's client and partner transactions.  Much of that information is confidential and proprietary to Workscape.

26.    Gioja has admitted that during his employment at Workscape, he acquired a great deal of highly confidential information regarding Workscape's competitive marketing strategy, including without limitation product differentiations.  Gioja has admitted that he had access to and obtained information regarding Workscape products and services, as well as anticipated future products and services (including the "product roadmap"), and how Workscape's products and services are integrated and how they compare with others in the marketplace.  Gioja has admitted that he had access to and obtained information regarding Workscape's current and anticipated time requirements for go-live implementation and execution of product delivery.  Much of that information is confidential and proprietary to Workscape.

27.    While at Workscape, Gioja's responsibilities included, among other things, the executive management and oversight of the development of Workstream's human resources technology products, software applications and services and their integration into a single platform.   Much of that information is confidential and proprietary to Workscape.

28.    While at Workscape, Gioja's responsibilities involved, among other things, the development and deployment, as well as the integration of Workscape's products info, the OneForce platform.  Much of that information is confidential and proprietary to Workscape.

<u>Workstream's Business, And Its Competition With Workscape</u>

29.    Workstream is based in Ottawa, Canada, and has approximately twenty (20) offices in locations throughout the United States.

30.    Workscape and Workstream are direct competitors.  (<u>See</u> <u>e.g.</u> Trial Exhibit No. 133, Deposition Transcript of Phillip Douglas, ("Douglas Depo. Trans.") at pp. 75-76 (With respect to the question of whether it is fair to characterize Workscape's and Workstream's competition as direct or head-to-head, "it would be hard to characterize it as anything other than that."))

31.    As does Workscape, Workstream markets and sells a range of comprehensive HR technology products and related service applications.  As does Workscape, Workstream products and web-based HR solutions and software applications are delivered primarily on a hosted basis.  (Trial Exhibit Nos. 37-43; 45; <u>see</u> <u>also</u> Trial Exhibit No. 127, Deposition of Workstream Chairman and CEO Michael Mullarkey, ("Mullarkey Depo. Trans.") at pp. 7, 14-15).

32.    Gioja admits that Workstream provides solutions and services that provide management assistance for employee recruitment, benefits, performance, compensation, rewards and transition, as well as portal technology.  <u>Id</u>.

33.    It is undisputed that Workstream markets and sells its HR software applications, products and services throughout the United States. (Mullarkey Depo. Trans., p. 86)

34.    As does Workscape, Workstream provides organizations with the option of software applications that include a service approach through a hosting function, and, if desired by the customer, through a portal application. Similarly, as does Workscape, Workstream's software products and solutions are used to complement or enhance its customers' broad ERP software applications.

35.    Both Workscape and Workstream sell their HR software products and solutions individually. (See Mullarkey Depo. Trans., at pp. 19-24.) [Workstream emphasizes a suite of products much more so than Workscape does, and that Workstream's suite is broader.]

36.    Both Workscape and Workstream, through either in-house development or a number of acquisitions and mergers, directly compete in the development and provision of product suites that deliver employee and manager self-service HR applications, including compensation planning, benefits administration, performance management, and portal applications. For example:

(a) Compensation Planning. Workscape's Compensation Planner solution directly competed with a solution application offered by Kadiri, a small company whose products and solutions focus solely on compensation planning. Workstream acquired Kadiri. Through its acquisition of Kadiri, Workstream's product suites now include compensation planning solutions and, therefore, compete

11

directly with Workscape's Compensation Planner solution. (See Trial Exhibit Nos. 3, 34, 35 and 37.)

(b) <u>Performance Management</u>. Both Workscape and Workstream have completed the acquisition of small, niche vendors whose products and solutions focused primarily on performance management solutions. Within the past year, Workscape acquired performance management vendor Performaworks and Workstream acquired Trimbus. As a result of these acquisitions, Workscape's and Workstream's product suites, respectively, now include functions tailored to performance management solutions and, therefore, Workscape and Workstream compete directly in the provision of performance management solutions. (See Trial Exhibit Nos. 3, 38 and 52).

Both companies market their compensation planning and performance management solutions together as a "pay for performance" solution. (See Trial Exhibit Nos. 5, 6, 42 and 43). Workscape sold both its compensation planning and performance management solutions to Electronic Arts during 2004, winning the deal over competition from Kadiri/Workstream. (See Trial Exhibit Nos. 34 and 35). While Workscape reviewed its performance management product to determine whether to continue selling it, the product remains a part of the portfolio of solutions Workscape offers to customers and is important to the Company's long-term success. (See Trial Exhibit No. 132, Deposition of Patrick Hackett, at p. 50).

(c) <u>Benefits Administration</u>. Workstream recently acquired benefits administration vendor ProAct. Again, with Workstream's acquisition of ProAct's products and

solutions, both Workscape's and Workstream's comprehensive products suites include benefits administration functionality.  (See Trial Exhibit Nos. 4 and 39.) While Workscape offers a call center that Workstream does not offer, both companies offer benefits enrollment and administration solutions on a hosted basis.  (See Trial Exhibit Nos. 4, 39, 44 and 45).

(d) <u>Portal Application</u>.  Both Workscape's and Workstream's clients are provided the option of software applications that include a service approach through a portal application, which provides their respective customer's employees or managers access to data and applications through an aggregated single point of entry.  (See Trial Exhibit Nos.  5-7 and 40-42.)

37.    [Some] Third parties also acknowledged the obvious: that Workstream is a competitor of Workscape.  For example:

a.    **Third party industry publications and market analysts** often **equate Workstream and Workscape as direct competitors.  Gioja admits that Yahoo Finance lists Workstream's "direct competitors" to be "Authoria, Webhire and Workscape."  (See Trial Exhibit No. 46.)**

b.    **Hoovers.com, a comprehensive company, industry, and market intelligence research service also includes Workstream's "closest competitors" to be "Authoria, Webhire and Workscape." (See Trial Exhibit No. 47).**

c.    **Furthermore, several other trade publications equate Workscape and Workstream as competitors within the market of providing comprehensive HR software products.  (See Trial Exhibit Nos. 48-51).**

38.     In addition, [to some extent] Workstream considers itself to be a Workscape competitor.

(a)     A Workstream-generated chart entitled "Workstream HR Competitive Landscape" contains seven columns, three of which include the headings "Benefits," "Performance Mgmt," and "Compensation." The chart contains twelve (12) rows. Each row contrasts Workstream's products with a product of the companies that Workstream considers its competitors, including Workscape. In the columns marked "Benefits," "Performance Mgmt," and "Compensation," Workstream has included Workscape as its competitor. (See Trial Exhibit No. 54).

(b)     Within its 10-K filings for fiscal year ending May 31, 2004, Workstream has admitted that it "competes with vendors of enterprise resource planning software, such as PeopleSoft, Oracle, SAP and PerformaWorks." Workscape recently acquired the performance management vendor Performaworks. (See Trial Exhibit No. 52).

39.     Workstream and Workscape also solicit the same customers and partners.

(a)     Workstream currently is selling and/or marketing its compensation products to multiple Workscape customers including without limitation, General Motors ("GM"). Gioja has admitted that as of the date of his departure from Workscape, both Workstream and Workscape were competing in response to a GM RFP relating to GM's executive compensation plan. (See Trial Exhibit No. 26).

(b)     Workscape and Workstream both maintain separate distribution partnerships with IBM. Gioja has admitted that as Executive Vice President, Products, Services and Technology at Workscape, his responsibilities included the management and

14

oversight of Workscape's partner relationship with IBM.  Gioja had access to and obtained sensitive confidential information regarding Workscape's relationship with IBM.  Both companies also compete for a partnership relationship with EDS; Workstream won that competition.

     (c)     The evidence further demonstrated that Workstream's sales force is attempting to solicit existing Workscape customers including T-Mobile.  (See Trial Exhibit Nos. 53 and 86).

**As Executive Vice President of Technology and Operations at Workstream, Gioja Will Participate In Competing Business Activities.**

     40.     **In his submissions to this Court, Gioja admits that as the Executive Vice President, Products, Service and Technology at Workscape, his responsibilities included, among other things, the executive management and oversight of the development of Workscape's human resources technology products, software applications and services and their integration into a single platform.**

     41.     **In his submissions to this Court, Gioja also admits that as the Executive Vice President, Technology and Operations at Workstream, his responsibilities will include, among other things, the integration of Workstream's various, disparate products into Workstream's existing talent center platform.**  Gioja admits he has no specific knowledge of the status of development of Workstream's products or of the extent of their integration or of what will be required to integrate them.

     42.     **Gioja also admits that as the Executive Vice President, Technology and Operations at Workstream, he will be a member of Workstream's Executive Committee. Gioja will necessarily be involved with discussions or decisions touching on a wide range of subjects including Workstream's products, product roadmap, pricing, margins, costs,**

potential customers, and company finances and strategy. Gioja continues to be aware of Workscape's confidential information on these same subjects, and there is a clear risk that he will be tempted to use such information to the competitive advantage of his new employer.

43.    In his submissions to this Court, Gioja also attempts to claim that his duties and responsibilities at Workstream do **not** compete. In doing so, Gioja makes claims that are patently unsustainable in light of the facts of which he is obviously **personally** aware:

(a)    Gioja has admitted that Workstream recently acquired Kadiri, and as such, Gioja admits that both Workstream and Workscape market and sell a compensation planning product.

(b)    Gioja also has admitted that Workstream acquired Perform and Workscape acquired Performaworks and, therefore, both Workstream and Workscape market and sell a performance management product.

(c)    Gioja further admits that Workstream also recently acquired benefits administration vendor ProAct. Gioja further admits that both Workstream and Workscape market and sell benefits-related products.

(d)    At Workstream, Gioja will be responsible for product research and development, as well as all quality assurance, hosting and IT functions.

(e)    Gioja also has admitted that as of the date of his departure from Workscape, both Workscape and Workstream were competing in response to a GM RFP.

(f)    **In a press release statement dated April 4, 2005, Workstream announced that Gioja had joined Workstream as Executive Vice President of Technology and Operations and would "be responsible for managing Workstream's Research and**

Development team, data center operations and day-to-day technology and operational activities." (See Trial Exhibit No. 55.)

44.     In March 2005, Gioja accepted a full-time Executive Vice President, Technology and Operations position at Workstream, with the apparent general responsibilities for the executive management of Workstream's product engineering, product management, product research and development and technology and operational activities. In connection with his employment at Workstream, Gioja and Workstream executed an employment agreement that does not limit his duties as Executive Vice President, Technology and Operations. Rather, Gioja's employment agreement with Workstream states only that Gioja will be responsible for "fulfilling the title and role of the Executive Vice President" and "such other duties as may be reasonably required." (See Trial Exhibit No. 58, § 2.2.)

45.     Gioja will not be working in a division of Workstream separate and apart from its compensation planning, performance management, and benefits products. Rather, he will be charged with research and development of those products, including without limitation fixing those products. This Court also finds that it is likely that Workstream will issue new releases or enhancements to those products, and that Gioja will necessarily be involved with, if not responsible for, such new releases or enhancements.

46.     Gioja also attempts to claim that his duties and responsibilities at Workstream will not require customer-related activities that might implicate the customer goodwill of Workscape. In doing so, Gioja makes claims that are inconsistent with his position as a member of the Workstream Executive Committee, as well as the preliminary documents generated by Workstream that demonstrate that his duties and responsibilities include the executive management of customer-related activities. (See e.g, Trial Exhibit Nos. 76-77.)

**Gioja's Separation Agreement With Workscape,**
**And Subsequent Employment With Workstream**

47.     On February 3, 2005, Workscape CEO Timothy Clifford met with Gioja and told him that Workscape would not renew Gioja's Employment Agreement when it expired on May 6, 2005.  As the result of the non-renewal of his Employment Agreement, Workscape would have been obligated to continue to pay Gioja his salary and benefits through the balance of the approximately three months remaining on his term, but Gioja was not entitled to any severance payments pursuant to Sections 18 and 6(f) of the Employment Agreement, and was obligated not to compete with Workscape for a period of two years following May 6, 2005 pursuant to Section 7(a) of the Employment Agreement.

48.     During the February 3 meeting, Gioja asked about severance and Clifford told him that while Workscape would continue to pay him through May 6, 2005, Gioja was not entitled under the Employment Agreement to any severance payments after that date.

49.     Thereafter, Workscape's counsel prepared a draft Separation Agreement containing a two-year non-competition period.  (See Trial Exhibit No. 60).  Gioja's counsel responded with a draft containing a six-month non-competition period.  (See Trial Exhibit No. 61).  Gioja and Clifford then met and discussed the issue of the non-competition period. Gioja acknowledged that Workscape was at 2 years and he was at 6 months, and inquired whether a compromise could be reached.  Clifford indicated a willingness to split the difference, and suggested that the lawyers work it out.  Workscape's counsel then circulated a draft reflecting the agreed-upon one-year non-competition period.  (See Trial Exhibit No. 62).  Gioja's counsel accepted the draft with minor revisions.  The parties' mutual intent was that there would be a one-year non-competition agreement.

50.    The final letter agreement was dated February 15, 2005 (the "Separation Agreement") and set forth the terms of Gioja's departure from Workscape.  The Separation Agreement confirmed that Workscape would not renew Gioja's Employment Agreement, but would nevertheless provide certain benefits to Gioja that he was not otherwise entitled to as the result of the non-renewal.  (Trial Exhibit No. 2)

51.    The Separation Agreement states in its introductory paragraph that it is "written to notify you, pursuant to Section 2 of the Employment Agreement, of the Company's election to not extend the term of the Employment Agreement, and to offer the following terms and conditions in connection with such election."  In Section 1.a. of the Separation Agreement, Gioja "acknowledge[d] that, pursuant to the last sentence of Section 18 of the Employment Agreement, Section 6(f) does not apply to this election of the Company, which shall be deemed [to] be a non-renewal of the Employment Agreement upon the expiration of the current term.  Nonetheless, in connection with this election, the Company agrees, in consideration of the terms hereof, to provide the following ..."  (Trial Exhibit No. 2)

52.    In Section 1.a.(i) of the Separation Agreement,  the parties agreed that the Employment Agreement would terminate as of February 18, 2005; "provided, that, except as expressly modified by the terms hereof, the terms of the Agreement that survive termination are hereby ratified and confirmed including, without limitation those set forth in Sections 7, 8 and 9 of the Employment Agreement." (emphasis in original).  Section 7 of the Employment Agreement set forth, among other things, Gioja's non-competition and confidentiality obligations that under the Employment Agreement would survive its termination.  By ratifying that these obligations would survive termination, the parties

19

expressed their mutual intent that Gioja would continue to have non-competition and confidentiality obligations beyond the term of the Employment Agreement. This mutual intent was further expressed in Section 3 of the Separation Agreement, where Gioja specifically acknowledged that he was a party to the Employment Agreement, which included terms regarding, among other things, confidentiality and non-competition, and that the terms of the Separation Agreement in no way superceded those terms of the Employment Agreement, unless otherwise expressly specified. Gioja specifically agreed "that the terms of Sections 7 through 18 of the Employment Agreement remain in full force and effect and survive pursuant to their terms…."

53.    The substantive deal struck by the parties had two key elements. First, the parties agreed in Sections 1.a (ii) and (iii) that Workscape would pay six months of severance benefits to Gioja (subject to set-off for any compensation amounts in connection with new employment), notwithstanding that Gioja was not entitled to any such payments in light of the non-renewal of his Employment Agreement. Second, the parties agreed in Section 3.a. that the non-competition provision of Section 7 of Gioja's Employment Agreement would extend for only one year, rather than the two years that would have otherwise been in effect as the result of the non-renewal of the Employment Agreement. These concessions were made by Workscape in response to Gioja's claim that he was in effect being terminated without cause, which would have entitled him to six months of severance with only a six-month non-competition obligation under Sections 6(f) and 7(a) of the Employment Agreement. The parties compromised their respective claims by agreeing, with advice of counsel, to a one-year, non-competition obligation.

20

54.    **The Separation Agreement contained a typographical error that escaped notice by either party. Gioja admits that while Section 3.a of the Separation Agreement states that the non-competition period shall end on "February 18, 2005," this was a typographical error and should have read "February 18, 2006."**

55.    **The parties' clear intent was for Section 3 of the Separation Agreement to oblige Gioja to refrain from accepting employment with a competitor of Workscape for a period of one (1) year.** This obligation was expressly bargained for, paid for, and agreed to by Gioja as part of the Separation Agreement and his severance package. Workscape would not have agreed to execute the Separation Agreement in general or provide a severance package in particular, including six months of salary continuation, if Gioja had refused to execute the Separation Agreement that contained a one-year contractual non-competition obligation.

**Workscape's Other Or Former Employees' Agreements**

56.    **Gioja attempts to claim that Gioja's one-year non-competition covenant within the Separation Agreement is not supported by Workscape's legitimate business interests of protecting confidential and proprietary information and customer and partner goodwill. Gioja argues that his one-year non-competition obligation is unenforceable because other or former Workscape employees were either subject to a shorter non-competition period or were not required to sign non-competition agreement but remain subject only to a non-disclosure and confidentiality agreement.**

57.    **The majority of the other or former employees cited by Gioja were either Gioja's direct reports and subordinates or were lower-level employees at Workscape. In addition, these other or former employees did not have employment agreements with Workscape. These other or former Workscape employees also were not members of**

Workscape's Executive Committee and were not privy to the same breadth and depth of confidential information to which Gioja had access and obtained. Nevertheless, it is true that all of the other or former employees cited by Gioja were a party to a non-disclosure and confidentiality agreement with Workscape.

58.     Gioja also attempts to claim that his one-year non-competition obligation is unreasonable because three Workscape Executive Committee members, whose employment was terminated within the last nine months, are either subject to a shorter non-competition period or were not required to sign a non-competition agreement but remain subject to only a non-disclosure and confidentiality agreement.

(a)     <u>Elizabeth Zikakis</u>. Gioja relies heavily on the fact that Ms. Zikakis, the Executive Vice President of Marketing at Workscape, whose employment with Workscape was terminated in or about the summer of 2004, did not have a non-competition agreement. The factual background of Ms. Zikakis' employment with and departure from Workscape demonstrates that Workscape acted reasonably in not requiring that Ms. Zikakis to have a non-competition agreement.

In June 2002, Workscape hired Ms. Zikakis as its Executive Vice President of Marketing. Ms. Zikakis has no prior experience in the field of HR software solutions. Ms. Zikakis did not have a written employment agreement with Workscape, but was party to a non-disclosure agreement with Workscape. During the summer of 2004, Ms. Zikakis expressed an interest in becoming a full time mother and terminating her employment with Workscape. Around this same time, Workscape's CEO Tim Clifford was seeking to reduce the company's marketing expenses. Ms. Zikakis and Mr. Clifford came to an agreement that as part of Workscape's efforts to reduce its marketing expense, Ms. Zikakis would

leave the company to pursue her efforts in raising her four-year old daughter.  As part of this agreement, Ms. Zikakis and Workscape entered into a severance agreement dated August 13, 2004.  (See Exhibit No. 100)

During his testimony, Mr. Clifford explained that during the negotiation of Ms. Zikakis' severance agreement, Ms. Zikakis and he agreed that Mr. Zikakis would receive six (6) months of severance pay in exchange for six months of extended service on a part-time basis, but that he did not pursue nor request that Ms. Zikakis execute a non-competition agreement with Workscape.  Mr. Clifford explained the factors supporting Workscape's decision not to require Ms. Zikakis to enter into a non-competition agreement with Workscape included, among other things, Ms. Zikakis' stated intention to pause her career aspirations and go home and focus her efforts in raising her four-year-old daughter, the fact that Ms. Zikakis did not have an employment agreement or non-competition covenant when she joined Workscape, and in terms of the breadth of her knowledge, in terms of company goodwill, in terms of product development, ASP hosting operations, product management, Ms. Zikakis did not have the breadth of knowledge about the company but rather was very much focused in the marketing department during her tenure.

(b)    Phillip Douglas.    Until January 2005, Mr. Douglas served as the Chief Financial Officer ("CFO") at Workscape.  During his deposition in this matter, Mr. Douglas stressed that during his employment with Workscape as CFO, he was not familiar with the technology aspects of the hardware, software and infrastructure in general or the infrastructure that supported Workscape's hosting capabilities, which he considered to be Workscape's highly confidential information.  See Trial Exhibit No. 133, at p. 88.   Mr.

Douglas also did not have a significant amount of client contact during his employment at Workscape. Rather, the confidential information to which Mr. Douglas had access consisted of financial information including revenues, sales and accounting information. Id.

In connection with his employment at Workscape, Mr. Douglas signed an employment agreement that contained confidentiality and a two-year non-competition obligation. As part of a recent restructuring of the company, Mr. Douglas's employment was terminated by Workscape. During negotiations relating to his termination and severance agreement, Mr. Douglas requested that his non-competition obligations to Workscape be reduced from the two years as provided in his employment agreement to six months. Mr. Clifford explained that during these negotiations, he considered the nature of the confidential information to which Mr. Douglas had access and determined that from a risk management perspective, a six-month non-competition period appeared to be fair and reasonable. Mr. Clifford further explained that he believed that six-months would adequately serve Workscape's legitimate business interest of protecting the confidential information that Mr. Douglas obtained because of the length of time that such information remained valid, accurate and potential harmful should it be used competitively.

59.    Workscape does not dispute that Gioja's direct reports or subordinates have either no non-competition obligations or non-competition obligations of two-and-a-half months (e.g. Richard Jackson) depending on the nature of the confidential information to which they had access. Workscape demonstrated that other of its current or former executives have non-competition obligations that are either equivalent or of greater length than Gioja's non-competition obligations, including Workscape's CEO Tim Clifford, who

currently is subject to a two-year non-competition period should he voluntarily leave or is terminated from Workscape. Indeed, of the eleven current or former senior executives, including Gioja, four have non-competition obligations equal to two-years, five have non-competition obligations of six-months, Ms. Zikakis has no non-competition obligations, and Gioja has one-year non-competition obligation. Gioja's one-year obligation was a negotiated resolution and compromise of disputes between Workscape and Gioja regarding the length of the non-competition period as Workscape asserted that Gioja should have been subject to a two-year period and Gioja countered that the six-month non-competition period should have been applied. (See Trial Exhibit Nos. 2 and 117). The majority of executives who have six-month obligations agreed to those obligations even though they did not have employment agreements as part of an executive retention plan implemented in connection with a possible change in control of the Company.

60.    The non-competition provision contained within Gioja's Employment Agreement is consistent with the non-competition obligations of other Workscape Executives, including those Executives at the Company at the time he initially accepted his Executive position with Workscape. Indeed, four members of the Executive Committee at Workscape had a two-year non-competition covenant within their respective employment agreements (Clifford, Carlson, Gioja and Bowen). Mr. Zikakis and Ed Hurley-Wales, the Senior Vice President of Human Resources did not have employment agreements and, therefore, did not have non-competition obligations, while both did have non-disclosure agreements. (See Trial Exhibit No. 117). Clifford reasonably felt that Mr. Hurley-Wales did not require a non-competition agreement given that his area of management was the Company's human resources.

**Gioja's Acceptance Of An Offer At Workstream, Inc. As Workstream's "Executive Vice President of Technology and Operations"**

61.    Gioja admits that he attended, on behalf of Workstream, Workstream's customer user conference on March 21, 2005 and actively participated in conversations and discussions with Workstream employees regarding Workstream's products between March 21, 2005 and April 4, 2005.  (See Trial Exhibit Nos. 79-81).  Gioja stated in an email to Workstream's CEO that attendance at the conference would be a "great way to start." (See Trial Exhibit No. 80). Workstream paid for his travel and hotel expenses for the conference, he was introduced to attendees as joining Workstream, and he signed his employment agreement while attending the conference.

62.    By email sent after the close of business on Friday, April 1, 2005, Gioja informed Clifford that he would be employed by Workstream, a direct competitor of Workscape, as of Monday, April 4, 2005.

63.    In a press release statement dated April 4, 2005, Workstream announced that Gioja had joined Workstream as Executive Vice President of Technology and Operations.  The press release statement specifically cited to Gioja's previous senior management position at Workscape.  Workstream further announced that Gioja "will be responsible for managing Workstream's Research and Development Team, data center operations and day-to-day technology and operational activities." (Trial Exhibit No. 55)

64.    Gioja has admitted that as the Executive Vice President of Technology and Operations at Workstream, Gioja will be "responsible for managing Workstream's Research and Development team, data center operations and day-to-day technology and operational activities."

65.    Gioja has admitted that as the Executive Vice President of Technology and Operations at Workstream, Gioja also will be responsible for the executive management and

26

oversight of the development of Workstream's HR technology products, software applications

and services and their integration into a single platform or portal based application.

66.     These duties and responsibilities are virtually identical to the responsibilities he

held at Workscape as its Executive Vice President, Products, Services and Technology.

## PROPOSED CONCLUSIONS OF LAW

Workscape, for its proposed conclusions of law, states as follows:

## WORKSCAPE MEETS ALL REQUIREMENTS FOR INJUNCTIVE RELIEF

1.     Under Massachusetts law, to obtain a permanent injunction, a plaintiff must show
that

(a) plaintiff prevails on the merits; (b) that irreparable harm will result from the denial of the injunction; and (c) that the plaintiff's irreparable harm outweighs any harm the opposing party would suffer if the injunction were granted.

Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001);

Packaging Industry Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980); Cereva Networks, Inc. v.

Lieto, 2001 WL 1228040 (Mass. Super. Oct. 12, 2001).

**2.     Workscape has met these standards, as demonstrated below.**

**Workscape Prevails On The Merits, Because Gioja Cannot Work For Workstream As Workstream's Executive Vice President of Technology And Operations Without Violating The Non-Competition Covenant Within The Separation Agreement And Employment Agreement.**

3.     Section 7(a) of the Employment Agreement states in pertinent part:

No Competing Employment.  The Executive [Gioja] acknowledges that the agreements and covenants contained in this Section 7 are essential to protect the value of the Company's business and assets and by his employment with the Company, the Executive will obtain knowledge, contacts, know-how, training and experience regarding the Company and its proprietary information, and there is a substantial probability that such knowledge , know-how, contacts, training and experience could be used to the substantial advantage of a competitor of the Company and to the Company's substantial detriment. Therefore, the Executive agrees that **for the period commencing on the date of this Agreement and ending on the second anniversary of the termination of the Executive's employment period hereunder,** except in the event of termination by the

Company without Cause or by the Executive with Good Reason such period shall end on the date that is six months after the termination of the Executive's employment (either such period, as applicable, is hereinunder referred to as the "Restricted Period"), the Executive shall not participate or engage, directly or indirectly, for himself or on behalf of, or in conjunction with, any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder (except for the ownership of a less that 5% stock interest in a publicly-traded corporation), partner, joint venturer, investor or otherwise, in any business activities if such activity competes with the Company's business activities, including, without limitation, those expressly proposed to be undertaken by the Company or any of its subsidiaries as of the termination of the Executive's employment.

(emphasis added.)

    4.     In 2005, Workscape decided not to renew Gioja's Employment Agreement when it expired on May 6, 2005. Thereafter, Workscape and Gioja negotiated a Separation Agreement dated February 15, 2005 that set forth the terms of Gioja's departure from Workscape. The Separation Agreement confirmed that Workscape would not renew Gioja's Employment Agreement, but would nevertheless provide certain benefits to Gioja that he was not otherwise entitled to as the result of the non-renewal. Section 3 of the Separation Agreement states in pertinent part:

    a. I acknowledge that, in connection with my employment by Workscape, I am a party to the Employment Agreement, which includes terms regarding confidentiality, assignment of inventions, and certain other matters, and that I understand that the terms of this Agreement are in addition to those terms, and in no way supercede the terms of the Employment Agreement unless otherwise expressly specified. In connection with the foregoing, **I acknowledge that the terms of Sections 7 through 18 of the Employment Agreement remain in full force and effect and survive pursuant to their terms,** and the Company and I further agree that the Restricted Period shall end on February 18, 2005.

(emphasis added.)

    **Gioja Freely Entered Into The Separation Agreement And Therefore Is Bound By Its One-Year Non-Competition Covenant As A Matter of Law**

    5.     In connection with his employment with Workscape, Gioja executed an Employment Agreement that contained a non-competition obligation. Throughout the

negotiations relating to the terms and conditions of his Employment Agreement, counsel

represented Gioja. In February 2005, Workscape decided not to renew Gioja's Employment

Agreement when it expired on May 6, 2005. Thereafter, Workscape and Gioja negotiated the

Separation Agreement that set forth the terms of Gioja's departure from Workscape. Throughout

the negotiations of the Separation Agreement, Gioja again was represented by his attorney.

### The Separation Agreement Should Be Reformed As A Matter Of Law By The Court To Reflect February 18, 2006 As the Mutually Agreed End Date for Gioja's Non-Competition Obligation

6.      Gioja admits that the date referenced in the Separation Agreement, "February 18,

200<u>5</u>," was a typographical error, that the mutual intent of the parties was for a one-year non-

competition agreement to apply, and that the non-competition period in the Agreement was to

end on February 18, 200<u>6</u>. April 11, 2005 Hearing Transcript at 10.

7.      The Separation Agreement should be reformed as a matter of law to reflect a one-

year non-competition agreement. <u>Polaroid Corp. v. Travelers Indemnity Co.</u>, 414 Mass. 747,

756 (1993) (asserting that mutual mistake is reformable if contract language does not reflect true

intent of parties); <u>Mickelson v. Barnet</u>, 390 Mass. 786, 791 (1984) (stating mutual mistake is

reformable); <u>Nissan Automobiles of Marlborough, Inc. v. Glick</u>, 62 Mass. App. Ct. 302, 306

(2004) (stating that reformation is appropriate remedy for agreements containing mutual

mistake).

### The Separation Agreement Was A Novation And A Settlement Of A Dispute, And Therefore Governs The Length Of The Non-Competition Period As A Matter Of Law

8.      The Separation Agreement was a negotiated resolution and settlement of disputes

between Workscape and Gioja regarding, among other matters, the length of the non-competition

period. Workscape asserted that Gioja was bound by the two-year non-competition period due to

the non-renewal of his employment; Gioja countered that the six-month non-competition period

applied due to his alleged termination without cause.  The parties, both well represented by

counsel, agreed to a compromise of a one-year non-competition period, memorialized in the

Separation Agreement.

9.      Therefore, the parties entered into a substituted contract, accord and satisfaction

or novation by executing this Separation Agreement thereby resolving their dispute.  Restaurant

Consulting Services, Inc. v. Mountzuris, 253 F.Supp.2d 45, 52- 53 (D. Mass 2003) (stating that

for one agreement to supersede another, needs to be clear indication to that effect in new

agreement); Pagounis v. Pendleton, 52 Mass. App. Ct. 270, 273 (2001) (stating that substituted

contract or novation may be inferred, may be based solely on the circumstances of parties but

must rest on clear and definite indication of intent).

### The Separation Agreement Is Supported By Adequate Consideration As A Matter of Law

10.     The one-year non-competition period contained within the Separation Agreement

is supported by adequate consideration.  Absent the Separation Agreement, Workscape had the

right not to renew Gioja's Employment Agreement when it expired on May 6, 2005.  Under the

plain language of the Employment Agreement (§§ 7(a), 18), Gioja would have been subject to a

two-year non-competition period and entitled to no severance pay.  Workscape was entitled to

exercise this right so long as it gave 30 days advance written notice.  Id. § 2.  Workscape made

clear to Gioja that it intended to exercise this right unless other arrangements were made, and

that it was prepared to continue employing him through the end of the term of his employment.

Gioja specifically acknowledged in the Separation Agreement Workscape's right not to renew

his Employment Agreement, as well as that Workscape had complied with the 30-day written

notice requirement  See Trial Exhibit No. 2, Separation Agreement, at 1.

11.     Gioja also specifically acknowledged within the Separation Agreement that the

Separation Agreement, including without limitation the one-year non-competition period, is

supported by adequate consideration.  Id.

12.     Rather than enforce all of these rights, Workspace compromised with Gioja and

provided him substantial benefits that he was not otherwise entitled to: a reduction in the non-

competition period to one year, and six months of severance pay (worth some $116,000), a

release of claims, and payment of moving expenses.  This is sufficient consideration as a matter

of law.  Horner v. Boston Edison Co., 45 Mass. App. Ct. 139 (1998) (release of claims

constitutes sufficient consideration); American Management Services, Inc. v. Nygren, 1999 WL

852831 (Mass. Super. Sept. 17, 1999) (release of claims constitutes sufficient consideration);

Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 285, 86 (1974) (sufficient consideration

where employer paid benefits not otherwise owed at that time).

### The One-Year Non-Competition Covenant Within The Separation Agreement Is Enforceable Under Massachusetts Law To Protect Workspace's Legitimate Business Interests As Matter Of Law

13.     Because Gioja's Agreement with Workspace protects Workspace's legitimate

business interests, and is reasonable in scope and purpose, injunctive relief is appropriate.

Blackwell v. E. M. Helides, Jr., Inc., 368 Mass. 225, 229 (1975).  Massachusetts courts have

consistently enforced non-competition agreements that seek to protect an employer's legitimate

business interests of protecting confidential information and goodwill.  Cereva Networks, Inc. v.

Lieto, 2001 WL 1228040 at *5; Kroeger v. Stop & Shop Companies, Inc., 13 Mass. App. Ct.

310, 316 (1982); Marcam Corp. v. Orchard, 885 F.Supp. 294, 299 (D. Mass. 1995) (holding that

the protection of confidential information is a legitimate business interest); All Stainless, Inc. v.

Colby, 364 Mass. 773 (1974) (legitimate business interests include trade secrets, confidential information and good will).

14.    The one-year non-competition period within the Separation Agreement seeks to protect Workscape's confidential and proprietary technical, product, strategic and financial information and customer and partner goodwill from being unlawfully exploited by a former executive in support of a competitor.  These kinds of interests are repeatedly found to be "legitimate" when enforcing non-competition agreements in Massachusetts.  Kroeger, 13 Mass. App. Ct. at 316; Cereva Networks, Inc. v. Lieto, 2001 WL 1228040 at *5; American Stop Loss Ins. Brokerage Serv., Inc. v. Prince, 2001 WL 173178 *2 (Mass. Super. Feb. 14, 2001).

15.    The Cereva court clearly recognized that the information acquired by an executive with access to products, development strategies and additional significant business information is not "set aside" when such an executive goes to work for a competitor.  The information "is bound to influence" his work for his competitor, and this puts the former employer at a disadvantage.  Cereva, 2001 WL 1228040 at *6 (quoting Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995)); see also Boch Toyota, Inc./Boch Toyota Honda v. Klimoski, 2004 WL 1689770 * 3 (Mass. Super. 2004) ("employee still may be enjoined if the appropriate confidential information is merely in his memory").

16.    **Gioja was a highly compensated member of the Executive Committee who was responsible for two-thirds of the company's approximately 350 employees.  He knew product details, product functionality and integration plans and anticipated future product roadmaps, managed a patent application and knew proprietary information about the integration of Workscape's various products into a complementary suite, as well as the technology and architecture supporting Workscape's hosting services.  This type of**

information in a competitor's hands is severely detrimental to Workscape; Workscape

seeks to protect its legitimate business interests and therefore, the Agreement must be

enforced. Browne v. Merkert Enterprises, Inc., 1998 WL 151253 at *4 (Mass. Super.

March 31, 1998) ("Preservation of confidential information is a legitimate business

interest."); Marcam Solutions, Inc. v. Sweeney, 1998 WL 1284184 at *2 (Mass. Super.

March 25, 1998).

17.    Goodwill is another legitimate business interest protected by employee non-

competition agreements. Cereva, 2001 WL 1228040 at *5; Browne, 1998 WL 151253 at *4.

Goodwill refers to those intangible attributes of a business, such as its reputation among its

customers or potential customers and repeat business with its customer base. Cereva, 2001 WL

1228040 at *5; EMC Corp. v. Gresham, 2001 WL 1763449 at *3 (Mass. Super. Nov.14, 2001).

18.    Goodwill attaches not only in the sales context; anyone who had substantial

contact with decision makers or was introduced to decision makers could use those relationships

so developed "to injure (i.e., appropriate) the former employer's good will." Hurwitz Group,

Inc. v. Ptak, 2002 WL 32717868 at *3 (Mass. Super. June 27, 2002).

19.    Gioja had substantial contact and responsibilities with Workscape customers

and partners, access to pricing information, played a role in sales work in promoting and

selling the product and in fostering goodwill with current and potential customers and

partners. He was a key, high-level executive at Workscape. Workscape is entitled to

protect this goodwill through the enforcement of its non-competition covenant whether or

not Gioja has any role in sales or product pricing at Workstream. Gresham, 2001 WL

1763449 at *3 (finding that employee's position was "sufficiently high" that company had a

"justifiable interest beyond ordinary competition" in seeking to enforce non-compete

agreement); <u>Browne</u>, 1998 WL 151253 at *4 (enforcing non-compete agreement where "strong likelihood" that employee would injure employer's good will if worked immediately for competitor); <u>Veridiem, Inc. v. Phelan</u>, 2003 WL 22481390 *2 (Mass. Super. Sept. 23, 2003).

### Workscape Does Not Need To Show That Confidential Information Obtained by Gioja Will Be Inevitably Disclosed

20.    Gioja argues that since he will be working with Workstream's existing technology platform, rather than overseeing its development, that he will not use any of Workscape's confidential information.  In addition, he argues that since he allegedly has no role in sales or product pricing, or any direct interaction with customers at Workstream, there will be no disclosure of customer identities, pricing information or other Workscape proprietary information.

21.    **However, under Massachusetts law, in order to show a breach of a non-competition agreement, Workscape need only show that disclosure of confidential information is at risk, not that it will be inevitably disclosed.  "A non-compete provision may be enforceable where there is a significant potential for the misappropriation of trade secrets and confidential information to a competitor." <u>Intertek Testing Services NA, Inc. v. Curtis-Strauss LLC</u>, 2000 WL 1473126 at *6 (Mass. Super. Aug. 8, 2000) (emphasis added); <u>Cereva Networks, Inc. v. Lieto</u>, 2001 WL 1228040 at *5-6.  The harm to Workscape cannot be avoided by Gioja's intention not to disclose any confidential information or by his best efforts to avoid disclosure.**

22.    This Court need not find that Gioja took confidential information when he left Workscape.  Gioja admits that he had access to Workscape confidential information.  This access is sufficient to support enforcement of the non-competition agreement. <u>Cereva Networks, Inc. v.</u>

Lieto, 2001 WL 1228040 * 6 (enforcing non-compete as to key executive who had access to confidential information.; Marcam Corp. v. Orchard, 885 F. Supp. at 297); see also Boch Toyota, Inc./Boch Toyota Honda v. Klimoski, 2004 WL 1689770 *3 (Mass. Super. 2004) ("employee still may be enjoined if the appropriate confidential information is merely in his memory.")

23.    **In Marcam Corp. v. Orchard, the court recognized that despite the best efforts of a departing employee, the confidential information known by that highly compensated, highly placed executive would necessarily inform his decisions when working for a competitor. Gioja was a key executive and highly compensated employee, not a consultant, at Workscape. Given his overall intimate knowledge of Workscape's business, there is a significant potential that proprietary and confidential information will be disclosed. Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995); Walker Coal and Ice, Co. v. Westerman, 263 Mass. 235 (1928) (ruling that information gained by employee while working for employer in ice business could be used for benefit of competitor so non-competition agreement enforced).**

24.    Of course Gioja had knowledge and experience prior to joining Workscape, however, he also gained access to substantial confidential information, the protection of which is a legitimate business interest. Walker, 263 Mass. 235 (holding that enforcement of non-competition agreement to prevent disclosure of information gained by employee while working for employer in ice business was necessary for protection of legitimate business interest); Cereva, 2001 WL 1228040.

25.    Gioja points to CSC Consulting, Inc. v. Arnold, 2001 WL 1174183 (Mass. Super. July 12, 2001), arguing that Workscape must show that Gioja has threatened to disclose trade

secrets or will eventually disclose them. However, CSC involves an allegation of misappropriation of trade secrets where the employee did not sign a non-competition agreement, or any other kind of employee agreement, nor was the employee asked to sign any agreement with respect to post-employment activities. The court in Intertek distinguished two types of situations.

> A non-compete provision may be enforceable where there is a significant potential for the misappropriation of trade secrets and confidential information to a competitor. [citations omitted]. A claim of breach of the provision protecting trade secrets and confidential information, however, must be supported by evidence of an actual breach; a plaintiff cannot defeat summary judgment on such a claim simply by showing the potential for such a breach.

Intertek, 2000 WL 1473126 at *6. In CSC, the court found **in light of the absence of any employment agreement**, that there was insufficient evidence to establish that the employee disclosed confidential information or that it was inevitable that the employee would rely on this information at a later time. CSC, 200 WL 1174183 at *2-3. As Workscape has filed an action for enforcement of its non-competition agreement, the court's analysis in CSC is entirely inapplicable to the instant matter.

**The One-Year Non-Competition Covenant Within The Separation Agreement Is Reasonable In Time and Scope As A Matter Of Law**

26.     **Given the nature of the confidential and proprietary information and customer and partner goodwill to which Gioja has admitted he had access and obtained during his employment with Workscape, the one year restriction is of reasonable duration. A non-competition agreement must be reasonable in time and scope to be enforceable. Cereva, 2001 WL 1228040 at *6. One-year periods are generally enforced as reasonable. Id.; Gresham, 2001 WL 1763449 at *3; EMC Corp. v. Allen, 1997 WL 1366836 (Mass. Super. Dec. 15, 1997). See also Philips Electronics North America Corp. v. Halperin, 2000**

36

WL 33171040 at *3 (Mass. Super. Dec. 12, 2000) (stating that reasonable non-compete covenants of up to two years consistently enforced in Massachusetts courts, up to five years if reasonable); <u>All Stainless</u>, 364 Mass. at 779 (enforcing two-year non-competition covenant).

  27. The one-year restriction is particularly reasonable as it is the result of a negotiated resolution to Workscape's right to a two-year non-competition and Gioja's claim to a six-month non-competition period.  In addition, Workscape paid Gioja in excess of $600,000 over his two years of employment, and even though Gioja was not entitled to any severance payment under the Employment Agreement, Workscape agreed to pay him six months of severance (worth $116,000) as a compromise – an additional three months beyond the May 9, 2005 date on which the terms of his Employment Agreement expired.  In these circumstances, the one-year non-competition period is entirely reasonable as a matter of law.

  **28.** **The non-competition agreement also is reasonable as a matter of law in its geographic scope.  Workscape and Workstream compete throughout the entire United States and Canada for business, including over the Internet.  While the non-competition agreement has no geographic limit, Workscape has no objection to Gioja performing a non-competing business activity.  <u>Allen</u>, 1997 WL 366836 at *1 (finding that an unrestricted geographic scope was reasonable given the market for products was worldwide); <u>Philips Electronics North America Corp. v. Halperin</u>, 2000 WL 33171040 at *3 (geographic scope covering entire United States reasonable); <u>New England Circuit Sales, Inc. v. Glidden</u>, 1994 WL 16009938 * 4 (Mass. Super Oct. 13, 1994) (unrestricted geographic scope was reasonable given employer's international business).**

  **<u>The Non-Competition Obligations Of Other Or Former Employees Are Immaterial To The Enforcement Of Gioja's Non-Competition Obligations To Workscape.</u>**

29.     There is no merit to Gioja's argument that the one-year non-competition obligation within the Separation Agreement is unenforceable because other or former Workspace employees were either subject to a shorter non-competition period or were not required to sign a non-competition agreement but remain subject only to a non-disclosure and confidentiality agreement.  The non-competition obligations of other or former employees are immaterial to the enforcement of defendant Michael Gioja's non-competition obligations to Workspace and the content of other or former employees' non-competition agreements is not relevant.  **Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 642-43 (2004) (content of other employee agreements not relevant because employer may reasonably decide which persons pose greatest risk of using confidential information competitively).**

30.     Whether or not other Workspace employees have a shorter non-competition period is not relevant to this action because what is reasonable depends on the facts of each employee's case.  Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287 (1974) (other citations omitted).

31.     Gioja contends that his one-year non-competition obligation to Workspace is not supported by the legitimate business interest of protecting its confidential information and goodwill.  Gioja does not dispute that he had access to and obtained Workspace's highly confidential and proprietary information.  Rather, Gioja asserts that it is significant that other or former Workspace employees are subject to either a shorter non-competition period or were not required to sign a non-competition agreement but remain subject only to a non-disclosure agreement.  The Massachusetts Supreme Judicial Court, however, recently determined that the content of other employee agreements is not relevant because an employer may reasonably

decide which persons pose the greatest risk of using confidential information competitively. Boulanger v. Dunkin' Donuts, Inc., 442 Mass. at 642-43.

32.    In Boulanger, the plaintiff, a franchisee, challenged the enforceability of his non-competition agreement with Dunkin' Donuts claiming that the agreement served no legitimate business interests.  The court, however, concluded that the non-competition agreement served to protect Dunkin' Donuts' confidential information and goodwill.  Nevertheless, the plaintiff argued that it was significant that the Dunkin' Donuts corporate employees, who also had access to the same information as he did, were not required to sign a covenant-not-to-compete.  Id. at 642-43.  The Massachusetts Supreme Judicial Court disagreed, stating "the fact that [Dunkin' Donuts] does not require all employees to sign a covenant not to compete is not relevant, because Dunkin' Donuts may reasonably decide which persons pose the greatest risk of using confidential information competitively."  Id. (emphasis added).

33.    This Court concludes that an employer may reasonably not require non-competition agreements from other employees but still possess a legitimate business purpose in the protection of confidential information and customer goodwill for Gioja's one-year non-competition agreement.  Boulanger, at 642-43.  Here, there is no evidence that Workscape acted unreasonably.

34.    In the instant matter, Workscape does not dispute that Gioja's direct reports or subordinates have no non-competition obligations, while other of his direct reports or subordinates had non-competition obligations from two-and-a-half months to six months depending on the nature of the confidential information to which they had access.  Workscape also has demonstrated that other executives at Gioja's level had non-competition obligations that are either equivalent or of greater length than Gioja's non-competition obligations.

35.     This Court agrees that the content of other or former employees' non-competition agreements is not relevant to the question of whether Gioja's one-year non-competition agreement seeks to protect Workscape's confidential and proprietary information from being used competitively, given that Gioja has admitted that he had access to and acquired a great deal of highly confidential and proprietary information and customer goodwill at Workscape. Boulanger at 642-43 (content of other employee agreements not relevant because employer may reasonably decide which persons pose greatest risk of using confidential information competitively); Chapman & Drake v. Harrington, 545 A.2d 645, 649-50 (Me. Supreme Ct. 1988) (content of non-competition agreements signed by other employees is not relevant as to question of whether it advanced employer's legitimate business interests); Cutright v. Metropolitan Life Ins. Co., 201 W.Va. 50, 56 (1997) (whether other employees do or do not have to execute non-competition agreements "is of no consequence to this case as this aspect 'rises and falls with each individual case.'"

36.     **Even if the content of current or former employees' non-competition agreements were relevant, the testimonial and documentary evidence offered by Workscape still demonstrates that the individualized determinations made by Workscape were reasonable and served the Company's legitimate business purpose of protecting Workscape's confidential information and customer goodwill.  Workscape's argument applies with particular force to those non-competition obligations of Gioja's subordinates who were not privy to the same level of Workscape confidential, proprietary and non-public information.  [I have considered the departure situations of all of the various employees who have left Workscape.  Not all of their situations can be perfectly rationally distinguished from that of Mr. Gioja.  I further conclude, however, that as Boulanger**

**teaches, this is a matter to be left largely in the hands of an employer which must make**

**these difficult decisions on the ground, and which must consider a number of factors,**

**including feasibility, expense and the like.]**

37.     Here, like in <u>Boulanger</u>, Gioja contends that it is significant that "his direct

reports," who may have had access to the same information as he did, was not required to sign a

non-compete.  Gioja points to <u>Gateway 2000, Inc. v. Kelley</u>, 9 F. Supp.2d 790, 795-797 (E.D.

Mich. 1998)), arguing that the content of other or former Workscape employees' non-

competition agreements indicate that Gioja's non-competition obligation is unenforceable.

However, <u>Gateway</u> involves a situation where the defendant's boss and a number of other

employees in his office were only required by the plaintiff to sign a "list agreement" prohibiting

them from joining a list of enunciated competitors.  <u>Id</u>.  This Court declines to follow the

rationale offered by the <u>Gateway</u> court.

38.     Even if the principles set forth in <u>Gateway</u> are applicable to this matter, the facts

presented at trial demonstrate that <u>Gateway</u>'s principles were not violated by Workscape's

policies and conduct.  Here, Gioja was the boss and Workscape has demonstrated that Mr.

Gioja's direct reports, subordinates and the lower-level employees either did not possess the

same breadth, depth or understanding of, or did not have access to, the same confidential and

proprietary information and customer and partner goodwill.  As Executive Vice President,

Products, Services and Technology, Gioja was responsible for product engineering, research and

development, professional services and the operational and technical administration of

Workscape's client hosting and information technology infrastructures, and was a member of the

company's five-person executive management committee, who reported to the Chief Executive

Officer.  He was responsible for the company's product roadmap and had relationships with and

responsibilities for several major customers and partners. As such, Gioja was privy to a vast amount of confidential and proprietary information to which "his direct reports" and subordinates were not.

39.    This Court also finds that an employer may reasonably decide to subject certain employees to non-disclosure and confidentiality agreements while still having a legitimate business interest in seeking to protect confidential information and goodwill to subject other employees to non-competition agreements. Therefore, Gioja's argument also is without merit as there is no legal reason why Workscape cannot require certain employees to be bound by both confidentiality and non-competition agreements. Boulanger, at 643, n. 12.

### Workstream Is A Workscape Competitor

40.    Workscape and Workstream compete in the marketplace in the field of HR software products, solutions and services. Workscape and Workstream, through either in-house development or a number of acquisitions and mergers, directly compete in the development and provision of comprehensive product suites that deliver employee and manager self-service HR applications, including compensation planning, benefits administration, performance management, and portal applications. This activity in the marketplace is head-to-head competition.

41.    Industry publications and market analysts often equate Workstream and Workscape as direct competitors.

42.    An Internet Search on Yahoo Finance about Workstream also includes information regarding Workstream's "direct competitors" whom Yahoo includes to be "Authoria, Webhire and Workscape."

43.     Similarly, Hoovers.com, a comprehensive company, industry, and market intelligence research service also includes Workstream's "closest competitors" to be "Authoria, Webhire and Workscape."

44.     Moreover, Workstream considers itself to be a Workscape competitor.  There is no question that Workstream does compete with Workscape, and Workstream acknowledges that it competes with Workscape:

(a)     A Workstream-generated chart entitled "Workstream HR Competitive Landscape" contains seven columns, three of which include the headings "Benefits," "Performance Mgmt," and "Compensation."  The chart contains twelve (12) rows.  Each row contrasts Workstream's products with a product of the companies that Workstream considers its competitors, including Workscape.  In the columns marked "Benefits," "Performance Mgmt," and "Compensation," Workstream has included Workscape as its competitor.

(b)     Within its 10-K filings for fiscal year ending May 31, 2004, Workstream states that it "competes with vendors of enterprise resource planning software, such as PeopleSoft, Oracle, SAP and PerformaWorks."  As stated above, Workscape acquired the performance management vendor Performaworks in March 2004.

45.     Workstream and Workscape also solicit the same customers.  Workstream currently is selling and/or marketing its compensation products to multiple Workscape customers including, General Motors ("GM").  Gioja has admitted that as of the date of his departure from Workscape, both Workstream and Workscape were competing in response to a GM RFP.

**Gioja's Position And Activities As Executive Vice President of Technology and Operations At Workstream, A Direct Competitor, Violate The Non-Competition Covenant Within The Separation Agreement**

43

46.    Gioja would be in breach of his non-competition obligations as a result of his responsibility for product research and development, as well as all hosting functions at Workstream. Moreover, Workstream has announced that Gioja "will be responsible for managing Workstream's Research and Development team, data center operations and day-too-day technology and operational activities."

**47.    Gioja admits that he has joined Workstream as its Executive Vice President of Products and Technology, the same position he originally held at Workscape. Gioja further admits that he will be a member of Workstream's Executive Committee, an equivalent position he also held during his employment with Workscape. Gioja's position at Workscape was "sufficiently high" that Workscape has a "justifiable interest beyond ordinary competition" in seeking to enforce the one-year non-competition covenant within the Separation Agreement. <u>Veridiem, Inc. v. Phelan</u>, 2003 WL 22481390 *2 (Mass. Super. Sept. 23, 2003).**

48.    Gioja contends that contends that the non-competition covenants were not breached because the covenants require not only that the companies themselves be in competition with each other, but that Gioja's specific responsibilities at Workstream constitute competing activity. Gioja argues that because he will not have operational responsibilities for services or implementation, contact with customers or any role with pricing or sales, he will not be engaged in any competing activity at Workstream. This Court need not concern itself with the duties and responsibilities Gioja claims he will not be responsible because the duties he admits he will be responsible at Workstream violate his one-year non-competition agreement with Workscape.

49.    **Even if Gioja's claims that he will not have operational responsibilities for services or implementation, zero contact with customers or any role with pricing or sales were true, Gioja would still be in breach as a result of his responsibility for product research and development – including with respect to the compensation planning, performance management, and benefits products - as well as all quality assurance, hosting and IT functions at Workstream.  Given this responsibility, Gioja's characterization of his work as merely involving a methodology of extending or developing a "platform" for Workstream's products does not immunize such work from being competitive activity within the meaning of Section 7(a) of the Employment Agreement.  In any event, Gioja's activities on Workstream's Executive Committee will be sufficiently competitive in nature to be in breach of Section 7(a).**

50.    This Court finds that the products are in the same industry; both Workscape and Workstream provide HR software applications and products on a hosted basis for employee benefits administration, compensation planning, performance management, and portal applications.  Workstream's products are marketed and sold to the same customers and partners as those of Workscape.  No customer would buy products made by both Workscape and Workstream in a particular area.  Cereva Networks, Inc. v. Lieto, 2001 WL 1228040 at *4 (concluding that companies in same storage networking industry who market to same customer base are direct competitors).  These companies are in direct competition, Gioja's activities at Workstream will compete with Workscape, and, therefore, Gioja is in breach of the non-competition covenant within the Separation Agreement.

**Gioja Is Enjoined From Working For Workstream Through March 11, 2006, A Period Of Time Commensurate With The Time During Which He Was In Breach Of The Agreement With Workscape**

51.    **Gioja specifically agreed that in the event he breached the non-competition covenant to the Separation Agreement and Employment Agreement, the non-competition period is to be extended automatically for any time Gioja is found to be in violation of the covenant. Section 9 of the 2004 Employment Agreement provides:**

> **Extension of Restricted Period. In addition to the remedies the Company may seek and obtain pursuant to Section 8 of this Agreement, the Restricted Period shall be extended by any and all periods during which the Executive shall be found by a court to have been in violation of the covenants contained in Section 7 hereof.**

**(Emphasis added.)**

52.    **Gioja left Workscape on February 18, 2005**, then attended, on behalf of Workstream, Workstream's customer user conference on March 21, 2005, actively participated in conversations and discussions relating to Workstream products throughout the month of March, **and joined Workstream as its Executive Vice President, Technology and Operations on April 4, 2005. [Mr. Gioja worked one week for Workstream prior to the injunction.]**

53.    In addition, Gioja worked for Workstream from April 4 through the April 11 hearing on Workscape's Motion for Temporary Restraining Order and Preliminary Injunction, at which time he was enjoined from working at Workstream. Because Gioja was in violation of Section 7 of the Agreement for twenty-one days between March 21, 2005 and April 11, 2005, the one-year non-competition period expires twenty-one days after February 18, 2006, or <u>March 11, 2006</u>.

### Gioja Has Breached The Non-Disclosure Covenant Contained Within The Separation Agreement

54.    Section 3 of the Separation Agreement and Section 7(b) of the Employment Agreement specifically oblige Gioja to refrain from disclosing any of Workscape's confidential information either during or subsequent to his employment at Workscape.   The Court concludes

that there is sufficient risk of Gioja breaching this non-disclosure obligation to warrant

permanent injunctive relief against him.

### Gioja Has Breached The Covenant Of Good Faith And Fair Dealing Contained Within The Separation Agreement

55.    In all contracts executed in the Commonwealth of Massachusetts, including

employment agreements, there is an implied covenant of good faith and fair dealing. Gioja

breached the covenant of good faith and fair dealing implied in the Agreements by intentionally

and willfully failing to comply with the terms of the Agreements. Equity does not favor the

former employee who is "aware of the restrictions imposed on him by his contract" and takes "a

voluntary, knowing and calculated risk by deciding to violate that contract. Sigma Chem. Co. v.

Harris, 605 F. Supp. 1253, 1265 (E.D. Mo. 1985), aff'd in relevant part, 794 F.2d 371 (8th Cir.

1986).

### The Public Interest Would Not Be Adversely Affected By A Permanent Injunction And Is In Fact Best Served By Recognizing And Enforcing Agreements That Are Voluntarily Entered Into And Accepted

56.    Workscape's request for injunctive relief should be allowed because the public

interest is served by recognizing and enforcing limited non-competition agreements that are

voluntarily entered into, agreed-upon and relied upon by employers in entrusting employees with

competitive sensitive confidential and proprietary business information.

57.    In the absence of permanent injunctive relief, Workscape will be irreparably

harmed. Courts have acknowledged that there is no adequate remedy at law where a defendant is

allowed to work for a competitor in violation of a non-competition clause. Damages are almost

impossible to measure. See, e.g., Cereva, 2001 WL 1228040 at *6; Shipley v. Kozlowksi, 926

F.Supp. 28, 29 (D. Mass. 1996) citing Jackson v. Fair, 846 F.2d 811, 814-815 (1st Cir. 1988)

(enforcing one-year covenant-not-to-compete upon a finding that the defendant violated the non-competition provision by <u>accepting employment with a competitor</u>) (emphasis added).

58.    The equitable relief Workscape requests is not only appropriate in this setting, but enforcement of the limited non-competition provision of the Separation Agreement and Employment Agreement by means of a permanent injunction is not unexpected.  Indeed, Gioja specifically acknowledged, upon advice of counsel, and granted Workscape the right to obtain injunctive relief in the very agreements he is in breach (Separation Agreement, § 3; Employment Agreement, § 8), and he further acknowledged that Workscape would suffer "irreparable harm" if he breached the non-competition provision to the Separation Agreement and Employment Agreement.  Only through equitable relief will Workscape protect itself from the harm to its business that would certainly result if Gioja works for its direct competitor.  <u>See</u> <u>Kroeger v. Stop & Shop Companies, Inc.</u>, 13 Mass. App. Ct. 310, 322 (1982) <u>rev. denied</u> 386 Mass. 1101 (1982) ("[T]he task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one."); <u>Cereva</u>, 2001 WL 1228040 at *6 (recognizing that loss of customer good will cannot be entirely remedied by monetary damages).

59.    The injury that Workscape will suffer if the agreed-upon and paid-for agreement is not enforced decidedly outweighs any harm that might be caused to Gioja (if any) in having to seek -- as previously agreed-to -- non-competitive employment.  In addition, in the event Gioja is enjoined from working at Workstream as a result of the breach of his one-year non-competition obligation to Workscape, Gioja may be entitled to six months of salary payments and benefits from Workstream as provided in Section 17 of the Workstream Employment Agreement.  (<u>See</u> Trial Exhibit No. 58).  Given that he would have had no severance and a two-year non-competition period had Workscape simply not renewed his Employment Agreement, any harm to

Gioja pales in comparison to the harm to Workscape from his immediate employment with its direct competitor.

### Permanent Injunction

60.     The Court hereby orders that Gioja is (a) permanently enjoined from using or disclosing the confidential, proprietary and/or trade secret information acquired by him during his employment at Workscape; shall immediately return to Workscape all Workscape property and materials containing confidential, proprietary and/or trade secret information; and is permanently enjoined from working for Workstream, Inc. until <u>March 11, 2006</u>.  The Court deems it necessary and appropriate to issue such permanent injunctive relief in order to protect Workscape's confidential and proprietary information and customer and partner goodwill.


Respectfully submitted.


WORKSCAPE, INC.

By its attorneys,


David E. Lurie, BBO#542030
Thomas E. Lent, BBO#644970
Lurie & Krupp, LLP
One McKinley Square
Boston, MA 02109
Dated: May 16, 2005                Tel: (617) 367-1970

### CERTIFICATE OF SERVICE

I, Thomas E. Lent, certify that on May 16, 2005, a true copy of this document was served by hand on defendant Michael Gioja's counsel, Christopher Sanzone, Sanzone & McCarthy, LLP, 888 Worcester Street, Suite 110, Wellesley, MA 02482 and Richard E. Lieberman, McGuireWoods, LLP, 77 West Wacker Drive, Suite 4100, Chicago, IL 60601.

Thomas E. Lent

Commonwealth of Massachusetts

MIDDLESEX, SS                                    29 Pages

Workscape, Inc.
        ,Plaintiff.


            V.                          #MICV05-1205

Michael Gioja
        ,Defendant.                      ORIGINAL


MOTION HEARING


BEFORE: The Honorable Raymond J. Brassard ,J.

PLACE: Middlesex Superior Courthouse
        40 Thorndike Street
        Cambridge, Massachusetts 02141

DATE: June 20, 2005

TIME: 2PM


**Christopher J. Griffin, Reporter**
**543 Centre Street, #2**
**Newton, Massachusetts 02458**
**(617) 965-3694**
**Cell: (857) 636-0470**
**griffin.reporter@gmail.com**

2

<u>A P P E A R A N C E S</u>

<u>For the Plaintiff:</u>

David E. Lurie, Esquire
Lurie & Krupp, LLP
153 Milk Street
Boston, Massachusetts 02109

Thomas E. Lent, Esquire
Lurie & Krupp, LLP
153 Milk Street
Boston, Massachusetts 02109

<u>For The Defendant:</u>

Richard Lieberman, Esquire
McGuire Woods, LLP
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1815

3

<u>INDEX</u>

MOTION HEARING PP. 4-29

<u>EXHIBITS</u>

NONE INTRODUCED OR ATTACHED

4

1    COURT IN SESSION

2              CLERK:    2005-1205, Workscape, Inc.

3    versus Gioja.  Your Honor, this matter is

4    before The Court in motion for relief to file

5    expedited appeal.  Counsel, please step

6    forward and introduce yourselves please.

7              MR. LURIE:    Good afternoon, Your

8    Honor, David Lurie for Workscape.

9              THE COURT:    Mr. Lurie.

10             MR. LIEBERMAN:    Good afternoon,

11   Richard Lieberman, Your Honor, for Gioja.

12             MR. LENT:    Good afternoon, Your

13   Honor, Tom Lent for Workscape.

14             THE COURT:    Right, and this is Mr.

15   Gioja, yes.  Okay, folks, I've had a chance to

16   review over the papers, counsel, and let me

17   just ask, I know there was some sort of

18   Appellate Court action going on.  Where does

19   that stand, just so I know where I'm at the in

20   the sequence of things?

21             MR. LURIE:    It was denied, Your

22   Honor.  We don't know why.

23             THE COURT:    Right.

24             MR. LURIE:    But it was denied.

5

THE COURT:    Right, okay, so this is
your motion, Mr. Lurie, and your colleague's
on a few grounds.  A couple of which seem to
be not really in dispute and we can dispose of
those readily I think.  I'm perfectly glad to
enter final judgment.

I've had the stenographer make a few small
typographical type changes to the transcript
that I believe you have all seen.  I've
finalized that.  When the clerk is in,
probably I'll wait for Mr. Sutherland
tomorrow, I'll have him enter judgement in
accordance with my decision.  And, so that
will take care of request number one.

As far as request number two goes, I'm glad
to allow it.  I don't know what arrangements
you have to make with the stenographers in
order to expedite the preparation of the
transcript.  We had two of them.  Apparently
one of them would be glad to accommodate you.
I've only spoken to her indirectly through the
clerk.  I have not spoken either directly or
indirectly to the other stenographer.  But of
course they all have back logs, and so you'll

1   have to chat with them.  And, I'm sure Mr.

2   Sutherland can put you in touch with them.

3       And, Mr. Lieberman did not object to either

4   of those two efforts on your part Mr. Lurie.

5   Is that right Mr. Lieberman?

6             MR. LIEBERMAN:     Correct, Your

7   Honor.

8             THE COURT:    Right, so we're in good

9   shape on that.  So, that leaves us with your

10   request, Mr. Lurie, for me to, in effect,

11   modify the injunction that I issued at the end

12   of the trial, lengthening, perhaps, the time

13   of the non-compete provision to coincide with

14   your pursuit of your appellate rights.  If I

15   understood your motion correctly.

16             MR. LURIE:     Yes, Your Honor, we

17   plan on pursuing an expedited appeal.  We were

18   going to move for the Appellate Court too for

19   an expedited briefing schedule.  To my

20   understanding under appellate rule 6A, that

21   it's my obligation to go before the Trial

22   Court and try to obtain as much relief as I

23   can before the Trial Court before going to the

24   Appellate Court, and thus that's why we asked

1    you to preserve the status quo.

2            THE COURT:    Right, you could under

3    the rule of appellate procedure ask the

4    Appellate Court to modify the injunction

5    during the pendency of the appeal.

6            MR. LURIE:    Yes, and we'll do that

7    as well in the event that we have no success

8    with Your Honor.

9            THE COURT:    Right.  Well, I've

10   looked that over, Mr Lurie, and I'm certainly

11   glad to hear you on it.  I know that you

12   contend on behalf of Workscape, that the

13   agreement reached with Mr. Gioja prior to his

14   departure from the firm was that he would not

15   compete for a year.  And, that I modified that

16   to the six months and that you believe that to

17   be without justification.  And, I'm certainly

18   glad to hear you on it.

19           MR. LURIE:    Well, Your Honor,

20   you've heard us at length, I don't believe

21   that we need to repeat the arguments.  You're

22   well aware of our position on that, and

23   basically the way we read your rulings you

24   acknowledge that one year was a reasonable

1    period as a matter of law to protect

2    Workscape's confidential information and

3    customer good will, but nevertheless reduced

4    it to six months.

5        And, frankly, we were not quite sure what

6    the specific rationale for that was, other

7    than the general discretionary ruling by Your

8    Honor.  And, to the extent that, Your Honor,

9    relied upon the six months provision in the

10   underlying 2004 employment agreement, as

11   evidence saying that that was all that was

12   necessary to protect Workscape's legitimate

13   business interests.  We don't believe that was

14   proper.

15            THE COURT:    The six months, where

16   did you say, Mr. Lurie?

17            MR. LURIE:     That, I believe, that

18   Your Honor indicated in your findings of fact

19   and conclusions of law that one of the reasons

20   for your decision was that in the underlying

21   2004 employment agreement, that was superceded

22   by the separation agreement, that there was a

23   provision in the event of a termination

24   without cause, that there would only be a six

1          months non-competition.

2                    THE COURT:    Yes, I recall that.

3                    MR. LURIE:      And, that you

4          indicated that that was a fact indicating that

5          that was all that was necessary to protect

6          Workscape's legitimate business interest.  The

7          fact that under termination without cause, it

8          would only be a six months non-competition

9          agreement.  That was a finding that was

10         submitted by the defendant that you adopted.

11           And, we believe that that does not warrant a

12         reduction of the one year to six months,

13         because that was in fact superceded by the

14         separation agreement.  And, also we don't

15         believe that the fact that that is contained

16         within the employment agreement itself

17         necessarily means that that was all that was

18         necessary to protect Workscape's legitimate

19         business interests.

20           To the contrary, I believe that Mr. Clifford

21         specifically testified that the one year that

22         he ended up negotiating with Mr. Gioja, after

23         the issue was joined in connection with the

24         separation was necessary to protect its

1    business interests.

2        So, for those reasons, Your Honor, we

3    believe, and we haven't found any case under

4    Massachusetts Law that warrants reduction of a

5    non-comp in terms of time, from one year to

6    six months when The Court has specifically

7    found that the one year period was reasonable.

8            THE COURT:    Where did I make that

9    finding, Mr. Lurie?

10            MR. LURIE:    That was a finding

11    that we proposed to The Court and that you

12    adopted.

13            THE COURT:    So, I adopted it as one

14    of the proposed findings?

15            MR. LURIE:    And, it's my

16    understanding that that becomes a finding of

17    The Court.

18            THE COURT:    Right.  Well, I

19    certainly won't renege on that, and withdraw

20    that finding.  My thought process was more

21    along the lines that by itself the one year

22    was not unreasonable.  The way, for example,

23    sometimes a very lengthy non-compete can be

24    found to be unreasonable, for example, two

1    years or three years or longer.  But, I hope

2    that the overall decision that I made conveys

3    the judgement, that under all the

4    circumstances here, and there were many, that

5    it was my best judgement that six months would

6    adequately and reasonably protect the

7    legitimate business interests of Workscape.

8    The factors there were numerous.  And, I

9    won't ry to recollect them all right at this

10   moment here during this hearing, but they

11   certainly included what was my sense of what

12   was needed in this very fast moving field of

13   endeavor to protect Workscape's interest.  It

14   certainly included, as well, my sense of what

15   Workscape has done with other senior employees

16   at the company, senior management people.

17   And, you're right, that in part I looked to

18   the original employment agreement that I know

19   was the subject of negotiation at the time of

20   Mr. Gioja's departure.  And, I may well have

21   considered some other factors as well.  I

22   certainly hope that my findings do not suggest

23   that in some sense I threw a dart at the board

24   to come up with six months.  It seemed to me a

1    reasonable time frame under all of those

2    circumstances.

3        I appreciate that there was a very unusual

4    aspect of the case that the parties themselves

5    had negotiated a resolution.  But I tried to

6    look at all of the circumstances leading up to

7    the negotiation of that resolution.  Some of

8    which I've identified here, and thought that

9    the six months was right.  I made a

10   corresponding, I thought, proportional change

11   in the severance obligation of the employer,

12   which I thought fairness required to be even

13   handed.

14       I certainly respect your thought that all of

15   that was not appropriate, was a mistake as a

16   matter of law, but it certainly constitutes my

17   best judgement on the matter.

18       Mr. Lieberman, I'm glad to here from you as

19   well.

20           MR. LIEBERMAN:     Yes, Your Honor,

21   you're articulating precisely what I was going

22   to say, and I will say very briefly.  I reread

23   your opinion.  You articulated four reasons

24   for the modification, and excuse me if I'm

interpreting what you said.

THE COURT:    Go right ahead, counsel.

MR. LIEBERMAN:    Number one was that Workscape itself determined the one year restricted period was not necessary to protect its confidential information.  And, that was based on the six months if one left for, fired without cause, one year of they left for other reasons.  And, you said that adopting our proposed -

THE COURT:    One year or two year?

MR. LIEBERMAN:    One year.  You adopted our proposed findings and then expanded on them.  And, in essence, said that, at least as I understood it, this was evidence that Workscape itself felt that six months was enough if they in fact had such term that they had put into effect only a few months before.

THE COURT:    In the whatever year that employment agreement was, 04 was it?

MR. LIEBERMAN:    Exactly, well, actually it was just a few months before the termination.

14

1              THE COURT:    The actual

2    documentation, but it related back to a period

3    several months before as I recall.

4              MR. LIEBERMAN:        Correct.  So,

5    that was number one.  Number two, you said

6    that you've considered the market here as

7    rapidly changing and have considered what is

8    necessary to protect the legitimate interests

9    of Workscape as to its confidential

10   information and customer good will.

11      And, we pulled some cases.  There's the

12   Kroger case where The Court modified the time

13   period for the same reason.  That is, it would

14   be a Massachusetts Court said that the

15   information had a limited shelf life.  And, so

16   The Court properly limited the period in

17   enforcing it.  So, that was number two.

18      Three, you said you considered the impact on

19   the individual, Mr. Gioja, with respect to his

20   efforts to work.  And, that is, of course,

21   properly part of the injunctive relief

22   standard that is weighing the irreparable harm

23   to the plaintiff against the suffering the

24   opposing party would endure if a judgement was

1    granted.

2        It also, of course, is a component of rule

3    62, that is whether or not there would be

4    substantial harm to the defendant if the

5    injunction or the request was granted.

6            THE COURT:    Rule 62 being the

7    injunction rule?

8            MR. LIEBERMAN:    Yes, the

9    emergency injunction rule.

10            THE COURT:    Oh, the one that the

11    motion here is really - the motion to in

12    effect modify is premised upon.

13            MR. LIEBERMAN:    Correct. And,

14    the fourth, Your Honor, you said The Court had

15    considered the situation of other employees

16    bearing in mind what the Massachusetts Supreme

17    Judicial Court has said regarding the fact,

18    such decisions must be reasonably made.  But,

19    you did, that was the fourth criteria.

20        So, as we read it, these are all, as a

21    matter of law, valid basis to modify.  There

22    are several cases out there, two, three, four

23    cases where Massachusetts Courts have

24    recognized that a court, sitting in equity,

1   has the authority to modify these non-

2   competes, both in terms of time and geography,

3   it's the same concept.

4      Plaintiff, I think, and we read their Court

5   of Appeals papers, which are much more

6   specific in terms of their argument than what

7   they presented here.  Essentially, as I read

8   what they were saying, the said on one hand

9   you adopted their finding saying that one year

10  was reasonable, then on the other hand, you

11  articulated these reasons why the time period

12  should be limited.  And, I think they were

13  saying there's a disconnect between, how can

14  it be reasonable on one hand, and how can it

15  be modified on the other.

16     I read that as really being more semantics

17  than anything else.

18          THE COURT:    More what?  I'm sorry.

19          MR. LIEBERMAN:    Semantics.

20          THE COURT:    Semantics, okay.

21          MR. LIEBERMAN:    Yes, exactly.

22  But to the extent that there's any confusion

23  that it creates, we would certainly have no

24  objection to The Court, you know, modifying

1       that.

2       In any event, that-

3       THE COURT:   I don't recall the

4 precise - I know I made my own findings and

5 then I endeavored to go through each of the

6 sets of respective findings each of you had

7 given me, because I felt that you were

8 entitled to that and that it would make my

9 opinion more complete and more thorough.  But

10 I certainly did not intend or envision any, so

11 called, disconnect or inconsistency.

12       MR. LIEBERMAN:    Here's the

13 language.  It's plaintiff's 26.  It says,

14 given the nature of the confidential and

15 proprietary information and customer and

16 partner good will to which Gioja has admitted

17 he had access and obtained during his

18 employment with Workscape, the one year

19 restriction is of reasonable duration.

20       THE COURT:    Okay.

21       MR. LIEBERMAN:    And, a non-

22 compete agreement must be reasonable in time

23 and scope to be enforceable.  And, again I

24 think as I read their Court of Appeal's

1   papers, they said, it can't be reasonable on

2   one hand and not have a legitimate purpose on

3   the other hand.  We read it I think exactly

4   the way you have stated it now and stated a

5   few minutes ago.  But it thin that, again, was

6   the basis of their argument.

7        THE COURT:    I think Mr. Lurie's

8   point certainly has some reasonableness to it.

9   And, the fault no doubt is mine in not,

10  perhaps, parsing through that proposed finding

11  and adding to my decision a bit as to what I

12  intended.  What I intended to say was that the

13  one year standing by itself, given the nature

14  of the senior level work that Mr. Gioja was

15  doing, would not be unreasonable.  I mean, it

16  wouldn't be something that was way out of line

17  as I saw it.

18     But, what I tried to do with my decision was

19  to take into account all of the evidence in

20  the case, all of the circumstances, certainly

21  most of which have been touched upon by Mr.

22  Lieberman here a moment ago, and bring all of

23  that into focus.  And, it was in doing so that

24  it seemed to me the six months would be

1    appropriate and would be what was needed to

2    protect the legitimate interest of the

3    plaintiff here under all of the circumstances.

4        To the extent there is inconsistency there,

5    I will say plainly that in my view, six months

6    is the right number, the appropriate number,

7    the reasonable number.  But, Mr. Lurie, let me

8    just ask you; the original employment

9    agreement, if there was a termination without

10   cause as I recall, that was a six month

11   period?

12           MR. LURIE:    Yes.

13           THE COURT:    And, if there was just

14   the expiration of if the employee left

15   without, I forget the term, compelling reason,

16   or something like that.  What was the length

17   of it?

18           MR. LURIE:    Two years.

19           THE COURT:    That's what I thought.

20   I thought it was two years.

21           MR. LIEBERMAN:    I'm sorry, you're

22   absolutely right.

23           THE COURT:    I wanted to be sure I

24   had not misremembered it when Mr. Lieberman

1    seemed to think I had mistaken it, but I

2    thought it as the two.  And, I recall the

3    evidence quite vividly from Mr. Gioja, Mr.

4    Clifford, that the one was at six months, the

5    other was at two years, that the negotiated

6    document turned out to be the one year.

7        Counsel, did you want to add to your

8    remarks?  Glad to hear you.

9            MR. LURIE:    Of course, let there

10   be no mistake that we appreciate your hard

11   work on the case.

12           THE COURT:    Oh, of course.

13           MR. LURIE:    We appreciate the

14   result that Mr. Gioja has been enjoined for

15   six months.  We do believe there's a bona fide

16   issue of law as to the reduction of the

17   negotiated one year period to six months.

18   And, that is what we wanted to attempt, to the

19   extent possible, to bring to the Appeals

20   Court's attention.  And, we wanted to do

21   everything possible in the Trial Court.

22           THE COURT:    Of course.

23           MR. LURIE:    And, that it happen as

24   soon as possible, because we understand there

21

1    may be an issue if the injunction expires on

2    August 18th and the Appeals Court has not yet

3    ruled on it.

4            THE COURT:    I think there would

5    clearly be an issue.  Under my understanding

6    of the protocol of things in the Appeals Court

7    and I think you're absolutely right to come

8    here and it's certainly a serious issue, and

9    one that I respect.

10        But, for the reasons I've made plain, I

11    hope, I'm going to deny that aspect of your

12    motion, Mr. Lurie.  And, again, we'll say, as

13    I hope I did at the end of the trial, but I've

14    had a few since then, that the matter was very

15    well tried.  I know, Mr. Gioja, you had to go

16    at the last moment before we got the jury

17    verdict.

18        So, it's appropriate for me to repeat it in

19    your presence.  I think both parties here were

20    extraordinarily well represented, and the

21    matter was tried most effectively by counsel

22    for all the parties, for both parties, all the

23    lawyers for both of the parties.  And, the

24    case certainly presented some difficult

1    issues, and I wish you all well with the

2    balance of it, if it need go forward further.

3    And, in any event, well in you general

4    endeavors.

5     I'll enter a docket order appropriately

6    folks.  And, I will ask the clerk tomorrow to

7    get a final judgement entered which will

8    mirror the language of the last page or two of

9    my set of findings.

10      MR. LURIE:    Just a couple clean up

11    issues, Your Honor.

12      THE COURT:    Sure.

13      MR. LURIE:    During discovery the

14    parties had entered into a confidentiality

15    order.

16      THE COURT:    Well, yes, I'm glad you

17    brought that to my attention.

18      MR. LURIE:    And, we'd neglected to

19    file it as a joint motion until after the

20    conclusion of the trial.

21      THE COURT:    Yeah, I took a look at

22    that Mr. Lurie, and here's the thing.  I won't

23    say that I studies each and every word of it,

24    but, and maybe I'm a little idiosyncratic on

1        this, I think there's an important boundary in

2        our legal system between agreements the

3        parties make as between themselves as to what

4        you'll do with documents you got from Mr.

5        Gioja and vice versa, on the one hand.  And,

6        on the other hand, what access, if any, the

7        public has to documents that came forward

8        during a court trial.

9            As to the latter, we have a very strict

10       rule, as I'm sure you know, Trial Court rule,

11       I think it's roman numeral eight, I think it's

12       at about page 354, I may be off by a magnitude

13       of 100 in the rules book, but it requires,

14       among other things, an affidavit, it requires

15       a showing of good cause, it requires really

16       much more than the assent of the parties.

17       Because I know you all would be delighted to

18       have no one else look at the documents.

19           But, if the thrust of your motion is to

20       prevent the public from looking at exhibits in

21       this trial, for example or a transcript, it's

22       a much more difficult motion for you, quite

23       frankly.  And, you'll have to file it in

24       accordance with that rule, which requires at a

24

1  minimum that affidavit and a showing of good

2  cause.

3          MR. LURIE:    Well, we wanted The

4  Court to approve - and I understand your

5  issue, Your Honor, and we were-

6          THE COURT:    And, it's one that I'm

7  fussy about, if I may interrupt you Mr. Lurie,

8  because I think there's an important interest

9  of the public here.  Which is that we do our

10  work, as you well know, in full view of the

11  public.  And, to bottle up a case raises very

12  serious issues about our legal system.  It can

13  be done for a darn good reason, but even to

14  consider it I would want to have the

15  appropriate platform.

16          MR. LURIE:    We appreciate that,

17  and we weren't intending by this motion to

18  bottle up the entire case.  But, we were, and

19  I'm waiting for final direction from Workscape

20  on this matter, intending to file a limited

21  motion for impoundment.

22          THE COURT:    Okay.

23          MR. LURIE:    I believe that's the

24  rule that you cited.

1                THE COURT:    Yes.  It's a Trial

2   Court rule, not a Superior Court rule.

3                MR. LURIE:    For things such as

4   testimony about the sale of the company.  You

5   recall that there was-

6                THE COURT:    Yes, I do.

7                MR. LURIE:    And, about potential

8   buyers of the company.

9                THE COURT:    Yes.

10               MR. LURIE:    And, the current

11  executives' employment agreements, which were

12  entered into evidence.

13               THE COURT:    I don't recall that,

14  but I'm sure they were.

15               MR. LURIE:    And, so those are two

16  examples of things that we were going to bring

17  to The Court's attention, and make the

18  necessary-

19               THE COURT:    That's fine, I'm glad

20  to have a look at it whenever you folks

21  present it to me.  If it's by agreement that's

22  fine, but do have a careful look at the rule

23  as I'm sure you would.  And, I'll take no

24  action on this motion.  I'm sure as between

1  yourselves you've got certain agreements in

2  place that really don't require, although if

3  you wish it, I can endorse it, but it seems to

4  me that that is probably unnecessary.

5  　　But vis-a-vis the public and the trial, why

6  don't you file a new motion, I'll have a look

7  at it and make it as targeted and precise as

8  you can and I'll be delighted to rule on it

9  promptly.

10 　　　　　　MR. LURIE:    Thank you, Your Honor.

11 　　　　　　THE COURT:    And, if I'm over in

12 Boston when it comes in, which I expect to be,

13 well, in two weeks from today, just ship me a

14 courtesy copy over to the courthouse in Boston

15 where I'll be, and I'll be glad to rule on it

16 their and let the clerk in the session here

17 know about it.

18 　　　　　　MR. LURIE:    Thank you, Your Honor.

19 　　　　　　THE COURT:    Okay.

20 　　　　　　MR. LURIE:    Lastly, we had

21 indicated in our papers that we were seeking

22 costs in this matter.  We've served, pursuant

23 to rule 9A, a motion for such costs, there are

24 about 10,000 dollars of costs that we're

1    seeking.  I asked Mr. Lieberman if he would

2    have the opportunity to review that and

3    address it today.  He did not, because we did

4    not actually get the chance to serve it until

5    Friday.

6       But, I wanted to put that on the - give The

7    Court notice about that.

8            THE COURT:    These are, I gather,

9    primarily deposition transcript costs?

10           MR. LURIE:    Yes.

11           THE COURT:    And, I've had this

12   issue 25 times, and I've had to look at the

13   rules 25 times.  Are the deposition costs

14   allowed as of right or on discretion of The

15   Court?  I think it's the latter.

16           MR. LURIE:    It's the latter.

17           THE COURT:    Yeah, it's the more

18   mundane costs and the smaller costs that are

19   allowed as of right.

20           MR. LURIE:    Yes.

21           THE COURT:    Service fees and things

22   of that sort.

23           MR. LURIE:    Yes, there's filing

24   fees, service of process fees in there,

28

1          there's copying costs.

2                THE COURT:    But the money you're

3          after is primarily, probably 95 percent,

4          deposition?

5                MR. LURIE:    A big chunk of it is,

6          Your Honor, and these are depositions that

7          were noticed by the other side.

8                THE COURT:    Right, don't want you

9          to argue it today in fairness to Mr.

10        Lieberman, but I understand the gist of this.

11        And, I'll look for that motion as well once

12        Mr. Lieberman has had a chance to oppose it.

13              MR. LIEBERMAN:    We'll file our

14        papers.  Is that something The Court could

15        rule on without us reappearing?

16             THE COURT:    Almost to a certainty,

17        Mr. Lieberman.  And, if for some reason I

18        thought a hearing was necessary, I'll ask the

19        clerk to try to arrange something so that you

20        can avoid the trip in from the Mid-west.

21        We're always glad to have you come out to the

22        East Coast, but I surely wouldn't want to

23        bring you out for that.

24              MR. LIEBERMAN:    I appreciate it.

1              THE COURT:    Yeah, so I'll look to

2         get those two motions, and probably by the

3         time they percolate up I'll be over in Boston

4         in a criminal session.  But just ship me a set

5         over there and I'll be glad to rule on them

6         folks.

7              Alright, counsel, thanks very much, nice to

8         see you all.  And, Mr. Gioja, nice to see you

9         as well.

10    END OF TRANSCRIPT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

<u>CERTIFICATE</u>

COMMONWEALTH OF MASSACHUSETTS

I, Christopher J. Griffin, verbatim court reporter in and for the Commonwealth of Massachusetts, hereby certify:

That the foregoing is a verbatim transcript, prepared by me, of a hearing in the matter of *Workscape, Inc. v. Michael Gioja*, on June 20th, 2005, at which I was present.

I certify further that I am not a party interested in the outcome of the proceedings and am not related to any of the parties.

Christopher J. Griffin                    Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
WORKSCAPE, INC.,                                    )
            Plaintiff,                              )
                                                    )
        v.                                          )        Civil Action No. 05 11481MEL
                                                    )
WORKSTREAM, INC.,                                   )
            Defendant.                              )
_____)

## <u>ORDER</u>

After hearing on Defendant Workstream, Inc.'s Motion to Dismiss the Complaint pursuant to F.R.C.P. 12(b)(6), it is ORDERED that Plaintiff's Complaint is hereby dismissed in its entirety.

_____
Lasker, J.


Date: _____